**No. 18-30148**

IN THE

# United States Court of Appeals

FOR THE FIFTH CIRCUIT

---

TERESA BUCHANAN,

*Plaintiff-Appellant,*

v.

F. KING ALEXANDER, DAMON ANDREW, A.G. MONACO, and
GASTON REINOSO,

*Defendants-Appellees.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA, NO. 3:16-CV-00041-SDD-EWD,
THE HONORABLE SHELLY D. DICK, PRESIDING

---

## BRIEF OF PLAINTIFF-APPELLANT

---

Robert Corn-Revere
Ronald G. London
Lisa B. Zycherman
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC  20006
Tel: (202) 973-4200
Fax: (202) 973-4499

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record for Appellant Teresa Buchanan certifies that the following listed persons and entities as described in Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

**Appellant**

Teresa Buchanan

**Counsel for Appellant**

Robert Corn-Revere
Ronald G. London
Lisa B. Zycherman
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., N.W.
Suite 800
Washington, DC  20006
(202) 973-4200

**Appellees**

F. King Alexander
Damon Andrew
A.G. Monaco
Gaston Reinoso

**Counsel for Appellees**

Sheri M. Morris
Daigle, Fisse & Kessenich
8480 Bluebonnet Blvd., Suite F
Baton Rouge, LA 70810
(225) 421-1800

Carlton Jones, III
Louisiana State University
124 University Administration Bldg.
3810 W. Lakeshore Drive
Baton Rouge, LA 70808
(225) 578-6332

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant, Teresa Buchanan, respectfully requests oral argument.  This appeal will require the Court to interpret the law establishing limitations on a public university's ability to terminate a tenured professor for engaging in academic speech that purportedly conflicts with anti-sexual harassment policies. Oral argument may assist the Court in resolving this constitutional issue.

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTERESTED PERSONS ......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................2

INTRODUCTION ................................................................................................3

STATEMENT OF THE CASE..............................................................................3

      A.     Statement of Facts ...................................................................3

             Complaints About Dr. Buchanan .........................................4

             LSU's Investigation and Findings........................................6

             LSU's Decision to Seek Dismissal ......................................8

             The Faculty Committee Hearing.......................................10

             Alexander's Rejection of the Committee's Recommendation...........11

             Board of Supervisors Decision...........................................12

      B.     Procedural Background .........................................................12

SUMMARY OF ARGUMENT ...........................................................................13

ARGUMENT ......................................................................................................15

      I.      STANDARD OF REVIEW ................................................15

      II.     LSU'S SEXUAL HARASSMENT POLICY IS FACIALLY
             UNCONSTITUTIONAL ...................................................16

             A.     The First Amendment Requires Sexual Harassment
                   Policies Targeting Speech to Be Narrowly-Framed,
                   Precisely Defined, and Limited to Severe, Pervasive,
                   and Objectively Offensive Behavior........................................16

1.     The Government Cannot Restrict Speech Merely to Avoid Offense, and Any Regulation of Speech Must Be Narrowly Focused and Clearly Defined....................16

2.     Anti-Harassment Policies Are Subject to First Amendment Limits .........................................................20

B.     The District Court Applied the Wrong Standard of Review.....................................................................................23

C.     LSU's Policy Fails to Satisfy Constitutional Scrutiny .............25

III.     LSU'S SEXUAL HARASSMENT POLICY WAS UNCONSTITUTIONALLY APPLIED TO PROFESSOR BUCHANAN ...................................................................................31

A.     Professor Buchanan's Speech is Constitutionally Protected.................................................................................31

1.     Academic Freedom is of "Transcendent Value"............31

2.     The District Court Erroneously Held Dr. Buchanan's Academic Speech Was Unprotected .............................32

a.     The Undisputed Record Established That Dr. Buchanan Advanced Pedagogical Reasons for Her Speech .......................................32

b.     The District Court Misread the Law to Support Its Distorted View of the Record............36

B.     LSU's Poorly-Defined Policy and Haphazard Approach Allowed Anything to Be Defined as "Sexual Harassment"..............................................................................39

C.     LSU's Termination of Buchanan Violated the First Amendment.............................................................................44

IV.     APPELLEES CANNOT AVOID PERSONAL LIABILITY............48

A.     Qualified Immunity Does Not Apply .......................................48

B.     Professor Buchanan's Claims Are Not Time Barred...............52

C.  Appellees' Liability Is Not Discharged By the Board's
Vote ........................................................................................... 54

CONCLUSION ................................................................................................ 56

CERTIFICATE OF SERVICE .......................................................................... 58

CERTIFICATE OF COMPLIANCE .................................................................. 59

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adams v. Trustees of Univ. of N.C.-Wilmington*,
  640 F.3d 550 (4th Cir. 2011) ............................................................................32

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ..........................................................................................3

*Ashcroft v. ACLU*,
  535 U.S. 564 (2002) ........................................................................................17

*Ashcroft v. Free Speech Coalition*,
  535 U.S. 234 (2002) ........................................................................................18

*Baggett v. Bullitt*,
  377 U.S. 360 (1964) ....................................................................................19, 20

*Beattie v. Madison Cty. Sch. Dist.*,
  254 F.3d 595 (5th Cir. 2001) ........................................................................53, 55

*Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*,
  482 U.S. 569 (1987) ........................................................................................19

*Bonnell v. Lorenzo*,
  241 F.3d 800 (6th Cir. 2001) ................................................................36, 37, 38, 42

*Boos v. Barry*,
  485 U.S. 312 (1988) ....................................................................................18, 24

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984) ........................................................................................16

*Byrum v. Landreth*,
  566 F.3d 442 (5th Cir. 2009) ............................................................................16

*Carroll v. Metro. Ins.& Annuity Co.*,
  166 F.3d 802 (5th Cir. 1999) ............................................................................35

*Chaney v. New Orleans Pub. Facility Mgmt., Inc.*,
  179 F.3d 164 (5th Cir. 1999) ............................................................................15

*Cohen v. San Bernardino Valley Coll.*,
   92 F.3d 968 (9th Cir. 1996) ........................................................................*passim*

*College Republicans at San Francisco State Univ. v. Reed*,
   523 F. Supp. 2d 1005 (N.D. Cal. 2007) ..............................................30

*Cramp v. Board of Public Instruction*,
   368 U.S. 278 (1961) ............................................................................20

*Culbertson v. Lykos*,
   790 F.3d 608 (5th Cir. 2015) .......................................................52, 55

*Cushman v. Resolution Tr. Co.*,
   954 F.2d 317 (5th Cir. 1992) ..............................................................35

*Cutler v. Stephen F. Austin State Univ.*,
   767 F.3d 462 (5th Cir. 2014) ..............................................................49

*Dambrot v. Central Mich. Univ.*,
   55 F.3d 1177 (6th Cir. 1995) ..............................................21, 22, 30

*Davis v. Monroe Cty. Bd. of Educ.*,
   526 U.S. 629 (1999) ....................................................22, 27, 28, 44

*DeAngelis v. El Paso Mun. Police Officers Ass'n*,
   51 F.3d 591 (5th Cir. 1995) ..............................................21, 22, 27, 29

*DeJohn v. Temple Univ.*,
   537 F.3d 301 (3d Cir. 2008) ......................................................*passim*

*Demers v. Austin*,
   746 F.3d 402 (9th Cir. 2014) ..............................................................32

*DePree v. Saunders*,
   588 F.3d 282 (5th Cir. 2009) ..............................................................16

*Doe v. University of Mich.*,
   721 F. Supp. 852 (E.D. Mich. 1989) ...................................................30

*Edenfield v. Fane*,
   507 U.S. 761 (1993) ............................................................................16

*EEOC v. Boh Bros. Constr. Co.*,
  731 F.3d 444 (5th Cir. 2013) ..............................................................29

*EEOC v. R.J. Gallagher Co.*,
  181 F.3d 645 (5th Cir. 1999) ..............................................................15

*Esfeller v. O'Keefe*,
  391 F. App'x 337 (5th Cir. 2010) ......................................................25

*Expressions Hair Design v. Schneiderman*,
  137 S. Ct. 1144 (2017)..............................................................23, 36

*Faragher v. City of Boca Raton*,
  524 U.S. 775 (1998)..........................................................................22

*Frazier v. Fairhaven Sch. Comm.*,
  276 F.3d 52 (1st Cir. 2002)................................................................40

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006)..........................................................................32

*Gerlich v. Leath*,
  861 F.3d 697 (8th Cir. 2017) ..............................................................24

*Goodson v. City of Corpus Christi*,
  202 F.3d 730 (5th Cir. 2000) ..............................................................35

*Goudeau v. E. Baton Rouge Parish Sch. Bd.*,
  540 F. App'x 429 (5th Cir. 2013) ......................................................33

*Grady v. El Paso Cmty. Coll.*,
  979 F.2d 1111 (5th Cir. 1992) ............................................................52

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)..........................................................................19

*Hardesty v. Cochran*,
  621 F. App'x 771 (5th Cir. 2015) ......................................................49

*Hardy v. Jefferson Cmty. Coll.*,
  260 F.3d 671 (6th Cir. 2001) ......................................................38, 49

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982)....................................................................................48

*Harris v. Victoria Indep. Sch. Dist.*,
    168 F.3d 216 (5th Cir. 1999) .................................................................51

*Hustler Magazine, Inc. v. Falwell*,
    485 U.S. 46 (1988)......................................................................................17

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
    993 F.2d 386 (4th Cir. 1993) .................................................................24

*Jett v. Dallas Indep. Sch. Dist.*,
    798 F.2d 748 (5th Cir. 1986), *aff'd in part, remanded in part*,
    491 U.S. 701 (1989)....................................................................................55

*Kaprelian v. Texas Woman's Univ.*,
    509 F.2d 133 (5th Cir. 1975) .................................................................49

*Keefe v. Geanakos*,
    418 F.2d 359 (1st Cir. 1969)..................................................................39

*Keyishian v. Board of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967)....................................................................................31

*Kingsville Indep. Sch. Dist. v. Cooper*,
    611 F.2d 1109 (5th Cir. 1980) ................................................31, 38, 49

*Marceaux v. Lafayette City-Parish Consol. Gov't*,
    731 F.3d 488 (5th Cir. 2013) .................................................................15

*Martin v. Parrish*,
    805 F.2d 583 (5th Cir. 1986) .........................................................36, 37

*Matal v. Tam*,
    137 S. Ct. 1744 (2017)......................................................17, 18, 53

*McCauley v. Univ. of V.I.*,
    618 F.3d 232 (3d Cir. 2010) ..............................................21, 26, 27

*Miller v. Johnson*,
    515 U.S. 900 (1995)....................................................................................30

*Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*,
    460 U.S. 575 (1983)............................................................................53

*NAACP v. Button*,
    371 U.S. 415 (1963)............................................................................18

*Pearson v. Callahan*,
    555 U.S. 223 (2009)............................................................................49

*Porter v. Califano*,
    592 F.2d 770 (5th Cir. 1979) ............................................................56

*Pounds v. Katy Indep. Sch. Dist.*,
    517 F. Supp. 2d 901 (S.D. Tex. 2007)...............................................23

*Powers v. Northside Indep. Sch. Dist.*,
    143 F. Supp. 3d 545 (W.D. Tex. 2015) .............................................56

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)............................................................................24

*Reed v. Town of Gilbert*,
    135 S. Ct. 2218 (2015).........................................................23, 24, 53

*Reno v. ACLU*,
    521 U.S. 844 (1997)............................................................................19

*Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*,
    605 F.3d 703 (9th Cir. 2010) .............................................................30

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)......................................................................18, 24

*Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*,
    647 F.3d 156 (5th Cir. 2011) .............................................................40

*Sanchez v. Young Cty.*,
    866 F.3d 274 (5th Cir. 2017) .............................................................35

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001) .......................................................*passim*

*School Bd. of Avoyelles Parish v. U.S. Dep't of Interior*,
    647 F.3d 570 (5th Cir. 2011) ...............................................................35

*Schroeder v. Greater New Orleans Fed. Credit Union*,
    664 F.3d 1016 (5th Cir. 2011) .............................................................35

*Shelton v. Tucker*,
    364 U.S. 479 (1960)............................................................................31

*Sorrell v. IMS Health Inc.*,
    564 U.S. 562 (2011)............................................................................24

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957)............................................................................31

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.*,
    307 F.3d 243 (3d Cir. 2002) ...............................................................25

*Texas v. Johnson*,
    491 U.S. 397 (1989)............................................................................17

*Trent v. Wade*,
    776 F.3d 368 (5th Cir. 2015) ...............................................................16

*United States v. Playboy Entm't Grp.*,
    529 U.S. 803 (2000)............................................................................17

*United States v. Salerno*,
    481 U.S. 739 (1987)............................................................................23

*United States v. Stevens*,
    559 U.S. 460 (2010)...........................................................16, 18, 23, 24

*UWM Post, Inc. v. Board of Regents of Univ. of Wis. Sys.*,
    774 F. Supp. 1163 (E.D. Wis. 1991) ...................................................30

*Van Heerdan v. Board of Supervisors of LSU*,
    2011 WL 5008410 (M.D. La. Oct. 20, 2011)......................................53

*Vega v. Miller*,
    273 F.3d 460 (2d Cir. 2001) .........................................................*passim*

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)..................................................................24

*Ware v. Batson*,
    480 F. App'x 247 (5th Cir. 2010) .........................................35

*Washington State Grange v. Washington State Republican Party*,
    535 U.S. 442 (2008)..................................................................18

*Williams v. Ballard*,
    466 F.3d 334 (5th Cir. 2006) .................................................28

*Wisconsin Right to Life, Inc. v. FEC*,
    546 U.S. 410 (2006)..................................................................48

*Wolfe v. Fayetteville Sch. Dist.*,
    648 F.3d 860 (8th Cir. 2011) .................................................40

## Federal Statutes

20 U.S.C. §§ 1681-1688 ("Title IX") ......................................40

28 U.S.C.
    § 1292(a)(1) .............................................................................1
    § 1331........................................................................................1
    § 1343........................................................................................1

42 U.S.C.
    § 1983........................................................................................1
    § 1988........................................................................................1
    § 2000e, *et seq.* ("Title VII") ...............................................22

## Rules

Fed. R. App. P. 4(a)(1)(A) ........................................................1

Fed. R. Civ. P. 56 ....................................................................56

## Constitutional Provisions

U.S. Const.
    amend. I...........................................................................*passim*
    amend. XIV ...............................................................................1

## **JURISDICTIONAL STATEMENT**

This action arises under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §§ 1983 and 1988. The District Court and this Court have jurisdiction under 28 U.S.C. §§ 1331 and 1343, and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to hear this appeal from the District Court's January 10, 2018, order granting Appellees' motion for summary judgment and denying Appellant's cross-motion for summary judgment. Appellant timely filed her notice of appeal under Fed. R. App. P. 4(a)(1)(A) on January 31, 2018.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether Louisiana State University's sexual harassment policies violate the First Amendment because they allow the University to restrict speech based on broad, vague, and undefined terms, and include no requirement that the expression subject to regulation be severe, pervasive, and objectively offensive on the basis of sex.

2.      Whether Louisiana State University's sexual harassment policies are unconstitutional as applied to the Appellant, where Appellant's academic speech was constitutionally protected and the University's poorly-defined policy and haphazard approach allowed generalized allegations regarding offensive speech to qualify as "sexual harassment."

3.      Whether Appellees can avoid personal liability where First Amendment protections for academic speech are well-established, Appellant's claims were timely brought after her termination, and each Appellee acted as a final decision-maker seeking Appellant's termination based on her protected speech.

# INTRODUCTION

The Appellees at Louisiana State University ("LSU") fired Dr. Teresa Buchanan, a tenured and respected professor of early childhood education, for "sexual harassment" based on speech having nothing to do with either "sex" or "harassment."   They did so through application of poorly drafted policies that ignore First Amendment limits to regulating academic speech.   Defendants followed a process "akin to the child's game of 'telephone,' in which a message is repeated from one person to another," such that, "after some time, the message bears little resemblance to what was originally spoken." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 264-65 (1986) (Brennan, J., dissenting).   Vague charges were made, repeated, and recycled until—in the end—not even Dr. Buchanan's accusers could say what she did that justified her termination.   The First Amendment does not permit such an assault on basic rights, and the District Court decision upholding LSU's action rested on basic errors of fact and law.

# STATEMENT OF THE CASE

### A.     Statement of Facts

Dr. Buchanan served on the faculty of the LSU School of Education since 1995, and was promoted to Associate Professor with tenure in 2001.  ROA.1297. She is credited with creating LSU's renowned "Early Childhood Program" or "PK-3" program, which provides teacher education for pre-school through third-grade instruction.  ROA.1297.  Her research is published in top academic journals and

she has demonstrated significant success in securing research funding. ROA.1297.
For these distinctions, among others, Dr. Buchanan was recommended for
promotion to Full Professor in 2013. Following a rigorous review, Appellee
Damon Andrew, Dean of the College of Human Sciences and Education,
recommended to Appellee F. King Alexander, the President of LSU, that she be
promoted. ROA.1297.

### Complaints About Dr. Buchanan

Around the same time Andrew endorsed Buchanan's promotion, Ed
Cancienne, the Superintendent of the Iberville Parish Schools District, complained
to LSU that Dr. Buchanan had been critical of him and "condescending to the
teachers" during her site visits with LSU student teachers and their mentor
teachers. ROA.1298. When Dr. Buchanan learned of the complaint, she apolo-
gized if she caused offense and affirmed that the PK-3 program was "happy to be
placing students" in his parish. ROA.1044, 1298. Cancienne was not mollified,
however, and he called Associate Dean Jennifer Curry to complain that he had
heard from teachers in one of his schools that, at a meeting to assess a student
teacher Buchanan referred to Cancienne as "crazy," "talked awful about our
schools," and said "pussy three times." ROA.1298.

Although the claim Dr. Buchanan had used the word "pussy" was later cited
as part of LSU's primary rationale for firing her, Cancienne never believed that the

word was used in a sexual context or had anything to do with sexual harassment. ROA.1299. Rather, he complained Dr. Buchanan had criticized his schools and indicated that she used the word to instruct her student teacher how to cope with parents who may employ vocabulary different from their own. ROA.955, 1299.

No one at LSU ever talked to Cancienne about the substance of his complaint and Appellees simply assumed that his concern involved a sexual reference. ROA.822, 827, 829-830. Dean Andrew testified that Cancienne's complaint was proof that Dr. Buchanan used "inappropriate" language, regardless of context. ROA.357-359. A.G. Monaco, Associate Vice Chancellor of the Office of Human Resource Management, and President Alexander likewise made no inquiry, and similarly assumed Buchanan's use was slang for female genitalia. ROA.441, 338-339.

During the same period, LSU also received three student complaints regarding Dr. Buchanan, which also formed the basis of the investigation into her conduct. ROA.1299, 1301. One student alleged Buchanan had told students it was unacceptable to get pregnant while in the PK-3 program, supposedly offered to help them obtain condoms, and criticized one student's projects by questioning whether she would be able to repeat the project without the assistance of her boyfriend who may only be "supportive now while the sex is good." ROA.1299-1300. A second student claimed Buchanan recorded her crying during an assess-

ment meeting.    ROA.1300.    An administrator also obtained a copy of correspondence from winter 2012, purporting to represent the views of Buchanan's "Junior PK-3 Cohort" that she "made several inappropriate and offensive comments," including saying "that a woman is thought to be a dike if she wears brown pants," that "it was a choice to be in the program and it was not the fault or problem of the professors if any of us chose to be mommies or wives and not to expect to get an A in the class," and that Dr. Buchanan used "extreme profanity on a regular basis."    ROA.1301.

### LSU's Investigation and Findings

After receiving the complaints, Dean Andrew removed Professor Buchanan from the classroom for the spring 2014 semester while the Office of Human Resource Management ("HRM") investigated to determine whether any University policies had been violated "including the University Sexual Harassment policy." ROA.1011.    LSU policy PS-73 defines sexual harassment as "speech and/or conduct of a sexually discriminatory nature, which was neither welcomed nor encouraged, which would be so offensive to a reasonable person as to create an abusive working or learning environment and/or impair his/her performance on the job or in the classroom."    ROA.483-485.    LSU's policy on sexual harassment of students, PS-95, defines sexual harassment as "unwelcome verbal, visual, or physical behavior of a sexual nature."    ROA.487-492.    It includes *quid pro quo*

harassment and hostile environment harassment, which "has the purpose or effect of unreasonably interfering with an individual's academic, work, team or organization performance or creating an intimidating, hostile or offensive working environment." ROA.487-492.

Appellee Gaston Reinoso, LSU's HRM Director, conducted an investigation into whether Dr. Buchanan violated PS-73, PS-95, or other policies. ROA.1302. Reinoso interviewed Buchanan, who confirmed she occasionally used profanity and language of a sexual nature in classroom instruction, which she asserted supported her "overall pedagogical strategy." ROA.1304. Reinoso prepared a report setting forth summaries of his interviews with Dr. Buchanan, the student complainants, and faculty members. The report listed all the allegations but did not explain that only a few of the complaints listed therein contributed to his ultimate finding that the "reported behavior violates PS-73 & PS-95." ROA.862-875.

Reinoso later admitted that most of the allegations in the report did not contribute to his finding that Dr. Buchanan had violated LSU's sexual harassment policies. ROA.1304-1305. The Cancienne letter was among the complaints he rejected. ROA.830-831. The report contained no finding that the instances investigated were severe, pervasive, and objectively offensive.

**LSU's Decision to Seek Dismissal**

Dean Andrew reviewed Reinoso's report and decided to pursue disciplinary proceedings against Buchanan pursuant to LSU's policy for Dismissal for Cause for Faculty, PS-104. ROA.37, 474-480, 1304-1305. After meeting with Dr. Buchanan in June 2014, Andrew wrote that she "admitted to using profanity and language of a sexual nature, claiming it supported [her] overall pedagogical strategy when teaching at LSU." ROA.1034-1035, 1305. He found the explanation "unacceptable," noting he did not condone "any practices where sexual language and profanity are used when educating students, particularly those who are being educated to serve as PK-3 professionals." ROA.1034-1035, 1305.

Dr. Buchanan responded by letter "question[ing] the reliability and validity of Reinoso's findings, which centered on the complaints of a few disgruntled students and answers to leading questions of others, entirely discounting my explanation of the events." ROA.1038, 1306. Andrew did not reconsider his position, and instead sent a memorandum to Provost Stuart Bell, setting forth grounds for removal. ROA.1040-1042. Andrew dismissed Buchanan's assertion that her use of profanity, and what Andrew characterized as "language of a sexual nature," "supported her overall pedagogical strategy," and claimed that "Buchanan admitted to the behavior that led to the [HRM] conclusion." ROA.1040-1042.

Andrews' memo cited liberally from Reinoso's report, including allegations found
not actionable under the sexual harassment policies.  ROA.1040-1042.

In an August 2014 letter, Dr. Buchanan provided Bell with a further
explanation of her teaching pedagogy pertaining to, for example, human sexuality,
using occasional profanity, and confronting biases.    ROA.852-855, 1307.
Buchanan's letter provided a detailed description of her use of language and how it
was part of a pedagogical approach and backed by research.  For example, Dr.
Buchanan explained:

> [Profanity] is part of the common vernacular even among
> very young children today, and teacher-education
> students need to be aware that they will be confronted
> with that language and professionally decide how they
> will respond.  I have never had a student tell me that it
> was offensive or that they were uncomfortable with my
> language.

ROA.854.  Dr. Buchanan explained that she utilized humor to help student teachers
recognize their "own feelings regarding dress and sexuality" to prepare them for
their future interactions with "children from family backgrounds that are different
from their own" and their responsibility "for establishing and maintaining effective
and reciprocal relationships with all families."  ROA.854-855.  Dr. Buchanan
noted she was never given an opportunity to correct any problems identified, and
was never told she was making students uncomfortable.  She said "[h]ad it been

pointed out to me that a student was uncomfortable I would have corrected my behavior and language immediately." ROA.852.

## The Faculty Committee Hearing

In March 2015, a faculty committee conducted a PS-104 hearing to determine whether Plaintiff had violated LSU's policies. ROA.1307. Committee members were not provided with materials or training on the implementation or interpretation of the sexual harassment standards in PS-73 and PS-95. ROA.1308. The committee chair said he understood the sexual harassment policy used an "offensiveness" standard and that "sexual harassment is in the eye of the beholder." ROA.1308. Following the hearing, the committee concluded that violations of PS-73 and PS-95 had occurred, but unanimously recommended against dismissal. The committee criticized Dr. Buchanan's supervisors for failing to offer her "counseling before HRM engagement" or "re-training prior to implementing PS-104 proceedings," and critiqued the "closed nature of the HRM investigation," which "did not offer Dr. Buchanan an opportunity to resolve charges once specifics of charges became known." ROA.1309. Instead, the committee recommended that Dr. Buchanan be censured and that she modify her teaching methodology to reduce "potentially offens[ive] language and jokes." ROA.857-859, 1308-1309.

### Alexander's Rejection of the Committee's Recommendation

Contrary to the committee's decision, Dean Andrew, Monaco, and Provost Bell urged President Alexander to dismiss Dr. Buchanan. ROA.323-324, 446-447, 1309-1310. PS-104 required Alexander to base his recommendation "on the recommendation of the committee of the faculty and the evidence presented in the hearing." ROA.479. But Alexander did not review the PS-104 hearing transcript, never saw any hearing exhibits or evidence presented, and did not know which witnesses testified or what they said. ROA.326-327. Instead, Alexander said that his recommendation turned in large part on the Cancienne complaint despite the fact that Reinoso later confirmed it had nothing to do with sexual harassment and played no part of the HRM report's findings. ROA.338-339, 341, 1310. Alexander also accepted Andrew, Monaco, and the Provost's recommendations against offering retraining, as the faculty committee had advised. They claimed retraining would be fruitless because Dr. Buchanan had mentioned the importance of her pedagogy. ROA.329-331.

As a consequence, Alexander rejected the committee's recommendation and proposed dismissal for cause. ROA.907, 1309. Dr. Buchanan appealed this decision, ROA.941-942, 1310, but President Alexander rejected the appeal. ROA.1078.

**Board of Supervisors Decision**

The Board of Supervisors met in June 2015 to consider President Alexander's recommendation regarding Dr. Buchanan. ROA.334-335. Alexander attended the Board meeting, as did Monaco, who presented the HRM office's findings and the findings of the faculty committee. ROA.448. In addition, Monaco assembled a packet of materials for the Board that included multiple duplicate copies of Cancienne's complaint, correspondence from the complaining students, summary HRM memoranda, a few selected teaching evaluations, and legal memoranda that, paradoxically, called into question the constitutionality of LSU's sexual harassment policies.[1]  The Board accepted Alexander's recommendation to terminate Dr. Buchanan. ROA.339-340, 1312.

**B.     Procedural Background**

Plaintiff filed this civil rights action asserting three counts: an as-applied First Amendment challenge to LSU's sexual harassment policies; an as-applied due process challenge to LSU's PS-104 procedures; and a facial First Amendment challenge to LSU's sexual harassment policies. ROA.11-49. On cross-motions for

---

[1] ROA.1080-1195. The information provided to the Board included an August 2009 memorandum from the Office of General Counsel of the University of California which concluded that the university's anti-harassment policy "is vulnerable to a challenge that it violates free speech rights" and advocating that it be modified. ROA.1182-1187.

summary judgment, the District Court granted judgment for Appellees and dismissed the case with prejudice.  ROA.1296-1374, 1375.

The court rejected Appellant's facial challenge, finding that, "while the LSU policies could arguably have been crafted better," they did not lack "an objective" sexual harassment standard "akin to severe and pervasive."  ROA.1358.  It denied the as-applied challenge to LSU's sexual harassment policies, finding the speech for which Dr. Buchanan was terminated was not related to matters of public concern and therefore not protected by the First Amendment.  This was based on the court's conclusion that there was no record evidence that Dr. Buchanan's speech was "part of her overall pedagogical strategy for teaching preschool and elementary education to students."  ROA.1327, 1358-1359.  The District Court further held each Appellee was entitled to qualified immunity.  ROA.1336.  Additionally, the District Court dismissed claims against Andrew, Monaco, and Reinoso as time-barred.  ROA.1315-1317.  It dismissed claims against Reinoso and Monaco on the ground that Appellant did not allege they "caused or affected her termination."  ROA.1322.  The court also rejected Dr. Buchanan's due process challenge.

## SUMMARY OF ARGUMENT

LSU's sexual harassment policies flout the First Amendment's most fundamental premises that the government cannot restrict speech simply because

of its capacity to offend, and that any regulations affecting free expression must be written with narrow specificity. These principles fully apply to laws combatting sexual harassment when they seek to regulate speech, and not just harassing conduct. And they apply with particular force when the regulated speech is in the university setting, where academic freedom is a transcendent First Amendment value. LSU's policies employ overly broad and vague terms that permit the regulation of speech that may be considered "offensive" or "suggestive" without regard to whether the targeted expression is severe, pervasive, and objectively offensive. The District Court misanalyzed these overarching principles, and ignored numerous cases that have held similar policies are facially invalid.

The District Court also erred in denying Dr. Buchanan summary judgment and granting summary judgment to Appellees on her as-applied challenge to LSU's sexual harassment policy. First, the court ignored record evidence that Dr. Buchanan's use of language was in support of pedagogical objectives, and thus erroneously found her speech was not constitutionally protected. Second, the court failed to correctly articulate or apply controlling First Amendment principles that limit how the policies were used to sanction Dr. Buchanan. Third, the court's analysis permitted regulation of any speech that might be considered offensive whether or not it has any connection to sexual harassment, thus ratifying LSU's haphazard application of its policies.

The District Court's finding that qualified immunity shields Appellees from damage awards is erroneous where, as here, Dr. Buchanan's First Amendment rights were clearly established and where no reasonable university official could have failed to understand the constitutional infirmities of LSU's lax enforcement process. The court also erred in finding some Appellees' actions were outside the statute of limitations or were not "final decisionmakers" because it mistakenly applied legal analysis drawn from First Amendment retaliation cases. LSU's policies are unconstitutional and they were applied to Dr. Buchanan in violation of her First Amendment rights, but she has never alleged "retaliation," as the District Court wrongly assumed.

## **ARGUMENT**

### I.    **STANDARD OF REVIEW**

This Court reviews *de novo* the District Court's order granting summary judgment, *EEOC v. R.J. Gallagher Co.*, 181 F.3d 645, 652-53 (5th Cir. 1999), applying the same legal standards as the District Court. *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 167 (5th Cir. 1999). *De novo* review also is required because, "in cases raising First Amendment issues ... an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Marceaux v. Lafayette City-Parish Consol. Gov't*, 731

F.3d 488, 491-92 (5th Cir. 2013) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 284-86 (1964))) (internal quotation marks omitted).

Summary judgment lies only if there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law, viewing all facts and reasonable inferences from them in the light most favorable to the nonmoving party. *Trent v. Wade*, 776 F.3d 368, 374 n.1 (5th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)); *DePree v. Saunders*, 588 F.3d 282, 286 (5th Cir. 2009). In reviewing a challenge to a restriction on speech, it is well established that the party seeking to uphold the restriction carries the burden of justifying it. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)).

## II. LSU'S SEXUAL HARASSMENT POLICY IS FACIALLY UNCONSTITUTIONAL

### A. The First Amendment Requires Sexual Harassment Policies Targeting Speech to Be Narrowly-Framed, Precisely Defined, and Limited to Severe, Pervasive, and Objectively Offensive Behavior

#### 1. The Government Cannot Restrict Speech Merely to Avoid Offense, and Any Regulation of Speech Must Be Narrowly Focused and Clearly Defined

As a general matter, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Ashcroft*

*v. ACLU*, 535 U.S. 564, 573 (2002)). *See United States v. Playboy Entm't Grp.*, 529 U.S. 803, 811 (2000). This is particularly true where speech is regulated based on its capacity to offend. The Supreme Court has held "time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some … hearers.'" *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (quoting *Street v. New York*, 394 U.S. 576, 592 (1969)). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Indeed, "the fact that society may find speech offensive is not a sufficient reason for suppressing it," but rather is "a reason for according it constitutional protection." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988) (citation omitted).

Just last Term, the Court unanimously reaffirmed that restricting speech because of the possibility of giving offense "strikes at the heart of the First Amendment" because "[g]iving offense is a viewpoint." *Tam*, 137 S. Ct. at 1763-64. It invalidated on its face a provision of the Lanham Act that denied federal trademark registration for any proposed mark that "may disparage … persons … institutions, beliefs, or national symbols, or bring them into contempt, or disrepute." *Id*. at 1753 (quoting 15 U.S.C. § 1052(a)). The Court found this viewpoint-based regulation was an "egregious form of content discrimination" that

was "presumptively unconstitutional." *Id.* at 1766 (Kennedy, J., concurring) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995)).[2]   Noting that its cases "have long prohibited the government from justifying a First Amendment burden by pointing to the offensiveness of the speech to be suppressed," *id.* at 1767, the Court found the disparagement clause was not "narrowly drawn" to target actual discrimination and was "far too broad in other ways as well." *Id.* at 1764-65.

The decision in *Tam* applied the more general proposition that "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).  Under the First Amendment overbreadth doctrine, a law "may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Stevens*, 559 U.S. at 473 (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).  *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002) (a law is "unconstitutional on its face if it prohibits a substantial amount of protected expression").

---

[2] It does not matter if limitations on speech are "based on audience reactions," as this is just "government hostility and intervention in a different guise." *Tam*, 137 S. Ct. at 1767.  "Regulations that focus on the direct impact of speech on its audience" are content-based and subject to "the most exacting scrutiny." *Boos v. Barry*, 485 U.S. 312, 321-22 (1988).

Case: 18-30148    Document: 30-1    Page: 32    Date Filed: 04/27/2018

For similar reasons, the First Amendment prohibits vague speech regulations because nebulous laws set "no rule or standard at all." *Baggett v. Bullitt*, 377 U.S. 360, 374 (1964).[3]   As a general proposition, vague laws offend due process because they fail to give people of ordinary intelligence fair warning of what conduct is prohibited, allow arbitrary and discriminatory enforcement, and delegate basic policy matters to policemen, judges and juries for resolution on an *ad hoc* and subjective basis.  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  However, vagueness takes on added significance where the government seeks to regulate speech.  Entirely apart from due process concerns, vague statutes that affect "sensitive areas of basic First Amendment freedoms" are unconstitutional because they "inevitably lead citizens to 'steer far wider of the unlawful zone' … than if the boundaries of the forbidden areas were clearly marked." *Id*. (quoting *Baggett*, 377 U.S. at 372).  "[W]here the guarantees of the First Amendment are at stake the [Supreme] Court applies its vagueness analysis strictly." *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 972 (9th Cir. 1996) (quoting *Bullfrog Films Inc. v. Wick*, 847 F.2d 502, 512 (9th Cir. 1988)).

---

[3] Questions involving overbreadth and vagueness necessarily are related. *Reno v. ACLU*, 521 U.S. 844, 864 (1997) (vagueness is relevant to the First Amendment overbreadth inquiry).  However, a restriction can be unconstitutionally overbroad without being vague. *E.g.*, *Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc*., 482 U.S. 569, 570, 577 (1987) (resolution banning all "First Amendment activities" at Los Angeles International Airport is overbroad).

Vague speech restrictions are especially problematic in the area of academic speech.  For that reason, the Supreme Court struck down a statute requiring teachers to sign oaths affirming they did not "advise, teach, abet, or advocate" for the overthrow of government.  *Baggett*, 377 U.S. at 366-67.  The Court held that "the susceptibility of the statutory language to require the forswearing of an undefined variety of 'guiltless knowing behavior'" made the law unconstitutionally vague.  *Id*. at 368.  Likewise, in *Cramp v. Board of Public Instruction*, 368 U.S. 278, 280-81 (1961), the Court invalidated a Florida law that required public employees to swear they never lent "aid, support, advice, counsel or influence to the Communist Party."  The unanimous Court was troubled by "the extraordinary ambiguity of the statutory language."  *Id*. at 286-87.  Such concerns apply with particular force in this case.

### 2.    Anti-Harassment Policies Are Subject to First Amendment Limits

These general First Amendment principles fully apply when universities implement anti-harassment policies because "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause."  *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001).  It is undisputed that the government has a compelling interest in combatting sexual harassment, and that "non-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause."  *Id*. at 206.  However, the First Amendment necessarily is

implicated when "laws against harassment attempt to regulate oral or written expression." *Id*. As this Court has observed, "[w]here pure expression is involved," sexual harassment law "steers into the territory of the First Amendment." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995). And "when … sexual harassment claims [are] founded solely on verbal insults, pictorial or literary matter," as they are in this case, "the [regulation] imposes content-based, viewpoint-discriminatory restrictions on speech." *Id*. at 596-97. As a consequence, such policies are subject to searching constitutional scrutiny. *Saxe*, 240 F.3d at 207 ("This sort of content- or viewpoint-based restriction is ordinarily subject to the most exacting First Amendment scrutiny.").

Policies intended to combat sexual harassment that impose overly broad restrictions on speech violate the First Amendment. *See*, *e.g*., *McCauley v. Univ. of V.I.*, 618 F.3d 232 (3d Cir. 2010); *DeJohn v. Temple Univ.*, 537 F.3d 301, 316 (3d Cir. 2008); *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1183-84 (6th Cir. 1995); *Saxe*, 240 F.3d at 210-11. "Because overbroad harassment policies can suppress or even chill core protected speech, and are susceptible to selective application amounting to content-based or viewpoint discrimination, the overbreadth doctrine may be invoked." *DeJohn*, 537 F.3d at 314. Likewise, and for reasons set forth above, vague sexual harassment policies are unconstitutional. *Cohen*, 92 F.3d at 972 (vague sexual harassment policies "trap the innocent" by

21

failing to give fair warning, "delegate basic policy matters to low level officials," and "discourage[] the exercise of first amendment freedoms"); *Dambrot*, 55 F.3d at 1183-84. The First Amendment thus does not permit university officials to equate offensiveness with harassment. *E.g.*, *Saxe*, 240 F.3d at 215 ("[T]hat someone might take offense at the content of speech is not sufficient justification for prohibiting it."). *Cf. DeAngelis*, 51 F.3d at 597 ("Title VII cannot remedy every tasteless joke or groundless rumor … in the workplace.").

To satisfy constitutional requirements, anti-harassment policies that seek to regulate offensive words or symbols must be drafted narrowly and with precision, and must be limited to harassment that is "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651-52 (1999); *Saxe*, 240 F.3d at 205-06 (harassment must be severe, pervasive, and objectively offensive to satisfy First Amendment requirements). *See also DeAngelis*, 51 F.3d at 596 (mere utterance of epithets that engender offensive feelings "were not severe or pervasive enough to create an objectively hostile or abusive work environment"); *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). However, LSU's policies on sexual harassment fall far short of these constitutional requirements.

**B.     The District Court Applied the Wrong Standard of Review**

The District Court's analysis of LSU's sexual harassment policies was fundamentally flawed from the outset because it applied the wrong standard of constitutional review.  This alone is reversible error.  *See*, *e.g*., *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226, 2231 (2015) (reversing circuit court ruling for failure to apply heightened scrutiny to content-based regulation); *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151 (2017) (reversing circuit court ruling for failure to apply appropriate level of First Amendment scrutiny).

The District Court incorrectly posited that the standard for facial overbreadth "requires that a challenger establish that no set of circumstances exist under which the policies would be valid."[4]  This, however, is not the correct standard where First Amendment freedoms are involved.  The District Court was relying on a rule set forth in *United States v. Salerno*, which, the Supreme Court has explained, is not a "speech case."  *United States v. Stevens*, 559 U.S. 460, 472 (2010).  In the First Amendment context, the correct test for overbreadth asks whether the policies

---

[4]  ROA.1344, 1357-1358.  The court cited no Fifth Circuit authority for this standard, but instead relied on a district court case that in turn quoted *United States v. Salerno*, 481 U.S. 739 (1987).  *See* ROA.1344, 1357-1358 (citing *Pounds v. Katy Indep. Sch. Dist.*, 517 F. Supp. 2d 901, 912 (S.D. Tex. 2007) (quoting *Salerno*, 481 U.S. at 746)).  But the District Court neglected to include the next sentence from *Pounds*: "Although courts generally will pass on facial challenges, there is an exception for First Amendment challenges based on overbreadth."  517 F. Supp. 2d at 912.

would restrict or chill a substantial amount of speech relative to the policy's legitimate sweep. *Id.* at 473. *See supra* 18. As explained in more detail below, PS-73's and PS-95's vague and expansive terms can be used to restrict any speech considered to be offensive—and were so applied in this case.

The District Court's review of LSU's policies under intermediate scrutiny was also clear error. ROA.1359. As a form of viewpoint-based regulation, the elements of LSU's policies that directly regulate speech are presumptively unconstitutional and must satisfy strict scrutiny. *Rosenberger*, 515 U.S. at 828-29; *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *Boos*, 485 U.S. at 321-22; *Gerlich v. Leath*, 861 F.3d 697, 705 (8th Cir. 2017); *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 393 (4th Cir. 1993). "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed*, 135 S. Ct. at 2228 (citation omitted); *Sorrell v. IMS Health Inc.*, 564 U.S. 562, 566 (2011) ("The First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.'") (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Here, too, the District Court's failure to apply the proper level of scrutiny requires reversal.

### C.    LSU's Policy Fails to Satisfy Constitutional Scrutiny

LSU's sexual harassment policies under which Dr. Buchanan was terminated (PS-73 and PS-95) directly regulate protected speech.[5]  Although both policies regulate forms of conduct that are not constitutionally protected, they also regulate pure speech.[6]  PS-73 defines "sexual harassment" as "speech and/or conduct of a sexually discriminatory nature, which was neither welcomed nor encouraged;" PS-95 defines it as "unwelcome verbal, visual, or physical behavior of a sexual nature."

The expansive terms the policies employ to define speech of a "sexually discriminatory nature" and the standards they use are unconstitutionally overbroad. Both PS-73 and PS-95 merely list non-exclusive examples of prohibited expression and include no limiting principles or definitions.[7]  Among other things, what does

---

[5]  The District Court acknowledged that Dr. Buchanan has standing to bring a facial challenge to PS-73 and PS-95.  ROA.1342-1344.  *See Esfeller v. O'Keefe*, 391 F. App'x 337, 340 (5th Cir. 2010).

[6]  The policies address various forms of conduct that are not at issue in this case, including "unwelcome touching" and "*quid pro quo*" harassment where unwelcome sexual advances or requests for sexual favors are tied to employment or academic achievement.  ROA.483-484, 487-488.  But they also expressly regulate speech.  *See DeJohn*, 537 F.3d 314 n.12 ("While the harassment policy may be said to regulate conduct, it clearly regulates speech, insofar as it specifically targets certain expression.") (quoting *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 258 n.14 (3d Cir. 2002)).

[7]  The lists include "suggestive comments, offensive language or display of sexually oriented materials, obscene gestures, and similar sexually oriented behavior of an intimidating or demeaning nature," ROA.488, and "display of

it mean to make "suggestive" or "offensive" comments?  LSU's policies provide no clue.  Such broad terms could conceivably be applied "'to cover any speech' of a 'gender-motivated' nature 'the content of which offends someone.'"  *DeJohn*, 537 F.3d 317-18 (quoting *Saxe*, 240 F.3d at 217)).  "The scenarios in which [these speech restrictions] may be implicated are endless."  *McCauley*, 618 F.3d at 251. *See Cohen*, 92 F.3d at 971-72 (policy prohibiting "verbal, written, or physical conduct of a sexual nature" is unconstitutionally vague).  Prohibiting speech that may be merely "suggestive" or "offensive" is "entirely subjective and provides no shelter for core protected speech."  *McCauley*, 618 F.3d at 250.  Additionally, "[t]he fact that the provision only lists a few non-exclusive examples of when it may be invoked does not help its case for constitutionality."  *Id*. at 251.

PS-73 and PS-95 contain no requirement that the prohibited speech be severe, pervasive, and objectively offensive.  Under the policies' plain terms, even minor infractions can be punished, and even if there is no serious adverse impact. PS-95 defines sexual harassment as speech that "has the purpose *or* effect of unreasonably interfering with an individual's academic ... performance" or that creates an "offensive working environment."  ROA.488 (emphasis added).  This is a fatal defect, for a sexual harassment policy is overbroad if it "extends to speech

---

sexually oriented materials; deliberate, repeated gender-based humiliation or intimidation, and similar sexually oriented behavior of an intimidating or demeaning nature."  ROA.484.

that merely has the 'purpose' of harassing another." *Saxe*, 240 F.3d at 210-11.  PS-73 requires some showing of objective offensiveness (restricting speech "which would be so offensive to a reasonable person as to create an abusive … environment"), but contains no requirement for severity or pervasiveness (prohibiting speech that has "the purpose or effect of … creating … a … hostile or offensive working environment").  Absent any requirements "akin to a showing of severity or pervasiveness," LSU's policy "provides no shelter for core protected speech." *DeJohn*, 537 F.3d at 317-18; *McCauley*, 618 F.3d at 249.  *See Davis*, 526 U.S. at 651-52; *DeAngelis*, 51 F.3d at 596.

The District Court rejected Appellant's facial challenge, finding that "while the LSU policies could arguably have been crafted better," they did not lack "an objective" sexual harassment standard "akin to severe and pervasive."  ROA.1358.  This incorrectly conflated the independent requirements that harassment must be severe and pervasive as well as objectively offensive.  It also assumed other language in the policy ("unwelcome," "persistent," "unwanted," "deliberate," "repeated," "intimidating," and "demeaning") can serve as stand-ins for the requirement that harassment be severe and pervasive.  ROA.1358.  However, this is negated by the plain language of PS-73 and PS-95 that prohibits speech with either "the purpose *or* effect of unreasonably interfering with an individual's academic … performance."

27

The District Court attempted to distinguish several cases that invalidated sexual harassment policies, largely by pointing to purported factual distinctions, but offered no reasoning to support its conclusion that LSU's policies define sexual harassment in a precise or understandable way, or set a constitutionally acceptable threshold for violations. Even more striking is the fact that the principal bases on which the court sought to distinguish the policies in cases like *Saxe* and *DeJohn* do not illustrate differences at all. The District Court stated the policy invalidated in *Saxe* is broader than LSU's, yet it block-quoted the section of that ruling which explains how policies targeting the "purpose or effect" of prohibited language focus "on the speaker's motive rather than the effect of speech" and thus "appears to sweep in those 'simple acts of teasing and name-calling' that the *Davis* Court explicitly held were insufficient for liability." ROA.1348-1349 (quoting *Saxe*, 240 F.3d at 210-11). The District Court also tried to distinguish the policy in *DeJohn*, noting it was "overbroad because the policy focused on the motive of the speaker and not just the effect the speech had on the learning environment." ROA.1350. As noted above, however, LSU's policies ***do not differ*** on this score.[8]

---

[8] The District Court also attempted to distinguish the policy at issue in *Cohen*, ROA.1355-1356, but that case is irrelevant because the Ninth Circuit did not rule on the policy's facial validity. The District Court noted that qualified immunity was applied in *Cohen*, but that issue is not relevant to a facial challenge, as it applies only to damage claims, and does not protect against injunctive or declaratory relief. *E.g.*, *Williams v. Ballard*, 466 F.3d 334 & n.7 (5th Cir. 2006).

The District Court discussed *DeAngelis*, 51 F.3d at 596, only in a footnote, dismissing this Court's cautionary warning that sexual harassment law "steers into the territory of the First Amendment" when it seeks to regulate "pure expression," as LSU's policies do. ROA.1346. It summarily concluded *DeAngelis* was "not instructive to LSU's sexual harassment policies presented here" because it was "a case with very different facts" and was "not in the context of a college setting." ROA.1346. This terse statement offered no explanation for why the First Amendment principles articulated in *DeAngelis* are not controlling—as they were in *Saxe* and *DeJohn*—or what supposed facts distinguish it from the facial challenge in this case. Contrary to the District Court's unstated assumption, the university setting only magnifies the First Amendment concerns in light of the importance of academic freedom, as a number of this Court's judges have noted.[9]

Finally, the facial overbreadth and vagueness of LSU's policies are not ameliorated by boilerplate language stating they are "not intended to infringe upon constitutionally guaranteed rights nor upon academic freedom." ROA.483; ROA.487. As numerous courts have held, such pledges of restraint cannot save a speech regulation where there is nothing in the policy's language "to ensure the

---

[9] Six judges of this Circuit joined an opinion observing that federal guidance regarding campus speech tracks the similar speech code that *DeJohn* invalidated, and "will dramatically curtail free speech on campus in the name of alleviating sex discrimination." *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 476 n.3 (5th Cir. 2013) (Jones, J., dissenting) (citing *DeJohn*, 537 F.3d at 313-20).

University will not violate First Amendment rights even if that is not their intention." *Dambrot*, 55 F.3d at 1182-83. *See also UWM Post, Inc. v. Board of Regents of Univ. of Wis. Sys.*, 774 F. Supp. 1163, 1177-78 (E.D. Wis. 1991) (policy held overly broad notwithstanding policy guidance pledging conformity with First Amendment values); *Doe v. University of Mich.*, 721 F. Supp. 852, 867-68 (E.D. Mich. 1989) (same); *College Republicans at San Francisco State Univ. v. Reed*, 523 F. Supp. 2d 1005, 1020 (N.D. Cal. 2007) (enjoining university conduct code despite language that "prohibits disciplinary action against students based on behavior protected by the First Amendment") (internal quotation marks and citation omitted).

Nor can LSU's policies be saved by framing them as an attempt to implement federal policies. "First Amendment principles must guide [] interpretation of the right to be free of purposeful [] harassment" in colleges. *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 709 (9th Cir. 2010); *Saxe*, 240 F.3d at 205-06. No "interpretive guidance" from the federal government can alter this constitutional requirement. *Miller v. Johnson*, 515 U.S. 900, 923 (1995). LSU has a higher obligation to obey the Constitution, which, in this case, it failed to do.

## III.    LSU'S SEXUAL HARASSMENT POLICY WAS UNCONSTITUTIONALLY APPLIED TO PROFESSOR BUCHANAN

### A.    Professor Buchanan's Speech is Constitutionally Protected

#### 1.    Academic Freedom is of "Transcendent Value"

The speech for which Dr. Buchanan was fired falls squarely within the First Amendment's protections.  As the District Court agreed, "it is undisputed [Dr. Buchanan]'s speech was made while performing her official duties of teaching and supervising student teachers." ROA.1335-1336.  In this setting, the Supreme Court has made clear that "[t]he classroom is peculiarly the 'marketplace of ideas,'" *Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967), and that the "essentiality of freedom in the community of American universities is almost self-evident."  *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Academic freedom is a "transcendent value" and "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. 603.  Accordingly, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).

The District Court recognized these overarching principles in light of this Circuit's settled law that "classroom discussion is protected" by the First Amendment.  *Kingsville Indep. Sch. Dist. v. Cooper*, 611 F.2d 1109, 1113 (5th Cir.

1980).[10]  It correctly acknowledged that academic freedom "has been viewed as a special concern of the First Amendment" and "consists in 'the right of the individual faculty member to teach … without interference from … the university administration, or his fellow faculty members.'"  ROA.1325 (quoting *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 312 (1978), and *Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1275 (7th Cir. 1982) (citation omitted)).  Nevertheless, it misapplied the law.

### 2.     The District Court Erroneously Held Dr. Buchanan's Academic Speech Was Unprotected

The District Court erroneously concluded that the speech for which Dr. Buchanan was sanctioned served no academic purpose and therefore is unprotected by the First Amendment.  ROA.1327.  The decision seriously misread the record and misapplied applicable law.

### a.     The Undisputed Record Established That Dr. Buchanan Advanced Pedagogical Reasons for Her Speech

Perhaps the most glaring error in the analysis below was the court's assertion that the record contained "no evidence" that Dr. Buchanan's speech was

---

[10]  The District Court correctly found that the doctrine limiting First Amendment rights of public employees for job-related speech does not apply to "speech related to scholarship or teaching."  *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006).  ROA.1324-1325.  The decision below is consistent with other courts that have held *Garcetti* does not limit free speech rights "in the academic context of a public university."  *See Adams v. Trustees of Univ. of N.C.-Wilmington*, 640 F.3d 550, 561 (4th Cir. 2011); *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014).

intended to serve a pedagogical purpose. ROA.1334. The District Court concluded Buchanan's statements "are not matters of public concern" protected by the First Amendment, ROA.1327, claiming that Buchanan "offered no evidence that her speech and/or conduct served an academic purpose." ROA.1334. The basis for the court's conclusion is hard to fathom, since it was never disputed that Dr. Buchanan explained the pedagogical purpose underlying her use of the language that resulted in her termination.[11] In fact, one reason Appellees gave for terminating Buchanan was their assumption she would not change her teaching methods because they were based on her pedagogical approach.[12]

The District Court's multiple claims that there was "no evidence" of a pedagogical purpose cannot be taken literally, as the court itself cited many of the

---

[11] Specifically, Dr. Buchanan described the need to create "cognitive disequilibrium" in her students, to get them past preconceptions that they have already seen all there is in teaching based on their own elementary, secondary, and post-secondary school experiences. ROA.853. Dr. Buchanan cited specific scholarship and models she applied, and explained her intent to "challenge mentor teacher beliefs and practices" as "an unanticipated but often positive outcome of our [] process." ROA.854. She further explained how "human sexuality is a part of our curriculum" such that she "discussed matters related to that in ways that are direct but healthy." ROA.854. Additionally, there can be no doubt that her speech criticizing Cancienne or his school district are matters of public concern. *E.g.*, *Goudeau v. E. Baton Rouge Parish Sch. Bd.*, 540 F. App'x 429, 434-35 (5th Cir. 2013).

[12] ROA.331. It was, however, undisputed that, if Dr. Buchanan had been told her methods were creating discomfort, she signaled her willingness to alter her approach. ROA.368.

record statements on this point.  For example, it observed that "Cancienne
… claimed [] he did not believe [Buchanan's use of the word "pussy" was] in a
sexual context" but rather was "part of Plaintiff's instruction to student teachers
regarding coping with parents."  ROA.1299.  The court also noted Dean Andrew's
assertion that Plaintiff "admitted to using profanity and language of a sexual
nature, claiming it supported [her] overall pedagogical strategy."  ROA.1305.  The
District Court cited evidence from Dr. Buchanan, as well.[13]  It recited Dr.
Buchanan's explanation that she utilized humor "to help student teachers recognize
their 'own feelings regarding dress and sexuality' to prepare them for their future
interactions with 'children from family backgrounds that are different from their
own' and their responsibility 'for establishing and maintaining effective and
reciprocal relationships.'"  ROA.1307 (quoting ROA.854-855).

The District Court thus plainly erred in concluding Dr. Buchanan "failed to
present any summary judgment evidence" regarding academic purpose and
pedagogy.  ROA.1335.  By the court's own reasoning Dr. Buchanan only had to
provide evidence that "her conduct and language *related in any way* to

---

[13]  It noted, for example, that "she wrote … to explain how the complained-
of speech was part of her pedagogical strategy" and, taking one particular aspect,
how "[p]rofanity is part of the common vernacular even among very young
children today, and teacher-education students need to be aware that they will be
confronted with that language and professionally decide how they will respond."
ROA.1307.  *See also* ROA.854, 1303-1304.

assignments, instruction, and education of preschool and elementary teachers," ROA.1335 (emphasis added), that is "at least tangentially related to the subject matter." ROA.1355 (citing *Cohen*, 92 F.3d 968 (9th Cir. 1996)). Having done so, the court was "not free to disregard significant evidence" as it did here. *School Bd. of Avoyelles Parish v. U.S. Dep't of Interior*, 647 F.3d 570, 584 (5th Cir. 2011); *Carroll v. Metro. Ins.& Annuity Co.*, 166 F.3d 802, 807 (5th Cir. 1999); *Cushman v. Resolution Tr. Co.*, 954 F.2d 317, 322 (5th Cir. 1992).

The District Court was not really saying there was "no evidence" in the record, but that it chose to reject the evidence of academic purpose as "spurious," ROA.1335, thus creating error of a different kind. The court's failure on summary judgment to view all facts and reasonable inferences from them in the light most favorable to the nonmoving party is reversible error. *E.g.*, *Schroeder v. Greater New Orleans Fed. Credit Union*, 664 F.3d 1016, 1026 (5th Cir. 2011). In effectively rejecting Dr. Buchanan's explanations and support for her approach and adopting Appellees' position, the decision below "improperly drew legal conclusions from disputed facts." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 741 (5th Cir. 2000). The District Court's analysis "amounted to a credibility determination that," as this Court has firmly held, is "inappropriate for summary judgment." *Ware v. Batson*, 480 F. App'x 247, 248 (5th Cir. 2010) (*per curiam*). *See Sanchez v. Young Cty.*, 866 F.3d 274, 293 (5th Cir. 2017) (Barksdale, J.,

35

concurring in part and dissenting in part) (drawing such inferences represents an "extremely improper misstep into impermissible fact-finding [on] summary judgment").

Because of its improper evaluation of the record evidence, the court incorrectly concluded it need not even consider "the reason for the discipline." ROA.1335-1336. This failure to conduct the necessary constitutional review is fatal and reversible error as well. *Expressions Hair Design*, 137 S. Ct. at 1151 (reversing and remanding decision where court of appeals "had no occasion to conduct a further inquiry into whether [the law], as a speech regulation, survived First Amendment scrutiny"). Thus, the District Court decision must be reversed on the threshold question alone.

### b. The District Court Misread the Law to Support Its Distorted View of the Record

The District Court's legal analysis was skewed to match its misreading of the record. This analysis consisted largely of quoting long passages from cases such as *Martin v. Parrish*, 805 F.2d 583 (5th Cir. 1986), *Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001), and *Vega v. Miller*, 273 F.3d 460 (2d Cir. 2001), none of which apply to the circumstances of this case, where a professor employed language, considered offensive to some, in service of pedagogical objectives. ROA.1327-1333. Instead, those cases stand for nothing more than the proposition that the gratuitous use of profanity and abusive language can be sanctioned when it

36

is unrelated to any educational purpose. The District Court could rely on them only by assuming away the record in this case.

None of the cases on which the District Court relied relates to the record here. In *Parrish*, for example, the professor sought only to run his students down, for no purpose "other than cussing [them] out … as an expression of frustration with their progress." 805 F.2d at 585. In that circumstance, this Court properly held such speech was "a deliberate, superfluous attack on a 'captive audience' with no academic purpose or justification" and thus was not protected under the First Amendment. *Id*. at 586. Likewise, in *Bonnell*, the Sixth Circuit held only that because Bonnell's offensive language was "not germane to the subject matter," he did "not have a constitutional right to [utter it] in a classroom."[14] *Vega* involved a classroom exercise in which students were encouraged to shout obscenities, some of them standing on chairs as they did so. The Second Circuit declined to rule "on whether the [College]'s action was unlawful" in view of Vega's "First Amendment academic freedom rights," and decided only the issue of qualified immunity. *Vega*, 273 F.3d at 468.

---

[14] 241 F.3d at 820. The court in *Bonnell* stressed that such decisions depend on the facts of each case, and it held that the professor's in-class profanities were not protected "where they are not germane to the subject matter" but that his language that did address matters of public concern was protected by the First Amendment. *Id*. at 820-21, 824.

The District Court's lengthy recitation but superficial analysis seemed only to suggest that, because certain offensive words were found to be unprotected in the cases it cited, they are unprotected in this case as well.  It quoted at length from *Bonnell* and *Vega* and concluded "[t]here is no argument … support[ing] Plaintiff's claim that using … 'pussy' and 'fuck,' … are relevant to educating students on becoming teachers of preschool through third grade students."  ROA.1334.  But unlike those cases, it is undisputed here that Dr. Buchanan's use of such language was not in a sexual context and was employed to further educational objectives.  The court's reference to "preschool through third grade students" was entirely beside the point, as there was never any suggestion Dr. Buchanan used—or suggested the use of—such language with children.  Rather, it was employed in the training of adult students in how to cope with interactions with other adults.

Having gotten the context wrong, the District Court gave short shrift to cases holding the First Amendment protects the use of offensive language in order to educate students.  In *Cooper*, 611 F.2d at 1113, for example, this Court upheld a First Amendment claim after a high school history teacher was terminated for an in-class role-playing exercise that "evoked strong student feelings on racial issues" after being instructed that "nothing controversial should be discussed in the classroom."  *Id*. at 1111.  Other courts have reached similar conclusions.  *E.g*., *Hardy v. Jefferson Cmty. Coll*., 260 F.3d 671, 679-80 (6th Cir. 2001) (First

Amendment protects classroom use of "nigger" and "bitch" in discussing how terms are used to marginalize minorities); *Keefe v. Geanakos*, 418 F.2d 359, 360-61 (1st Cir. 1969) (enjoining termination of high school English instructor for assigning article that repeatedly used a "highly offensive … vulgar term for an incestuous son" where the term had a valid pedagogical use).  Under the reasoning of these cases, and even by the District Court's logic, Dr. Buchanan's speech is fully protected by the First Amendment where it is used for legitimate pedagogical purposes.

**B.**     **LSU's Poorly-Defined Policy and Haphazard Approach Allowed Anything to Be Defined as "Sexual Harassment"**

For reasons already set forth, the First Amendment does not permit sexual harassment policies that seek to prohibit offensive speech generally.  *See supra* 20-22.  Given that fact, application of a constitutionally defective policy to terminate Dr. Buchanan is inherently invalid.  Here, however, the District Court embraced and compounded the error by holding that the termination would be valid "even if LSU's anti-harassment policies were facially unconstitutional," and, indeed, "even if [LSU] had no sexual harassment policy" at all.  ROA.1359-1360 (quoting *Vega*, 273 F.3d at 470).  In short, any complaint about Dr. Buchanan, no matter how trivial and regardless of whether it had anything to do with sexual harassment, was simply lumped together and treated as a sort of *ad hoc* performance review.

Contrary to this reasoning, Dr. Buchanan was not terminated for "inappropriate" behavior generally, or based on claims she was "unprofessional" or "abusive," as Appellees admitted. ROA.439, 830. She was not fired for failing to teach students, or for "nonperformance." ROA.475. Rather, Appellees sought and secured Buchanan's termination because of her constitutionally protected speech, ***and for no other reason***, based solely on claims that it constituted "sexual harassment" in violation of PS-73 and PS-95. *See supra* 6-12. *See also* ROA.117. However, such policies (and the federal laws on which they are based) do not— and cannot—establish general "vulgarity codes" or prohibitions on "offensiveness." *Saxe*, 240 F.3d at 215 ("[T]hat someone might take offense at the content of speech is not sufficient justification for prohibiting it."). Rather, they can only apply to conduct that discriminates "on the basis of sex."[15]

Despite this, Appellees admitted that the investigation of Dr. Buchanan and her termination rested predominantly on utterances having nothing whatsoever to do with sexual harassment. Rather, as with the child's game of "telephone," the

---

[15] This Court and others have interpreted Title IX to mean that vulgar language not aimed at a student based on her sex is not sexual harassment under the law. "The offensive behavior … must still be based on sex, per the words of title IX, and 'not merely tinged with offensive sexual connotations.'" *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (quoting *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002)). *See Wolfe v. Fayetteville Sch. Dist.*, 648 F.3d 860 (8th Cir. 2011) (vulgar harassment not based on plaintiff's sex not actionable under Title IX).

supposed "sexual harassment" was embellished, distorted, and ultimately took on

dimensions that cannot meet any legal—or constitutional—definition of the term.

The sexual harassment finding against Dr. Buchanan in fact rested in all but a few

particulars on speech that LSU's "expert," Director Reinoso, admitted was uncor-

roborated or did not constitute sexual harassment, such that most allegations in his

report, he agreed, ***did not*** support his finding that Buchanan violated LSU's sexual

harassment policies.[16]

Reinoso's report included no analysis explaining which actions by Dr.

Buchanan violated LSU's sexual harassment policies and it did not conclude they

were severe, pervasive, and objectively offensive.  Nor did the report indicate

which of the allegations were false, unsubstantiated, or unrelated to sexual

harassment, and for that reason the spurious allegations found their way into the

PS-104 hearing, President Alexander's recommendation for termination, and,

ultimately, the District Court's opinion.  A prime example was the word "pussy,"

the use of which was never complained of as a sexual term and which formed no

---

[16]  ROA.821, 822, 833-834, 835, 836-837, 839, 840-841, 842-843, 845, 847.
Allegations he rejected included claims that Buchanan stated "You can't be in this
program if you're pregnant," ROA.833-834, 839, 840-841, 843; alleged comment
that a woman is thought to be a "dike" if she wears brown pants, ROA.842-843;
videotaped a crying student, ROA.821-822, 837; was "harsh" and asked a student
take notes instead of speaking in class, ROA.834, 837; and told a student, "You've
not faced rejection yet, but it's coming."  ROA.834.  The report also eliminated
some claims regarding alleged profanity.  ROA.845.  *See also* ROA.847.

part of Rienoso's conclusions.  ROA.830-31.  Nevertheless, Alexander seized the

example as a primary reason for his recommendation to the Board.  ROA.881-882.

The District Court was so taken with this example it cited the word "pussy" ten

times in its opinion, making it a centerpiece of its analysis of *Bonnell* and *Vega*.

ROA.1298-1299, 1329-1330, 1334, 1339.

Most of what Reinoso's report deemed "inappropriate" played no role in any

finding of "sexual harassment."[17]  He later testified the report's conclusions boiled

down to less than a handful of examples:  a remark attributed to Buchanan about

the availability of birth control and condoms based on her belief that unwanted

pregnancy would hamper students' abilities to handle challenging coursework; the

allegation that Buchanan once said a student's fiancée was "supportive now while

the sex is good" but may not be later; use of profanity in unspecified contexts; and

a suggestion that Buchanan made a remark about her own sex life during a time

---

[17]  This included matters in addition to those he discounted as recited *supra* note 16.  ROA.836 (no corroboration that Buchanan "told us to stay away from boys unless the sex is good" so alleged remark did "not necessarily" contribute to sexual harassment finding); ROA.839, 840-841, 843 (statement that if you want to be a wifey or a mommy, this is not the profession for you did not constitute sexual harassment); ROA.841 (Buchanan discussing her divorce in class did not contribute to finding of sexual harassment), ROA.834-835 (comment from elementary-school teacher to complaining student that "I've heard all about you from Dr. Buchanan" did not factor into sexual harassment finding), ROA.837 (being yelled at, told "listen to me," and dismissing coat drive had nothing to do with sexual harassment), ROA.837, 838 (criticism and similar complaints did not constitute sexual harassment).

she went through a difficult divorce.  ROA.833-834, 837, 839, 841, 847, 839; ROA.1305.  There was no effort to show how these few remaining allegations related to LSU's sexual harassment policy, much less constituted a violation. Nevertheless, the report's generalized conclusion, as well as discredited complaints, fueled efforts by Appellees to terminate Dr. Buchanan.[18]

The faculty committee hearing did nothing to cure these deficiencies.  The hearing testimony merely restated second-hand accounts that had been reported to Reinoso, even though he had—unbeknownst to anyone else—discounted most of the statements as unrelated to sexual harassment.  ROA.434-435, 819, 821, 822, 837, 845, 929:20-25, 934:21-25, 937:10-18, 937:1-7, 935:25-936:22.  The committee was operating under the belief that PS-73 and PS-95 had been violated if it were to find that any of Dr. Buchanan's statements could be considered subjectively offensive—which it found—yet it still recommended against

---

[18] Dean Andrew relied on later-disavowed parts of the report in rejecting Buchanan's defense of her pedagogy and in setting the PS-104 hearing.  His memo to the Provost is littered with statements that have nothing to do with sexual harassment.  This included his stated intent to pursue dismissal based in part on Cancienne's complaint, ROA.1035, and his memorandum citing, *inter alia*, Dr. Buchanan's "brown pants" and "mommies and wives" comments, and other matters that Reinoso disavowed as not contributing to his findings.  ROA.1040-42.

termination. ROA.1308-1309. Despite this recommendation, Appellees continued to press for Dr. Buchanan's termination based on irrelevant evidence.[19]

That net result is *exactly* what happens when policies governing "harassing" speech are not sufficiently defined or limited. *See Cohen*, 92 F.3d at 972 ("[V]ague policies … impermissibly delegate basic policy matters to low level officials for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."). There was absolutely nothing to indicate that anyone, at any stage, determined that these few statements met any legal test for "harassment," much less that they were severe, pervasive, and objectively offensive as to deny educational opportunities, as the First Amendment requires. *See Davis*, 526 U.S. at 652.

### C.    LSU's Termination of Buchanan Violated the First Amendment

LSU's application of its sexual harassment policies to terminate Dr. Buchanan violated the First Amendment for the same reasons the Ninth Circuit articulated in *Cohen*, 92 F.3d 971-72, where a professor was sanctioned based on complaints regarding "the sexual nature of [his] teaching material and his frequent

---

[19] The Cancienne complaint was once again prominent, serving as one of the few points cited in an appeal of the committee finding to President Alexander. ROA.881-882. Alexander in turn rejected the committee recommendation despite having not read the PS-104 hearing transcript, ROA.326-327, not knowing the definition of sexual harassment the committee used, ROA.330-331, 346, not understanding the constitutional standard, ROA.336-339, and generally not knowing what actually happened.

use of derogatory language, sexual innuendo, and profanity." The court noted that Cohen used "a confrontational teaching style designed to shock his students and make them think and write about controversial subjects" and that this "did not fall within the core region of sexual harassment as defined by the Policy" (*e.g*., *quid pro quo* harassment, unwelcome sexual advances, or requests for sexual favors). *Id*. at 972. In order to find a violation, college officials applied the policy "on an entirely ad hoc basis," using the "nebulous outer reaches to punish teaching methods Cohen had used for many years." The court characterized this as "a legalistic ambush" and it held the policy's terms "were unconstitutionally vague" as applied. *Id*.

A similar ambush happened in this case. Before the events that led to her termination, Dr. Buchanan had been recommended for promotion to Full Professor in 2013 following a rigorous review process. But after LSU received a complaint from a school superintendent who believed Dr. Buchanan had criticized him and his district—a complaint that not even the superintendent thought related to sex— Appellees launched an investigation that led to her firing. Although Director Reinoso discounted most of the allegations as unsubstantiated or unrelated to sexual harassment, his generalized conclusion was that the policies had been violated based on a handful of anecdotes. But no one analyzed how these "findings" satisfied the terms of the policy or evaluated whether they amounted to

severe, pervasive, and objectively offensive behavior.  Senior officials and LSU's President simply went along with Reinoso's conclusion, making this the very paradigm of a case where a university "delegate[s] basic policy matters to low level officials for resolution on an ad hoc and subjective basis."  *Cohen*, 92 F.3d at 972.

The District Court acknowledged that *Cohen* is "the most factually analogous to the case before the Court," ROA.1352, but tried to distinguish it by claiming that Cohen's speech, unlike Dr. Buchanan's, was "at least tangentially related to the subject matter being taught," ROA.1355, that the defendants were entitled to qualified immunity, and that the policy was facially defective.  None of these supposed distinctions has merit.

First, the court's claim that Cohen's abrasive teaching style was used to further his pedagogical approach but that Dr. Buchanan's speech was not is based on the erroneous conclusion that there was no "summary judgment evidence" on this point.  ROA.1355.  However, as explained, the record contained ample evidence of Dr. Buchanan's academic purpose, which the court wrongly ignored. *See supra* 32-34. Second, the fact that the defendants were entitled to qualified immunity in *Cohen* does not help the Appellees in this case.  The specific reasons for denying qualified immunity in this case are discussed *infra* at 48-52, but it is worth noting that the applicable constitutional principles were not as well

46

established when *Cohen* was decided twenty-two years ago.[20]  Now, they are.  *See*

*supra* 20-22, 36-39.  Third, the District Court's statement that "the most significant

distinction" with *Cohen* is that LSU's policies "include the objective standard,"

ROA.1335-1336, is simply irrelevant to the as-applied challenge.  As set forth

above, LSU's policies are facially invalid, *supra* 25-30, but even if they were not,

their capricious application to Dr. Buchanan in this case violated the First

Amendment.[21]

The District Court simply abdicated its responsibility to analyze Dr.

Buchanan's as-applied challenge.  After erroneously ignoring record evidence and

concluding that Dr. Buchanan's speech was unprotected, the court assumed it was

unnecessary "to scrutinize the reason for the discipline."   ROA.1335-1336.

Accordingly, it conducted no analysis of whether the policy was properly applied

to Dr. Buchanan, or the extent to which LSU's process followed constitutionally-

---

[20]  The policy in *Cohen* was newly adopted, no other professors had yet been subjected to it and there were few reported decisions in this area of the law. *Cohen*, 92 F.3d at 970.  By contrast, there has been substantial legal development in this area over the past two decades, and Appellees themselves circulated legal memoranda that cast doubt on the constitutionality of their policy.  ROA.1182-1195.

[21]  The court in *Cohen* did not even address the facial validity of the school's policy, but it recognized a "legalistic ambush" when it saw one.  So too, here.

prescribed requirements.[22]  It simply assumed that the policies were properly invoked by claiming "Plaintiff's as-applied challenge rests on the same principle of law as her facial challenge [and] is denied on the same grounds." ROA.1359. Of course, this means if Appellees are wrong about the facial validity of LSU's policies, they lose on the as-applied challenge as well. But it is well-established (just as it was recognized in *Cohen*) that a plaintiff need not prevail on a facial challenge in order to show that a policy is unconstitutional as-applied. *Wisconsin Right to Life*, *Inc. v. FEC*, 546 U.S. 410, 411-12 (2006).

## IV.    APPELLEES CANNOT AVOID PERSONAL LIABILITY

### A.    Qualified Immunity Does Not Apply

The District Court also held that even if Dr. Buchanan's speech were protected by the First Amendment, the Appellees were shielded from liability for damages by qualified immunity. ROA.1335-1336. This is erroneous. Governmental actors performing discretionary functions enjoy qualified immunity only "insofar as their conduct does not violate clearly established … rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The defense must be denied where facts in the record make out a violation

---

[22] This failure is further illustrated by the court's citation of *Vega* and its conclusion that Dr. Buchanan's termination would have been valid even if LSU had no sexual harassment policy. It does not matter whether the court could imagine some other policy under which it might have upheld the termination. The only issue here is whether LSU's policy on sexual harassment was constitutionally applied, and the District Court failed even to conduct the necessary analysis.

of a constitutional right that was clearly established at the time the plaintiff's rights were violated. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 469 (5th Cir. 2014); *Hardesty v. Cochran*, 621 F. App'x 771, 780 (5th Cir. 2015).

The District Court did not seriously contest the proposition that Dr. Buchanan's First Amendment rights were clearly established at the time the events transpired.[23] The law in this Circuit is clear that "classroom discussion is protected activity" under the First Amendment. *Cooper*, 611 F.2d at 1113. *See Kaprelian v. Texas Woman's Univ.*, 509 F.2d 133, 139 (5th Cir. 1975). In light of these precedents, "the argument that teachers have no First Amendment rights when teaching, or that the government can censor teacher speech without restriction, is totally unpersuasive." *Hardy*, 260 F.3d at 680.

No reasonable public official in Appellees' position could have been unaware of the need to exercise extreme caution when applying the University's sexual harassment policies to sanction a tenured professor for her teaching methods. LSU policies expressly recognize the importance of academic freedom, ROA.474 ("The University recognizes that membership in the academic profession carries special responsibilities and that faculty must be afforded academic freedom

---

[23] The District Court held that Dr. Buchanan's speech was unprotected, but this was wrong for reasons already explained. *See supra* 32-39. The court otherwise agreed that the rights at issue were well-established. ROA.1325.

in teaching and research."), and PS-73 and PS-95 both pay lip service to these values with the promise that the policies are "not intended to infringe upon constitutionally guaranteed rights nor upon academic freedom." ROA.483, 487. Under these circumstances, Appellees could not have been unaware of the constitutional tensions in extending the policies beyond conduct such as inappropriate sexual advances and *quid pro quo* harassment to include what they considered to be "offensive" words that they understood to be part of a professor's teaching methods.

The District Court concluded Appellee's actions were "objectively reasonable," ROA.1336, but in fact they were oblivious to the constitutional sensitivities and disdainful of Dr. Buchanan's rights.[24] The court concluded their actions were "reasonable" because "several local schools would not allow Plaintiff to return to their campuses," ROA.1336, but LSU's investigator testified that this played no part in his conclusions regarding sexual harassment. ROA.828-30. More specifically, the only school administrator with a detailed complaint was

---

[24] Appellees cannot claim ignorance of constitutional constraints (and it would not help if they did since qualified immunity uses an objective test). The materials they furnished to the Board included a memo by the University of California General Counsel's office explaining that "[w]here public university anti-harassment policies have been challenged, courts virtually uniformly struck them down" on First Amendment grounds. ROA.1080-1195. The materials made clear that such policies cannot punish language simply because "some person finds [it] offensive." ROA.1189.

Cancienne, who was concerned because he believed Buchanan had criticized his schools (and him personally). *See supra* 4. He was the source of the allegation that Dr. Buchanan had used the word "pussy," yet he never thought it was used as a sexual term. *See supra* 4-5. LSU administrators simply assumed this to be the case, and even presented Cancienne's complaint to the Board as if it were, yet no one from LSU had ever pursued the matter with Cancienne to learn what his complaint was about. *See id.* & 11-2. The District Court found Alexander's recommendation to the Board to be "objectively reasonable," but the President had not read the PS-104 hearing transcript, did not know what definition of sexual harassment the committee used, and even as of his deposition erroneously believed the Cancienne complaint was about sex-related language. *See supra* 11.

Appellees' actions in terminating Dr. Buchanan were neither "reasonable" nor "objective." They consciously ignored First Amendment considerations and based their sexual harassment "finding" against Dr. Buchanan on a handful of stray statements amid a collected volume of speech that even Appellees could not identify as "harassment." There was nothing to indicate that anyone, at any stage of the process, determined (or even asked) whether these few statements were severe, pervasive, and objectively offensive, as constitutional authority requires. No reasonable administrator would have participated in such a process. *See, e.g.*, *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 224 (5th Cir. 1999) (denying

qualified immunity and finding defendants were "not insulated from their unconstitutional conduct merely because a balancing test is involved"); *Grady v. El Paso Cmty. Coll.*, 979 F.2d 1111, 1113-14 (5th Cir. 1992) (qualified immunity denied in Section 1983 claim that "[a] state educational institution may not refuse to rehire a non-tenure teacher due to his exercise of protected First Amendment freedoms").

### B.    Professor Buchanan's Claims Are Not Time Barred

The District Court erred in holding that Dr. Buchanan's claims against Andrew, Reinoso, and Monaco are time-barred on the assumption those Appellees did not engage in any wrongful acts within one year of her suffering injury. ROA.1316-1317.  The court reached the wrong conclusion because it treated this as a case of First Amendment retaliation, which it is not.  As a consequence, the court begins with the mistaken premise that this is "a clear attempt to apply the continuing violation theory to [Dr. Buchanan's] First Amendment retaliation claim." ROA.1317.  It is difficult to identify the source of this confusion, since the Complaint did not allege retaliation and Dr. Buchanan did not rely on case law relating to First Amendment retaliation.

As this Court has explained, First Amendment retaliation claims depend on, among other things, a showing of improper motive to censor speech and a causal link between that motive and the constitutional injury.  *See*, *e.g.*, *Culbertson v.*

*Lykos*, 790 F.3d 608, 617 (5th Cir. 2015); *Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 599, 601 (5th Cir. 2001).   Cases involving the enforcement of an unconstitutional policy, on the other hand, do not require any showing of motive, improper or otherwise.  *Reed*, 135 S. Ct. at 2228 (no showing of animus is required to invalidate acts enforcing an unconstitutional policy); *Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 592 (1983) ("Illicit legislative intent is not the *sine qua non* of a violation of the First Amendment."); *Tam*, 137 S. Ct. at 1767 (same).  With respect to causality, it is necessary to show only that the unconstitutional policy was enforced—unlike a retaliation case, where a governing body may act for valid reasons unrelated to the improper retaliation.  *Beattie*, 254 F.3d at 603-04.

Cases on which the District Court relied underscore the difference in how the law regarding retaliation applies, as distinct from cases arising from unconstitutional policies and their application.  It quoted *Van Heerdan v. Board of Supervisors of LSU*, 2011 WL 5008410 (M.D. La. Oct. 20, 2011), for example, which states that because "instances of retaliation for exercising First Amendment rights are almost always actionable, they almost always constitute discrete acts which do not admit of aggregation for purposes of pressing a continuing violation argument."  ROA.1315-1316 (quoting *Van Heerdan*, 2011 WL 5008410, at *8).  This case, by contrast, is not about discrete retaliatory acts, but instead alleges the

Appellees all participated in a single course of conduct to enforce an unconstitutional policy.

As the District Court itself put it, the Appellees reported their findings "up the administrative chain," leading to Alexander's recommendation to the Board and Dr. Buchanan's dismissal. ROA.1336. These were not distinct "adverse employment actions," as the court mischaracterized the issue. ROA.1319. Rather, Dr. Buchanan's suit claims only one injury: termination. Because Dr. Buchanan did not suffer injury until she was fired on June 19, 2015, her claims against all of the Appellees were timely filed, and the District Court's conclusion is clearly erroneous.[25]

## C.     Appellees' Liability Is Not Discharged By the Board's Vote

The District Court's conclusion that certain Appellees are not liable because they were not "final decisionmakers" suffers from the same fundamental flaw. It is based entirely on cases involving First Amendment retaliation rather than joint action to enforce an unconstitutional policy. ROA.1317-1323. However, as

---

[25] As elsewhere, the District Court ignored the record, and its own ruling, to find the statute of limitations barred Buchanan's claims against Monaco and Andrew. ROA.1316-1317. If claims against Alexander are timely because he overrode the faculty committee and recommended that the Board terminate Buchanan, ROA.1308-1309, Monaco's presentation of that recommendation to the Board, ROA.1311-1312, ROA.448, makes the claims against him timely as well. The record is also clear that Andrew continued to agitate for Buchanan's dismissal after the faculty committee recommendation, and these actions, too, fell within the statute of limitations. *See supra* 11.

explained above, the issue of an independent intervening cause for a termination in the retaliation context does not apply where a final decisionmaker simply implements unconstitutional policy recommendations of its subordinates. Even in the retaliation context, independent liability attaches where the Board adopts and ratifies improper motivations. *See*, *e.g.*, *Beattie*, 254 F.3d at 603 (liability exists if "allegedly improper motives can be imputed to the board"); *Culbertson*, 790 F.3d at 625-26 (state officials who sought dismissal of a school employee in retaliation for her political speech "could be liable" individually "if their retaliation … led to her termination"); *Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 758 (5th Cir. 1986) (requiring only that plaintiff show "an affirmative causal link" between a principal's recommendation to reassign an athletic director and the school district decision to do so), *aff'd in part, remanded in part*, 491 U.S. 701 (1989). Applying this logic, the District Court even considered Appellees Alexander and Andrew to have "caused" Dr. Buchanan's termination because of their recommendations. ROA.1321-1322.

In this case, it is unnecessary to establish a causal link to an improper motive where the very purpose of the Board's vote was to act on Appellees' unconstitutional recommendation. The record is undisputed that the Board exercised no independent judgment regarding the basis for dismissing Buchanan, and acted based solely on Appellees' selected evidence and recommendations to

terminate Appellant on the grounds that her speech violated LSU's sexual harassment policies.  *See supra* 12.   Dr. Buchanan amply demonstrated that Appellees' "effected the termination" handed down by the Board, which is "all that is necessary" to establish each Appellees' individual liability for violating her First Amendment rights.  *Powers v. Northside Indep. Sch. Dist.*, 143 F. Supp. 3d 545, 550 (W.D. Tex. 2015).   The District Court's contrary conclusion is clearly erroneous and must be reversed.

## CONCLUSION

As this Court has long recognized, "[a]s a general rule a court should use Rule 56 summary judgment most sparingly in a First Amendment case such as this involving delicate constitutional rights, complex fact situations, disputed testimony, and questionable credibilities," because district courts "must not allow Rule 56 and the interests of judicial economy to become a rubber stamp obscuring rights indelibly printed in the constitution."  *Porter v. Califano*, 592 F.2d 770, 778 (5th Cir. 1979).   In this case, the District Court ignored record evidence and misconstrued the law, and, as a consequence, reached the wrong outcome.  The decision should be reversed.

RESPECTFULLY SUBMITTED this 27th day of April, 2018.


By_____s/ Robert Corn-Revere_____
    Robert Corn-Revere
    Ronald G. London
    Lisa B. Zycherman
    DAVIS WRIGHT TREMAINE LLP
    1919 Pennsylvania Ave., N.W. - Suite 800
    Washington, DC  20006
    (202) 973-4200

    *Counsel for Plaintiff-Appellant*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on April 27, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.



s/ Robert Corn-Revere
Robert Corn-Revere

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,956 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


                    s/ Robert Corn-Revere
                    Robert Corn-Revere