No. 18-30148

# United States Court of Appeals for the Fifth Circuit

TERESA BUCHANAN,

*Plaintiff-Appellant,*

– v. –

F. KING ALEXANDER; DAMON ANDREW; A. G. MONACO; GASTON REINOSO,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA, BATON ROUGE
NO. 3:16-CV-41
THE HONORABLE SHELLY DECKERT DICK

## BRIEF OF AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT

*Counsel of Record:*
Nicholas J. Enoch
Lubin & Enoch, P.C.
State Bar No. 24042618
nich@lubinandenoch.com
221 N. Kansas Street, Suite 700
El Paso, TX 79901
(915) 585-8008

*Counsel for Amicus Curiae:*
Risa L. Lieberwitz
General Counsel
American Association of
University Professors
Professor of Labor and
Employment Law
School of Industrial and
Labor Relations
Cornell University
361 Ives Hall
Ithaca, NY 14853
(607) 255-3289

*Counsel for Amicus Curiae:*
Aaron M. Nisenson
Senior Counsel
Nancy A. Long
Associate Counsel
American Association of
University Professors
1133 19th Street N.W., Suite 200
Washington, D.C. 20036
(202) 737-5900
legal.dept@aaup.org

# CERTIFICATE OF INTERESTED PERSONS

Case No. 18-30148

*Teresa Buchanan v. F. King Alexander; Damon Andrew; A.G. Monaco; Gaston Reinoso*

The undersigned counsel of record certifies that, in addition to the persons and entities identified in the parties' Certificate, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 of the Rules of this Court have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

*Amicus Curiae:*

1. The American Association of University Professors has no parent corporation, and no publicly held company has any ownership interest therein.

Counsel for *Amicus Curiae:*

1. Nicholas J. Enoch
   Lubin & Enoch, P.C.
   221 N. Kansas Street, Suite 700
   El Paso, TX 79901
   (915) 585-8008

2. Risa L. Lieberwitz
   General Counsel
   American Association of University Professors
   Professor of Labor and Employment Law
   School of Industrial and Labor Relations
   Cornell University
   361 Ives Hall
   Ithaca, NY 14853
   (607) 255-3289

3. Aaron M. Nisenson
   Senior Counsel
   Nancy A. Long
   Associate Counsel
   American Association of University Professors
   1133 19th Street, N.W., Suite 200
   Washington, D.C. 20036

Dated: May 15, 2018                    /s/  Nicholas J. Enoch, Esq.
                                       Nicholas J. Enoch, Esq.

ii

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF AUTHORITIES .................................................................... iv

STATEMENT OF AUTHORITY TO FILE ............................................................1

STATEMENT OF INTEREST....................................................................1

SUMMARY OF ARGUMENT ..................................................................2

ARGUMENT ................................................................................4

I.    LSU's Hostile Environment Policies Are Facially Unconstitutional under the
      First Amendment ...............................................................................4

      A. Overbroad and Vague Sexual Harassment Policies in Public Universities
         Violate First Amendment Rights of Free Speech and Academic Freedom 4

      B. Public University Hostile Environment Policies Must Be Narrowly
         Tailored to Avoid Overbroad and Vague Prohibitions That Infringe on
         First Amendment Rights to Free Speech and Academic Freedom ...........12

      C. LSU's Policies Are Vague, Overbroad and Facially Unconstitutional.....14

II.   LSU Unconstitutionally Applied Its Overbroad and Vague Hostile
      Environment Policies to Professor Buchanan by Infringing on Her Academic
      Freedom to Choose Her Teaching Methods..................................................20

III.  Conclusion ....................................................................................27

CERTIFICATE OF SERVICE ...............................................................28

CERTIFICATE OF COMPLIANCE UNDER RULES 29(a) and 32(a) ...............29

# TABLE OF AUTHORITIES

Page

**Cases**

*Adams v. Trustees of Univ. of N.C.-Wilmington*,
 640 F.3d 550 (4th Cir. 2011) ..........................................................................25

*Baggett v. Bullitt*,
 377 U.S. 360 (1964)........................................................................................10

*Bd. of Regents v. Roth*,
 408 U.S. 564 (1972)..........................................................................................2

*Broadrick v. Oklahoma*,
 413 U.S. 601 (1973)..........................................................................................9

*Buchanan v. Alexander*,
 2018 U.S. Dist. LEXIS 4479 (M.D. La. 2018).................................. 15, 25, 26

*Bullfrog Films Inc. v. Wick*,
 847 F.2d 502 (9th Cir. 1988) ..........................................................................10

*Cohen v. San Bernardino Valley Coll.*,
 92 F.3d 968 (9th Cir. 1996) ................................................................. 9, 23, 24

*Connick v. Myers,*
 461 U.S. 138 (1983)........................................................................................26

*DeAngelis v. El Paso Mun. Police Officers Ass'n*,
 51 F.3d 591 (5th Cir. 1995) ............................................................................13

*DeJohn v. Temple Univ.*,
 537 F.3d 301 (3d Cir. 2008) .................................................... 9, 13, 15, 17, 19

*Demers v. Austin*,
 746 F.3d 402 (9th Cir. 2014) .....................................................................2, 25

*Dow Chemical Co. v. Allen*,
 672 F.2d 1262 (7th Cir. 1982) ..........................................................................5

# TABLE OF AUTHORITIES (Continued)

Page

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)........................................................................................25

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)..........................................................................................9

*Grutter v. Bollinger*,
    539 U.S. 306 (2003)......................................................................................2, 5

*Healy v. James*,
    408 U.S. 169 (1972)..........................................................................................5

*Hillis v. Stephen F. Austin State University,*
    665 F. 2d 547 (5th Cir. 1982) ........................................................................26

*Keyishian v. Bd. of Regents*,
    385 U.S. 589 (1967)............................................... 2, 3, 5, 8, 9, 10, 13, 16, 26

*Papish v. Board of Curators*,
    410 U.S. 667 (1973)..........................................................................................8

*Pickering v. Board of Ed.*,
    391 U.S. 563 (1968)........................................................................................26

*Regents of Univ. of Michigan v. Ewing*,
    474 U.S. 214 (1985)..........................................................................................2

*Rust v. Sullivan*,
    500 U.S. 173 (1991)..........................................................................................5

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001) ....................................................... 12, 14, 17, 19

*Silva v. Univ. of N.H.*,
    888 F. Supp. 293 (D.N.H. 1994*)* ..................................................................18

## TABLE OF AUTHORITIES (Continued)

**Page**

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957).................................................................................. 3, 6, 8

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.*,
307 F.3d 243 (3d Cir. 2002) ...........................................................................17

*Terminiello v. Chicago*,
337 U.S. 1 (1949)..............................................................................................8

*Tilton v. Richardson*,
403 U.S. 672 (1971)..........................................................................................2

*Univ. of Tex. Southwestern Med. Ctr. v. Nassar*,
570 U.S. 338 (2013)..........................................................................................2

## Statutes

Title IX, 20 U.S.C. § 1681(a)....................................................................... 10, 12, 18

Title VII, 42 U.S.C. § 2000d....................................................................... 12, 13, 18

## Other Authorities

*AAUP, 1915 Declaration of Principles on Academic Freedom and Academic
Tenure*, AAUP POLICY DOCUMENTS AND REPORTS (11th ed. 2015)...............6

AAUP, 1940 *Statement of Principles on Academic Freedom and Tenure,* AAUP
POLICY DOCUMENTS AND REPORTS (11th ed. 2015) ........................................6

AAUP, *Academic Freedom and Tenure: Louisiana State University, Baton Rouge,
A Supplementary Report on a Censured Administration* (Sept. 2015) .........22

AAUP, *Freedom in the Classroom*, AAUP POLICY DOCUMENTS AND REPORTS (11th
ed. 2015) ................................................................................................ 23, 24

**TABLE OF AUTHORITIES (Continued)**

Page

AAUP, *The History, Uses and Abuses of Title IX, Academe: Bulletin of the American Association of University Professors* (Jul.-Aug. 2016) ............4, 18

Jeannie Suk, "The Trouble with Teaching Rape Law," *New Yorker*, December 15, 2014 ...............................................................................................................18

LSU Policy PS-73 ................................................................................. 14, 16, 19, 22

LSU Policy PS-95 ........................................................................... 14, 16, 17, 19, 22

US Department of Education Office for Civil Rights, "First Amendment: Dear Colleague" (Jul. 28, 2003)..............................................................................11

US Department of Education Office for Civil Rights, *Revised Sexual Harassment Guidance:Harassment of Students by School Employees, Other Students, or Third Parties* (Washington, DC: 2001).................................................. 10, 11

## STATEMENT OF AUTHORITY TO FILE

All parties have consented to filing of this brief, as required by Federal Rules of Appellate Procedure 29(a)(2) and 29(a)(4)(D). In accordance with Rule 29(a)(4)(E), *Amicus* avers that: (i) no party's counsel authored this brief in whole or in part; (ii) no party or party's counsel contributed money intended to fund preparation or submission of the brief; and (iii) no person—other than the *amici curiae*, their members, or their counsel—contributed money intended to fund preparation or submission of the brief; and (iv) AAUP Foundation, a related 501 (c)(3) entity of the *Amicus,* provided support to Appellant through its Academic Freedom Fund for temporary financial assistance in the amount of $1,000.00 following her dismissal from Louisiana State University.

## STATEMENT OF INTEREST

The American Association of University Professors ("AAUP"), founded in 1915, is a non-profit organization of over 40,000 faculty, librarians, graduate students, and academic professionals, a significant number of whom are public sector employees. The mission of the AAUP is to advance academic freedom and shared governance; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, post-doctoral fellows, and all those engaged in

teaching and research in higher education; to help the higher education community organize to make our goals a reality; and to ensure higher education's contribution to the common good. The AAUP's policies have been recognized by the Supreme Court and are widely respected and followed in American colleges and universities. *See*, *e.g*., *Bd. of Regents v. Roth*, 408 U.S. 564, 579 n. 17 (1972); *Tilton v. Richardson*, 403 U.S. 672, 681-82 (1971). In cases that implicate AAUP policies, or otherwise raise legal issues important to higher education or faculty members, the AAUP frequently submits *amicus* briefs in the Supreme Court and the federal circuits. *See, e.g., Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, (2013); *Grutter v. Bollinger*, 539 U.S. 306 (2003); *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214 (1985); *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967); and *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014). Therefore AAUP stands uniquely situated to provide clarification to this Court regarding Appellant's discharge from Louisiana State University in light of AAUP standards and policy documents.

## SUMMARY OF ARGUMENT

Academic freedom in teaching is central to the public mission of the university and is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Board*

2

*of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). "[T]eachers must always remain free to inquire, to study and to evaluate, to gain new maturity and understand; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

"Because *First Amendment* freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button,* 371 U.S. 433 (1963). When addressing areas that impact academic freedom "precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *Keyishian*, 385 U.S. at 604. This constitutional axiom applies to public university codes and policies that restrict speech, including sexual harassment policies. Amicus AAUP has long emphasized that there is no necessary contradiction between a university's obligation to address problems of sexual harassment effectively and its duty to protect academic freedom. To achieve these dual goals, hostile environment policies, particularly those focused on speech alone, must be narrowly drawn and sufficiently precise to ensure that their provisions do not infringe on First Amendment rights of free speech and academic freedom.

The District Court erred in finding LSU's hostile environment policies to be constitutional on their face and as applied. LSU's hostile environment policies did not include the objective element of proving "severe or pervasive" sexual conduct,

3

which would provide a minimum constitutional safeguard against overbroad or

vague governmental restrictions of speech. LSU's policies, as written, will have a

chilling effect on faculty and students, who will be discouraged from exercising

their First Amendment rights to free speech and academic freedom. Further, LSU

applied its hostile environment policies to Professor Buchanan in violation of her

First Amendment rights to free speech and academic freedom to choose her

teaching methods.

## ARGUMENT

**I.     LSU's Hostile Environment Policies Are Facially Unconstitutional under the First Amendment**

### A. Overbroad and Vague Sexual Harassment Policies in Public Universities Violate First Amendment Rights of Free Speech and Academic Freedom

Amicus AAUP is deeply concerned with both the protection of academic

freedom and the elimination of sexual harassment in academia.  Amicus AAUP has

long emphasized that there is no necessary contradiction between a college or

university's obligation to address problems of sexual harassment effectively and its

duty to protect academic freedom.[1] To achieve these dual goals, universities must

adopt and implement policies that strike a careful balance between the university's

---

[1] *See*, AAUP, *The History, Uses and Abuses of Title IX, Academe: Bulletin of the American Association of University Professors* 69 (Jul.-Aug. 2016).

interest in prohibiting hostile environment sexual harassment and the university's interest in protecting faculty academic freedom in their teaching, research, and other forms of speech. In public universities, hostile environment policies must be narrowly drawn and sufficiently precise to ensure that their provisions do not infringe on free speech and academic freedom under the First and Fourteenth Amendments to the US Constitution.

The Supreme Court has consistently recognized academic freedom as "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603. The Court has "long recognized that . . . universities occupy a special niche in our constitutional tradition," *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003), and that as "a traditional sphere of free expression," universities play a role "fundamental to the functioning of our society." *Rust v. Sullivan*, 500 U.S. 173, 200 (1991). "[T]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy v. James*, 408 U.S. 169, 180 (1972). The First Amendment right of academic freedom consists of "the right of the individual faculty member to teach . . . without interference from . . . the university administration, or his fellow faculty members." *Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1275 (7th Cir. 1982), quoting, T. Emerson, The System of Freedom of Expression 594 (1970).

5

As the AAUP declared in its founding 1915 Declaration of Principles on Academic Freedom and Academic Tenure, universities "promote inquiry and advance the sum of human knowledge," serving as "intellectual experiment station[s], where new ideas may germinate and where their fruit . . . may be allowed to ripen until finally, perchance, it may become a part of the accepted intellectual food of the nation or the world." *1915 Declaration of Principles on Academic Freedom and Academic Tenure*, AAUP POLICY DOCUMENTS AND REPORTS 7, 9 (11th ed. 2015). Academic freedom in teaching is central to this public mission of the university. The 1915 Declaration states, "It is scarcely open to question that freedom of utterance is as important to the teacher as it is to the [researcher]. *Id.* at 7. AAUP's 1940 *Statement of Principles on Academic Freedom and Tenure* states, "Academic freedom in its teaching aspect is fundamental for the protection of the rights of the teacher in teaching and of the student to freedom in learning." AAUP POLICY DOCUMENTS AND REPORTS 14 (11th ed. 2015). To ensure that universities fulfill their important functions, "teachers must always remain free to inquire, to study and to evaluate, to gain new maturity and understand; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). The ability of university professors to voice their academic views without fear of retaliation is essential.

6

The use of provocative ideas and language to engage students, and to enliven the learning process, is well within the scope of academic freedom protected by the First Amendment.  Many things a professor says to his or her students may "offend" or even "intimidate" some among them.  If every such statement could lead to formal sanctions, and possibly even loss of employment, the pursuit of knowledge and the testing of ideas in the college classroom would be profoundly chilled.  Thus the precedent created by the District Court judgment is deeply disturbing, not only for teachers at all levels, but quite as much for students, parents and all citizens who depend upon robust and vigorous discussion of controversial issues in the classroom. We note here with alarm the grave risk to free speech on the college campus of basing adverse judgments about constitutional rights on an occasionally "abrasive" teaching style, or on methods of pedagogy that may appeal more to some students than to others.  If the First Amendment protects only "non-abrasive" teaching, or only those approaches to instruction so bland and uniform that all students find them equally acceptable, then the condition of academic freedom, and of teaching and learning at our colleges and universities, is in grave peril.

Indeed, the Supreme Court emphasized decades ago the importance of protecting provocative speech when it held:

7

> [A] function of free speech. . . is to invite dispute.  It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging.

*Terminiello v. Chicago*, 337 U.S. 1, 4 (1949).  The value of provocative speech in the college classroom is readily apparent.  A central mission of education is to open the eyes of students to ideas and views and values that may be new, even unsettling, to them.  "[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Board of Curators*, 410 U.S. 667, 670 (1973).

Because controversial speech is often at the core of the university's educational mission, proscriptions on speech can be particularly problematic and are frequently challenged as vague and overbroad. The Supreme Court addressed the interplay between academic freedom and constitutional challenges based on vagueness and overbreadth in *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967). In that case, faculty members at the State University of New York challenged as vague and overbroad New York statutes that, *inter alia,* required removal for "treasonable or seditious" utterances or acts.  After reiterating *Sweezy*'s defense of academic freedom the *Keyishian* Court explained:

> We emphasize once again that "[p]recision of regulation must be the touchstone in an area so closely touching our most precious

8

> freedoms," "[f]or standards of permissible statutory vagueness are strict in the area of free expression . . . Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."

*Id*. at 603-604 (citations omitted).

Overbroad or vague restrictions of speech in the university infringe academic freedom by creating a chilling effect on faculty willingness to experiment and take risks in their teaching and research. The US Supreme Court expressly recognize[d] that overbreadth review is a necessary means of preventing a chilling effect on protected expression. *Broadrick v. Oklahoma*, 413 U.S. 601 (1973). "This laudable goal is no less implicated on public university campuses throughout this country, where free speech is of critical importance because it is the lifeblood of academic freedom." *DeJohn v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008).

Vague regulations of speech violate the First Amendment because they do "not provid[e] fair warning . . . impermissibly delegate basic policy matters . . . for resolution on an ad hoc and subjective basis . . . [and] discourage[] the exercise of *first amendment* freedoms." *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 972 (9th Cir. 1996), citing, *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972). "'Where the guarantees of the *First Amendment* are at stake the [Supreme] Court applies its vagueness analysis strictly.'" *Cohen*, 92 F.3d at 972, quoting,

*Bullfrog Films Inc. v. Wick*, 847 F.2d 502, 512 (9th Cir. 1988).  Academic freedom

can be inhibited not only by broad proscriptions, but also by overly complex ones.

> The very intricacy of the plan and the uncertainty as to the scope of its
> proscriptions make it a highly efficient *in terrorem* mechanism. It
> would be a bold teacher who would not stay as far as possible from
> utterances or acts which might jeopardize his living by enmeshing him
> in this intricate machinery. The uncertainty as to the utterances and
> acts proscribed increases that caution in "those who believe the
> written law means what it says." *Baggett v. Bullitt*, *supra*, at 377 U.S.
> 374.  The result must be to stifle "that free play of the spirit which all
> teachers ought especially to cultivate and practice . . . "

*Keyishian*, 385 U.S. at 601.

Similarly, the *Keyishian* Court commented upon the impact of the sanction

of termination for statements made by the faculty members. "When one must guess

what conduct or utterance may lose him his position, one necessarily will 'steer far

wider of the unlawful zone . . . ' For '[t]he threat of sanctions may deter . . . almost

as potently as the actual application of sanctions.'" *Id*. at 604 (citations omitted).

Moreover, even the US Department of Education's Office for Civil Rights

(OCR) requires that educational institutions' sexual harassment policies under Title

IX, 20 U.S.C. § 1681(a), meet First Amendment standards protecting free speech

and academic freedom. The OCR's 2001 *Revised Sexual Harassment Guidance*

states:

10

> Title IX is intended to protect students from sex discrimination, not to regulate the content of speech. OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a sexually hostile environment under Title IX. In order to establish a violation of Title IX, the harassment must be sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program.

> Moreover, in regulating the conduct of its students and its faculty to prevent or redress discrimination prohibited by Title IX (*e.g.*, in responding to harassment that is sufficiently serious as to create a hostile environment), a school must formulate, interpret, and apply its rules so as to protect academic freedom and free speech rights.[2]

So strong is the importance of protecting freedom of speech and academic freedom that the OCR applies constitutional standards to private educational institutions, stating that "all actions taken by OCR must comport with First Amendment principles, even in cases involving private schools that are not directly subject to the First Amendment."[3]

Sexual harassment constitutes unacceptable behavior on the part of any responsible person, most especially on the part of a faculty member.  Harassing conduct such as physical assaults, unwelcome touching or offers to exchange benefits for sexual favors must be roundly prohibited.  However, when sexual

---

[2] US Department of Education Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Washington, DC: 2001).

[3] *Id. See also*, US Department of Education Office for Civil Rights, "First Amendment: Dear Colleague" (Jul. 28, 2003). http://www2.ed.gov/about/offices/list/ocr/firstamend.html

harassment policies prohibit both conduct and speech, universities must be sensitive to the need to avoid the risk of reaching protected expression. Hostile environment policies must be narrowly drawn and sufficiently precise to ensure that their provisions do not infringe on free speech and academic freedom.

### B. Public University Hostile Environment Policies Must Be Narrowly Tailored to Avoid Overbroad and Vague Prohibitions That Infringe on First Amendment Rights to Free Speech and Academic Freedom

Public universities have a compelling interest in preventing and remedying sexual harassment, including conduct and speech that create a hostile environment on the basis of sex. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209 (3d Cir. 2001). However, "[t]here is no categorical 'harassment exception' to the *First Amendment's* free speech clause." *Id.* at 204. To avoid First Amendment problems, sexual harassment policies must fulfill the state's compelling interest through narrowly tailored provisions that prohibit only unprotected speech.

Crafting narrowly tailored policies is especially important in the university setting, given the central importance of academic freedom to the public mission of the university. Judicial interpretations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Title IX of the Education Amendments of 1972 have defined hostile environment sexual harassment as including the objective element of "severe or pervasive" conduct. Courts have used these same elements to assess

whether university hostile environment harassment policies are sufficiently narrowly tailored to meet First Amendment standards. As the Third Circuit held in finding Temple University's overbroad harassment policy facially unconstitutional under the First Amendment, "Absent any requirement akin to a showing of severity or pervasiveness—that is, a requirement that the conduct objectively and subjectively creates a hostile environment or substantially interferes with an individual's work—the policy provides no shelter for core protected speech." *DeJohn,* 537 F.3d at 317-18. *cf. Keyishian* 305 U.S. at 604 (finding as a violation of academic freedom based on vagueness "[t]he regulatory maze created by New York [that was] wholly lacking in 'terms susceptible of objective measurement.'")

The objective element of "severe or pervasive" sexual conduct is essential to crafting and enforcing employment policies that distinguish unprotected harassing speech from constitutionally protected speech under the First Amendment. As this Court has observed, "Where pure expression is involved, Title VII steers into the territory of the *First Amendment*. It is no use to deny or minimize this problem because, when Title VII is applied to sexual harassment claims founded solely on verbal insults, pictorial or literary matter, the statute imposes content-based, viewpoint-discriminatory restrictions on speech." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596-97 (5th Cir. 1995). Relying on *DeAngelis*, the Third Circuit noted that "[t]his sort of content- or viewpoint-based restriction is

13

ordinarily subject to the most exacting *First Amendment* scrutiny." *Saxe,* 240 F.3d at 207. As in LSU's policies, the policy in *Saxe* prohibited conduct or speech of a sexual nature that "has the purpose or effect of substantially interfering with a student's educational performance or creating an intimidating, hostile or offensive educational environment." *Id.* at 202. The Third Circuit, in an opinion by then-Circuit Judge Alito, joined by Fifth Circuit Judge Duhe (sitting by designation), held that the public school district's hostile environment harassment policy was unconstitutionally overbroad:  "Because the Policy's 'hostile environment' prong does not, on its face, require any threshold showing of severity or pervasiveness, it could conceivably be applied to cover any speech about some enumerated personal characteristics the content of which offends someone." *Id.* at 217.

### C. LSU's Policies Are Vague, Overbroad and Facially Unconstitutional

LSU's hostile environment policies do not include the "severe or pervasive" standard. LSU Policy PS-73 prohibits unwelcome "speech and/or conduct of a sexually discriminatory nature…which would be so offensive to a reasonable person as to create an abusive working or learning environment and/or impair his/her performance on the job or in the classroom." LSU Policy PS-95 defines hostile environment as unwelcome speech or conduct of a sexual nature that "has the purpose or effect of unreasonably interfering with an individual's academic,

work, team or organization performance or creating an intimidating, hostile or offensive working environment."

The District Court erred in holding that the LSU's policies are facially valid. The District Court acknowledged that the objective element is essential to crafting a constitutionally valid hostile environment policy. *Buchanan v. Alexander,* 2018 U.S. Dist. LEXIS 4479, 75-76 (M.D. La. 2018). The court also considered relevant precedents from other Circuits striking down as facially unconstitutional university policies that lacked the objective requirement that conduct or speech of a sexual nature must be sufficiently severe or pervasive to create a hostile environment. The District Court described *DeJohn* as being "the strongest case in [Professor Buchanan's] favor," *Id*. at 72-73, and acknowledged that the LSU's policies are similar to those found unconstitutional in *DeJohn*. *Id.* at 75. Further, the court found that "*Saxe* is applicable to the issue herein . . . to the extent that it holds that a 'severe or pervasive' requirement should be in a policy." *Id*. at 71. Yet, the District Court held that LSU's policies were constitutionally valid, despite the absence from the LSU policies of the objective element that sexual conduct or speech was "severe or pervasive."

The District Court's reasoning in support of its holding reveals its failure to appreciate the depth of the harm to free speech and academic freedom resulting from overbroad and vague restrictions of speech in universities. The District Court

15

reads into LSU's policies limiting language that is absent from the policy and cannot reasonably be inferred. The District Court finds that "[t]he phrase 'so offensive to a reasonable person' [in LSU Policy PS-73] constitutes a requirement that the conduct be objectively severe, and the definitions and examples set forth in the policy emphasize that the offending conduct must be severe and pervasive as expressed by the words 'unwelcome,' 'persistent, 'unwanted,' 'deliberate,' 'repeated,' 'intimidating,' and 'demeaning.'" *Id*. at 85. This over-reading of the LSU policies is implausible. A faculty member or student reading the LSU policies would have no idea that a hostile environment exists only when conduct of a sexual nature is so severe or pervasive as to limit a student's ability to participate in or benefit from the education program or create an abusive educational or working environment. *cf. Keyishian, supra* ("The very intricacy of the plan and the uncertainty as to the scope of its proscriptions make it a highly efficient *in terrorem* mechanism.")

The District Court's holding simply leaves in place the overbroad and vague prohibitions in LSU Policy PS-73 and Policy PS-95. Further, the examples given along with LSU Policies PS-73 and PS-95 do not establish an objective "severe or pervasive" standard. Rather, they provide a list without an organizing principle or defining standard. The Third Circuit recognized that while it must "determine whether [a university policy] is susceptible to a reasonable limiting construction,"

16

*Saxe*, 240 F.3d at 215, a court "will not rewrite a . . . law to conform it to constitutional requirements." *DeJohn*, 537 F.3d at 315, quoting, *Sypniewski v. Warren Hills Reg'l Bd. of Educ.,* and 307 F.3d 243, 258-59 (3d Cir. 2002). As the Third Circuit held in *DeJohn*, without the limiting effect of a "severe or pervasive" requirement, the policy's use of the term "reasonable" did not save the university's policy from unconstitutionality. "[U]nless harassment is qualified with a standard akin to a severe or pervasive requirement, a harassment policy may suppress core protected speech." 537 F.3d at 320. Further, in *DeJohn*, the public university policy's use of the terms "hostile," "offensive", and "gender-motivated" was "on its face, sufficiently broad and subjective that they 'could conceivably be applied to cover any speech' of a 'gender-motivated' nature 'the content of which offends someone.'" *Id*. at 317.

Such overbroad and vague policies are anathema to academic freedom in the university. Even worse, some of the examples provided in the LSU policies exacerbate the problem of overbreadth and vagueness in ways that infringe academic freedom. The examples in Policy PS-95 of hostile environment include "offensive language or display of sexually oriented materials." Academic freedom in teaching, however, protects language and materials that students may find offensive, particularly in courses dealing with subjects of sex and sexuality. University policies that prohibit "offensive" speech as sexual harassment threaten

the core of academic freedom to teach and research controversial issues that

students or university administrators may find offensive. *See*, *e.g*. *Silva v. Univ. of*

*N.H*., 888 F. Supp. 293, 330 (D.N.H. 1994*)* (university unconstitutionally

suspended a professor under the university's sexual harassment policy for drawing

an analogy during class between sex and writing, as his comments were part of his

academic freedom to teach about writing).

As a result of the chilling effect created by overbroad or vague hostile

environment policies, the teaching and study of sex and sexuality have become

increasingly vulnerable, leading to self-censorship by faculty members. Some

faculty members have chosen to omit from their courses units on rape and sexual-

assault law out of fear that students may claim that the content is too emotionally

distressing. Harvard Law School professor Jeannie Suk notes that, ironically, after

long feminist campaigns to include rape law in the law school curriculum, the topic

has once again become difficult to teach. Students may find offensive discussions

of consent in a sexual encounter or of social inequalities (tied to class, race, or

sexual preferences) that might bias the assessment of an incident.[4] Under LSU's

overbroad and vague policies PS-73 and PS 95, some students might allege that

---

[4] Jeannie Suk, "The Trouble with Teaching Rape Law," *New Yorker*, December 15, 2014,
http://www.newyorker.com/news/news-desk/trouble-teaching-rape-law. *See also*, AAUP, *The
History, Uses and Abuses of Title IX*, at 82 (describing objections raised by the University of
Colorado at Boulder administration to Professor Patti Adler's long-time teaching of a course on
"Deviance in US Society.")

such debates about the law and sexual violence create a hostile environment. In a
letter to the OCR in August 2011, the AAUP warned of this danger, emphasizing
that "[a]ny training for faculty, staff, and students [about how to identify and report
sexual harassment] should explain the differences between educational content,
harassment, and 'hostile environments,' and a faculty member's professional
judgment must be protected. Women's studies and gender studies programs have
long worked to improve campus culture by teaching about issues of systemic
gender inequity, sex, and sexuality. [The OCR] should encourage discussion of
topics like sexual harassment both in and outside of the curriculum, but
acknowledge that what might be offensive or uncomfortable to some students may
also be necessary for their education." AAUP, *The History, Uses and Abuses of
Title IX*, *supra,* at 92.

This Court has applied the "severe and pervasive" standard in hostile
environment cases under Title VII and Title IX. We urge this Court to consider the
"severe and pervasive" standard as one element to assess First Amendment facial
validity of public university hostile environment policies, similar to the approach
used by the Third Circuit in *Saxe* and *DeJohn*. Applying this assessment to LSU's
hostile environment policies demonstrates that they are overbroad and vague on
their face. LSU's policies will have a chilling effect on faculty and students, who

19

will be discouraged from exercising their First Amendment rights to free speech and academic freedom.

## II.   LSU Unconstitutionally Applied Its Overbroad and Vague Hostile Environment Policies to Professor Buchanan by Infringing on Her Academic Freedom to Choose Her Teaching Methods

LSU's hostile environment policies were unconstitutional as applied to Professor Buchanan in violation of her First Amendment rights to free speech and academic freedom. LSU discharged Professor Buchanan based on her constitutionally protected speech that was part of her academic freedom to choose her teaching methods. Further, Professor Buchanan's speech simply did not constitute sexual harassment. The LSU administration may not have approved of Professor Buchanan's teaching style, but this should have been addressed within the normal context of discussions between deans and faculty members, not through a disciplinary procedure that violated her academic freedom.

In December 2013, Professor Buchanan experienced a stunning reversal of her status at LSU, when she went from being a successful tenured faculty member on the verge of promotion to full professor, to being charged by the administration with "unacceptable performance." This triggered an Office of Human Resources Management (OHRM) investigation that found her guilty of charges that she had created a hostile environment. Despite the subsequent Faculty Hearing

20

Committee's (FHC) unanimous conclusion that Professor Buchanan should not be dismissed, LSU President Alexander recommended her dismissal to the board of supervisors, which concurred in his recommendation. Faculty protests, including a Faculty Senate vote (39-5) to censure the administration, had no effect on the administration's actions. *Plaintiff's Motion for Summary Judgment*, at 12, Exhibit 59.

LSU's asserted basis for discharge, that Professor Buchanan engaged in sexual harassment, is implausible and unsubstantiated by either evidence or reason. The administration's allegations of sexual harassment are based only on Professor Buchanan's speech, consisting of the occasional use of profanity, poorly worded jokes, and sometimes sexually explicit jokes in her teaching. The administration's claim that this speech constituted a hostile environment demonstrates the harm to the First Amendment resulting from LSU's unconstitutional application of its hostile environment policies. Just as the existence of LSU's overbroad and vague policies will have a chilling effect on faculty exercise of academic freedom, so will the application of those policies to punish faculty for engaging in controversial teaching methods or other kinds of controversial speech. Without the limitations of an objective "severe or pervasive" standard, LSU's hostile environment policies were applied to Professor Buchanan under a broad and vague subjective standard of whether some students found her speech offensive. As Professor Buchanan

explained, her speech was part of her pedagogical method to prepare students for experiences they would encounter as future schoolteachers. Professor Buchanan's teaching style may be controversial, but it also fits easily within the scope of academic freedom and did not create a hostile environment.[5]

The FHC's report and recommendations show the mismatch between Professor Buchanan's speech and the allegations of sexual harassment. As the FHC reported, Professor Buchanan was forthright about her teaching methods, which had not been the subject of a disciplinary charge or other administrative action prior to this moment. That the FHC found that Professor Buchanan violated LSU PS-73 and LSU PS-95 is more likely attributable to the policies' overbroad and vague subjective standard than to any misconduct by Professor Buchanan. Indeed, the Chair of the FHC interpreted the LSU policies as providing for an "offensiveness" standard of hostile environment and stated that "sexual harassment is in the eye of the beholder." *Brief of Plaintiff-Appellant* at 10. Had LSU's PS-73 and PS-95 incorporated a narrowly tailored definition of hostile environment, including the objective requirement of "severe and pervasive" conduct, the FHC would likely have concluded that Professor Buchanan had not violated the policies.

---

[5] *See*, AAUP, *Academic Freedom and Tenure: Louisiana State University, Baton Rouge, A Supplementary Report on a Censured Administration* (Sept. 2015), at https://www.aaup.org/report/academic-freedom-and-tenure-louisiana-state-university-baton-rouge-supplementary-report

Further, the FHC unanimously concluded that there was no basis for dismissing Professor Buchanan. The FHC recommended that a written censure and some changes in pedagogical methods were appropriate measures, considering the nature and infrequency of Professor Buchanan's use of profanity or sexually explicit or poorly worded jokes. Moreover, the FHC's recommendations were based on LSU's failure to follow its own guidelines for working with faculty to address any concerns at an early stage through counseling or sexual harassment re-training. Thus, the FHC recognized that the administration could have and should have addressed any concerns outside the context of disciplinary charges. Yet, despite the FHC's 12-hour hearing, its report and recommendations, Professor Buchanan's excellent professional teaching and research record, and her long-time status as a tenured professor, LSU President Alexander recommended that LSU Board of Supervisors discharge her. This was an extreme and excessive action that violated the First Amendment through an "ad hoc" application of the "nebulous outer reaches" of LSU's overbroad and vague hostile environment policies. *See*, *Cohen*, 92 F.3d at 972.

The District Court erred in upholding LSU's disregard for Professor Buchanan's academic freedom to make pedagogical choices that may be controversial and even offensive to students, administrators, or trustees. The AAUP's *Freedom in the Classroom* report explains that "so long as an instructor's

allusions provoke genuine debate and learning that is germane to the subject matter of a course, they are protected by 'freedom in the classroom.'" *Freedom in the Classroom*, AAUP POLICY DOCUMENTS AND REPORTS 24 (11th ed. 2015). The report emphasizes that the definition of whether speech is germane is an expansive and deferential one: "How an instructor approaches the material in classroom exposition is, absent breach of professional ethics, a matter of personal style, influenced, as it must be, by the pedagogical goals and classroom dynamics of a particular course, as well as by the larger educational objective of instilling in students the capacity for critical and independent thought." *Id.* The court incorrectly dismissed Professor Buchanan's explanation of her pedagogical approach to teaching.

The court discussed, but did not apply, the principles in *Cohen v. San Bernardino Community College*, 92 F.3d 968, 972 (9th Cir. 1996), in which the Ninth Circuit held that the College violated the First Amendment by taking disciplinary action under a hostile environment policy that was vague and unconstitutionally applied to a tenured professor. In that case, the College had imposed discipline on Professor Cohen due to his pedagogical approach, consisting of "a confrontational teaching style designed to shock his students and make them think and write about controversial subjects." *Id.* at 972. Professor Cohen's teaching methods in a remedial English class included the use of "vulgarities and

24

profanity in the classroom" and class discussions of "controversial subjects such as obscenity, cannibalism, and consensual sex with children." *Id.* The Ninth Circuit held that "the [College's] Policy is simply too vague as applied to Cohen in this case. Cohen's speech did not fall within the core region of sexual harassment as defined by the Policy. Instead, officials of the College, on an entirely ad hoc basis, applied the Policy's nebulous outer reaches to punish teaching methods that [the professor] had used for many years." *Id.* While describing *Cohen* as "the most factually analogous" to the case at bar, 2018 U.S. Dist. LEXIS 4479 at 76, the District Court incorrectly concluded that Professor Buchanan had not adequately demonstrated an "arguable teaching motive" or even a tangential connection between her language and her area of teaching. *Id.* at 80.

In failing to recognize the academic freedom protection for Professor Buchanan's pedagogical approach, the District Court also erred in its application of the US Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), which held that public employees receive no First Amendment protection when they speak pursuant to their official duties. The District Court correctly interpreted *Garcetti* to find an academic freedom exception for "speech related to scholarship or teaching," *Id.* at 421, consistent with the Fourth and Ninth Circuit decisions on this issue. *Adams v. Trustees of Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011); *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014). The District Court further

recognized that the First Amendment protects academic freedom, including

"protect[ions] against infringements on a teacher's freedom concerning classroom

content and method." 2018 U.S. Dist. LEXIS 4479, at 39, quoting, *Hillis v.*

*Stephen F. Austin State University,* 665 F. 2d 547, 553 (5th Cir. 1982)*,* citing,

*Keyishian v. Board of Regents,* 385 U.S. at 603*.* However, the court erred in

finding that Professor Buchanan's speech is not protected by her academic freedom

to choose her teaching methods. Related to this finding, the court erred in

concluding that Professor Buchanan's speech was not of public concern under the

*Pickering/Connick* First Amendment test. 2018 U.S. Dist. LEXIS 4479, at 40-41,

54, applying, *Pickering v. Board of Ed.*, 391 U.S. 563 (1968) and *Connick v.*

*Myers,* 461 U.S. 138 (1983). Professor Buchanan's pedagogical approach, which is

aimed at preparing future teachers for the realities of the classroom, is inherently of

public concern. Faculty fulfill the public mission of the university by

experimenting and taking risks in their teaching in ways that push the boundaries

of the status quo. Moreover, to guard against the university administration's

actions that impose a "pall of orthodoxy over the classroom," *Keyishian*, 385 U.S.

at 603, the *Pickering/Connick* balancing test should weigh heavily in favor of

Professor Buchanan's academic freedom to choose to use controversial teaching

methods.

26

## III.    Conclusion

For the foregoing reasons, and those in the brief of Plaintiff-Appellant

Teresa Buchanan, the decision of the District Court should be reversed.

Dated:  May 15, 2018

Respectfully submitted,
*/s/*  Nicholas J. Enoch, Esq.
Nicholas J. Enoch, Esq.

*Counsel of Record:*
Nicholas J. Enoch
Lubin & Enoch, P.C.
State Bar No. 24042618
nich@lubinandenoch.com
221 N. Kansas Street, Suite 700
El Paso, TX 79901
(915) 585-8008

*Counsel for Amicus Curiae:*
Risa L. Lieberwitz
General Counsel
American Association of
University Professors
Professor of Labor and
Employment Law
School of Industrial and
Labor Relations
Cornell University
361 Ives Hall
Ithaca, NY 14853
(607) 255-3289

*Counsel for Amicus Curiae:*
Aaron M. Nisenson
Senior Counsel
Nancy A. Long
Associate Counsel
American Association of
University Professors
1133 19th Street N.W., Suite 200
Washington, D.C. 20036
(202) 737-5900
legal.dept@aaup.org

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2018, I electronically filed the foregoing *amicus curiae* brief with the Clerk for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. All participants in this case are registered CM/ECF users and will be served by the CM/ECF system.

Dated: May 15, 2018

Respectfully submitted,

*/s/* Nicholas J. Enoch, Esq.
Nicholas J. Enoch, Esq.

## CERTIFICATE OF COMPLIANCE UNDER RULES 29(a) and 32(a)

1.     This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 5,999 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type.

Dated:  May 15, 2018

Respectfully submitted,

/s/   Nicholas J. Enoch, Esq.
Nicholas J. Enoch, Esq.