No. 18-30148

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

TERESA BUCHANAN,

Plaintiff-Appellant

v.

F. KING ALEXANDER, DAMON ANDREW, A.G. MONACO,
AND GASTON REINOSO,

Defendants-Appellees.

Appeal from the
United States District Court for the Middle District of Louisiana
Case No. 3:16-cv-00041-SDD-EDW
The Honorable Shelly D. Dick

BRIEF OF *AMICI CURIAE*
NATIONAL ASSOCIATION OF SCHOLARS & ALLIANCE DEFENDING FREEDOM
IN SUPPORT OF PLAINTIFF-APPELLANT AND URGING REVERSAL

DAVID A. CORTMAN
TRAVIS C. BARHAM
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,
Ste. D-1100
Lawrenceville, Georgia 30043
(770) 339–0774

KRISTEN K. WAGGONER
TYSON C. LANGHOFER
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, Arizona 85260
(480) 444–0020

*Attorneys for Amici Curiae*

### CERTIFICATE OF INTERESTED PERSONS

Pursuant to FED. R. APP. P. 26.1(a) and Fifth Circuit Rules 26.1.1 and 28.2.1, the undersigned counsel of record certifies that the following listed persons and entitles as described in the fourth sentences of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

- *Amici curiae* incorporate by reference the certificate of interested persons set forth in Plaintiff-Appellant's Opening Brief.

- Alliance Defending Freedom ("ADF") is a tax-exempt non-profit corporation that has no parent corporation or other corporation that owns more than 10% of its stock.

- National Association of Scholars ("NAS") is a tax-exempt non-profit corporation that has no parent corporation or other corporation that owns more than 10% of its stock.

- Mrs. Kristen K. Waggoner is an attorney with ADF and represents *amici curiae* in this matter.

- Mr. David A. Cortman is an attorney with ADF and represents *amici curiae* in this matter.

- Mr. Tyson C. Langhofer is an attorney with ADF and represents *amici curiae* in this matter.

- Mr. Travis C. Barham is an attorney with ADF and represents *amici curiae* in this matter.

*Amici curiae* are not aware of any other person or entity that has an interest in the outcome of this case or appeal.

Respectfully submitted this the 4th day of May, 2018.

/s/ *Travis C. Barham*

TRAVIS C. BARHAM
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,
Ste. D-1100
Lawrenceville, Georgia 30043
Telephone:  (770) 339–0774
Facsimile:  (770) 339–6744
tbarham@ADFlegal.org

*Attorney for Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................ii

TABLE OF AUTHORITIES..............................................................................vi

AMICI CURIAE'S IDENTITY, INTEREST, AND AUTHORITY TO FILE ..................1

INTRODUCTION..........................................................................................4

ARGUMENT................................................................................................6

    I. The district court erred by applying *Garcetti's* "official duties"
       test to Dr. Buchanan's speech that is "related to teaching."...........6

       A. The Supreme Court has long ruled that the First Amendment
          protects faculty speech. ............................................................8

       B. The Supreme Court refused to extend *Garcetti* to faculty
          speech "related to teaching." ..................................................10

       C. Other federal appellate courts have ruled that *Garcetti's*
          "official duties" test does not apply to faculty speech. ..............12

    II. The district court erred by denying Dr. Buchanan's facial claim
        against the University's sexual harassment policy.......................14

       A. The district court applied the wrong legal standard. ...............14

       B. The district court failed to review the policy's terms on their
          merits, separate from Dr. Buchanan's speech. .........................15

       C. The district court failed to require the University to include a
          "severe and pervasive" standard in its policy. ..........................17

          1. The district court dismissed the Supreme Court's and Fifth
             Circuit's guidance on hostile environment claims. ..............17

          2. The district court ignored the flaws in the University's
             policy, flaws that mirror those in other stricken policies.....19

       D. The district court wrongly deferred to contradicted examples
          and a meaningless disclaimer. .................................................24

CONCLUSION ...........................................................................................26

RULE 32(g)(1) CERTIFICATE OF COMPLIANCE ............................................ 28

CERTIFICATE OF SERVICE .......................................................................... 29

<u>T</u>ABLE OF <u>A</u>UTHORITIES

CASES

*Adams v. Trs. of Univ. of N.C.-Wilmington*,

    640 F.3d 550 (4th Cir. 2011)........................................2, 12, 13

*Ariz. Christian Sch. Tuition Org. v. Winn*,

    563 U.S. 125 (2011)...................................................1

*Bair v. Shippensburg Univ.*,

    280 F. Supp. 2d 357 (M.D. Pa. 2003)..................................25

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth*,

    529 U.S. 217 (2000)...................................................1

*Booher v. Bd. of Regents, N. Ky. Univ.*,

    1998 WL 35867183 (E.D. Ky. July 22, 1998) ......................21

*Boy Scouts of Am. v. Dale*,

    530 U.S. 640 (2000)...................................................1

*Burwell v. Hobby Lobby Stores*,

    134 S. Ct. 2751 (2014)...............................................1

*City of Lakewood v. Plain Dealer Publ'g Co.*,

    486 U.S. 750 (1988) ..............................................16, 25

*Cohen v. San Bernardino Valley Coll.*,

    92 F.3d 968 (9th Cir. 1996)........................................16, 21

*Coll. Republicans at S.F. State Univ. v. Reed*,

    523 F. Supp. 2d 1005 (N.D. Cal. 2007) ...........................2, 25

*Dambrot v. Cent. Mich. Univ.*,

    55 F.3d 1177 (6th Cir. 1995)................................................ 16, 20, 25

*Dambrot v. Cent. Mich. Univ.*,

    839 F. Supp. 477 (E.D. Mich. 1993)....................................25

*Davis v. Monroe Cnty. Bd. of Educ.*,

    526 U.S. 629 (1999)................................................................18

*DeAngelis v. El Paso Mun. Police Officers Ass'n*,

    51 F.3d 591 (5th Cir. 1995)........................................... 17, 18

*DeJohn v. Temple Univ.*,

    537 F.3d 301 (3d Cir. 2008) .............................. 2, 16, 22, 23

*Demers v. Austin*,

    746 F.3d 402 (9th Cir. 2014)......................................... 13, 14

*Doe v. Univ. of Mich.*,

    721 F. Supp. 852 (E.D. Mich. 1989)............................. 19, 24

*Forsyth Cnty. v. Nationalist Movement*,

    505 U.S. 123 (1992)......................................................... 15, 16

*Garcetti v. Ceballos*,

    547 U.S. 410 (2006)........................................ 6, 7, 10, 11, 13

*Good News Club v. Milford Cent. Sch.*,

    533 U.S. 98 (2001)...................................................................1

*Harris v. Forklift Sys., Inc.*,

    510 U.S. 17 (1993).................................................................17

*Healy v. James,*

    408 U.S. 169 (1972) ................................................................ 26

*Keyishian v. Bd. of Regents of Univ. of N.Y.,*

    385 U.S. 589 (1967) ................................ 5, 9, 10, 13, 17, 25

*Masterpiece Cakeshop, Ltd. v. Col. Civil Rights Comm'n,*

    137 S. Ct. 2290 (2017) ............................................................ 2

*McCauley v. Univ. of V.I.,*

    618 F.3d 232 (3d Cir. 2010) ................................................ 23

*McCullen v. Coakley,*

    134 S. Ct. 2518 (2014) ............................................................ 1

*NAACP v. Button,*

    371 U.S. 415 (1963) ................................................................ 5

*Nat'l Inst. of Family & Life Advocates v. Becerra,*

    138 S. Ct. 464 (2017) .............................................................. 2

*Oncale v. Sundowner Offshore Servs., Inc.,*

    523 U.S. 75 (1998) ................................................................ 17

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205,*

    391 U.S. 563 (1968) ............................................................ 6, 7

*Pro-Life Cougars v. Univ. of Hous.,*

    259 F. Supp. 2d 575 (S.D. Tex. 2003) ................................ 26

*Reed v. Town of Gilbert,*

    135 S. Ct. 2218 (2015) ............................................................ 1

*Rosenberger v. Rector & Visitors of Univ. of Va.*,

    515 U.S. 819 (1995) ................................................................ 1

*Saxe v. State Coll. Area Sch. Dist.*,

    240 F.3d 200 (3d Cir. 2001) ...................................... 18, 21, 22, 23, 24

*Sheldon v. Dhillon*,

    2009 WL 4282086 (N.D. Cal. Nov. 25, 2009) .................................. 2, 14

*Susan B. Anthony List v. Driehaus*,

    134 S. Ct. 2334 (2014) ............................................................. 1

*Sweezy v. New Hampshire*,

    354 U.S. 234 (1957) ................................................................ 9

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.*,

    307 F.3d 243 (3d Cir. 2002) ..................................................... 22

*Town of Greece v. Galloway*,

    134 S. Ct. 1811 (2014) ............................................................. 1

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,

    137 S. Ct. 2012 (2017) ............................................................. 1

*United States v. Salerno*,

    481 U.S. 739 (1987) ........................................................... 14, 15

*United States v. Stevens*,

    559 U.S. 460 (2010) ........................................................... 15, 26

*UWM Post, Inc. v. Bd. of Regents of Univ. of Wis. Sys.*,

    774 F. Supp. 1163 (E.D. Wis. 1991) ........................................... 20, 24

*Vega v. Miller*,

    273 F.3d 460 (2d Cir. 2001) ................................................................24

*Wash. State Grange v. Wash. State Republican Party*,

    552 U.S. 442 (2008) ..........................................................................15

*Wieman v. Updegraff*,

    344 U.S. 183 (1952) ........................................................................4, 8

**RULES**

FED. R. APP. P. 29(a)(2) ....................................................................3

FED. R. APP. P. 29(a)(4)(E) ...............................................................3

## Amici Curiae's Identity, Interest, and Authority to File

**National Association of Scholars** is a nonprofit membership organization comprised of scholars and citizens united by their commitment to academic freedom, disinterested scholarship, and excellence in American higher education, which includes the freedom to question and think independently and the freedom from ideological imposition. It has served as *amicus curiae* in many cases defending freedom of speech and conscience, as well as the civil rights of educators and students.

**Alliance Defending Freedom** is a non-profit, public interest legal organization that provides strategic planning, training, funding, and direct litigation to protect our first constitutional liberties—religious freedom and freedom of speech. Since its founding in 1994, ADF has played a role, directly or indirectly, in many United States Supreme Court cases, including: *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017); *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015); *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014); *Burwell v. Hobby Lobby Stores*, 134 S. Ct. 2751 (2014); *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014); *McCullen v. Coakley*, 134 S. Ct. 2518 (2014); *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125 (2011); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001); *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217 (2000); *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995); plus hundreds more in lower courts.

ADF is also counsel in two Supreme Court cases this term: *Masterpiece Cakeshop, Ltd. v. Col. Civil Rights Comm'n*, 137 S. Ct. 2290 (2017); *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 464 (2017).

This case significantly concerns ADF because it implicates the free speech rights of university faculty nationwide. Through its higher education division, the ADF Center for Academic Freedom, ADF has litigated numerous cases defending the free speech rights of university faculty. *See, e.g.*, *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011); *Sheldon v. Dhillon*, 2009 WL 4282086 (N.D. Cal. Nov. 25, 2009). It has also represented students challenging speech codes, often housed in harassment policies, that stifle free speech on campus. *See, e.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008); *Coll. Republicans at S.F. State Univ. v. Reed*, 523 F. Supp. 2d 1005 (N.D. Cal. 2007).

Dissenting faculty often suffer unlawful censorship and retaliation because of their protected expression. The officials involved often rely on policies identical to those here and utilize legal arguments similar, if not identical, to those the district court endorsed to justify their actions. Thus, *amici* and the thousands of faculty and students they represent have a particular interest in this case's outcome. As this Court's decision could adversely impact university professors' (and even students') free speech rights, *amici* submit this brief to ensure that universities do not obtain *carte blanche* authority to punish faculty for their teaching or scholarship or to evade constitutional requirements for their policies.

Pursuant to FED. R. APP. P. 29(a)(2), *amici* file this brief with both parties' consent.

Pursuant to FED. R. APP. P. 29(a)(4)(E), *amici* state that no counsel for any party authored this brief in whole or in part, that no party or counsel for any party contributed money intended to fund the preparation or submission of this brief, and that no person—other than *amici*, their members, or their counsel—contributed money intended to fund the preparation or submission of this brief.

## INTRODUCTION

"Bad facts make bad law." Sadly, the district court here provided further proof of this age-old adage. In the process, it issued an opinion that, if affirmed by this Court, will imperil the free speech rights of thousands of professors at hundreds of universities, as well as countless students.

Early on, the district court revealed its belief that Dr. Buchanan is a scoundrel due to her vulgar, explicit, and sometimes invasive remarks.[1] To reach this procedurally suspect conclusion, it "rejected" Dr. Buchanan's contradictory evidence "as spurious." ROA.1335. From a juror at trial, this statement would be absolutely fitting. From a judge at summary judgment, it is legal error, usurping the jury's role.

At that point, it was not enough for the district court to rule against Dr. Buchanan. It was not even enough to rule against her on every claim. Instead, it had to rule against her on every element of every claim. Thus, the court's legal error became more pronounced and problematic.

First, the district court applied *Garcetti's* "official duties" test to speech that was obviously "related to teaching," the very speech the Supreme Court specifically exempted from that ruling. And it ignored appellate authority exempting this sort of faculty speech from that test given the time-honored role that professors—"the priests of our democracy," *Wieman v. Updegraff*, 344 U.S. 183, 196 (1952) (Frankfurter, J. concurring)—play in the marketplace of ideas.

---

[1]    While a *mici* do not endorse Dr. Buchanan's speech, the appropriate legal standard and constitutional policies must be applied to determine whether she can be punished.

Second, the district court failed to review Dr. Buchanan's facial claim against Louisiana State University's ("LSU") sexual harassment policy using the correct legal standard and failed to review that policy on its terms (separate from her speech). Rather than treating the First Amendment's requirement of a "severe and pervasive" standard as sacrosanct and mandatory, the district court adopted an "it's close enough for government work" standard. This standard is utterly foreign to First Amendment jurisprudence, where it has long been recognized that "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area *only with narrow specificity*." *NAACP v. Button*, 371 U.S. 415, 433 (1963) (emphasis added).

Ultimately, the district court established a regime where faculty speak at their own risk. After they do so, officials can parse every sentence, deciding which ones have a pedagogical purpose. For everything else (*i.e.*, remarks officials find objectionable), *Garcetti* applies, eliminating all constitutional protections. If professors (or students) challenge the policies used to justify disciplinary actions, officials can point to a disclaimer that promises to obey the Constitution, thereby immunizing the policies from scrutiny. Such a regime does precisely what the First Amendment does not tolerate—"cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967). Hence, the district court should be reversed.

## ARGUMENT

### I. The district court erred by applying *Garcetti's* "official duties" test to Dr. Buchanan's speech that is "related to teaching."

From the district court's own factual account, it is clear that all of Dr. Buchanan's speech occurred in the instructional context. Mr. Cancienne complained about "her visits to schools ... while she was overseeing the PK-3 program," "her site visits with LSU student teachers and their mentor teachers," and her criticism of his schools ROA.1298-99. Some remarks occurred in her classroom while instructing students. ROA.1299-1300, 1305. Others occurred during an "assessment team meeting," where she instructed a student. ROA.1300. A student or students complained about her in-class remarks. ROA.1301. Officials worried about her comments when "mentor[ing] student teachers" or during "assessment meeting[s]." ROA.1303. They faulted her "communication style with students, faculty, and outside administrators," ROA.1304, and her remarks "when educating students." ROA.1306. The committee determined that her comments created a "hostile learning environment" and recommended that she "modify her teaching methodology." ROA.1308-09. Whatever else may be said about these termination-sparking comments, they all occurred as she taught, advised, and mentored LSU students.

Due to this instructional context, the district court applied the "official duties" test from *Garcetti v. Ceballos*, 547 U.S. 410 (2006). This test adds a new threshold step to the First Amendment retaliation analysis:[2]

---

[2] Traditionally, public employees had to show they "spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418 (citing *Pickering v. Bd. of Educ. of Twp.*

6

"when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. Thus, the district court concluded it "must initially determine whether [Dr. Buchanan's] speech was pursuant to her official duties." ROA.1324.

The district court then conflated *Garcetti's* "official duties" test with *Pickering's* "public concern" test, relied on pre-*Garcetti* decisions (that provide no guidance on how to apply it), and "rejected … as spurious" Dr. Buchanan's explanation of the objectives behind her remarks. ROA.1324-36. It concluded that her statements *"in the classroom* do not constitute First Amendment protected speech." ROA.1327 (emphasis added). To emphasize that this ruling stemmed from *Garcetti*, it noted separately that her remarks "are not matters of public concern." ROA.1327. Later, the court noted that "it is undisputed that [Dr. Buchanan's] speech was made while performing her official duties of teaching and supervising student teachers." ROA.1336. This conclusion rested on an administrator-initiated, court-approved, highly subjective, and after-the-fact assessment of whether isolated comments constituted parts of a "pedagogical strategy." ROA.1327, 1336.

By applying *Garcetti's* "official duties" test, the district court placed all

---

*High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)). If so, then courts had to balance the individual's interest in speaking with the government's interest in efficiently providing services. *Id.* at 418–20.

of Dr. Buchanan's comments beyond First Amendment protection. Taken to its logical conclusion, this decision would signal the end of free speech for university professors. The district court erred by ignoring the Supreme Court's time-honored rulings protecting faculty speech, *Garcetti's* exceptions that protect faculty speech, and other federal appellate courts' refusals to apply *Garcetti* to faculty. Thus, it should be reversed.

## A. The Supreme Court has long ruled that the First Amendment protects faculty speech.

For almost seven decades, the Supreme Court has recognized the special role that public school teachers—especially professors—play in our democratic system and the necessity of keeping them free:

> To regard teachers—in our entire educational system, from the primary grades to the university—as the priests of our democracy is therefore not to indulge in hyperbole. It is the special task of teachers to foster those habits of open-mindedness and critical inquiry which alone make for responsible citizens, who, in turn, make possible an enlightened and effective public opinion.... They must have the freedom of responsible inquiry, by thought and action, into the meaning of social and economic ideas, into the checkered history of social and economic dogma. They must be free to sift evanescent doctrine, qualified by time and circumstance, from that restless, enduring process of extending the bounds of understanding and wisdom, to assure which the freedoms of thought, of speech, of inquiry, of worship are guaranteed by the Constitution of the United States against infraction by national or State government.

*Wieman*, 344 U.S. at 196–97 (Frankfurter, J. concurring). But under the lower court's ruling, any professor who follows this mission statement—and acts as a "priest of our democracy"—risks losing his job. For without First Amendment protection, public universities would have unbridled discretion to penalize professors based on their viewpoint. They could

simply declare that remarks they find objectionable are not part of a "pedagogical strategy." ROA.1327, 1336. Immediately, those remarks can become the basis for termination.

Six decades ago, a professor was sentenced to jail for contempt for refusing to answer questions about his Marxist views. *Sweezy v. New Hampshire*, 354 U.S. 234, 238–45 (1957). The Supreme Court reversed, declaring: "The essentiality of freedom in the community of American universities is almost self-evident." *Id.* at 250. This freedom rests on professors' free speech: "No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Id.* Any threat to these freedoms poses dire consequences: "Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Id.*

A decade later, the Supreme Court voided for vagueness a statute barring the employment of any person who "'advocates, advises or teaches the doctrine' of forceful overthrow of government" because it could "prohibit the employment of one who merely advocate the doctrine in the abstract," such as a "teacher who informs his class about the precepts of Marxism or the Declaration of Independence" or who "writ[es] articles" on the subject. *Keyishian*, 385 U.S. at 599–600, 602. The Court's concerns

were amplified because the university conducted an "*annual review* of every teacher to determine whether any utterance or act of his, *inside the classroom or out*, came within the sanctions of the laws." *Id.* at 602 (emphasis added). Such vagueness would "stifle 'that free play of the spirit which all teachers ought especially to cultivate and practice.'" *Id.* at 601.

> When one must guess what conduct or utterance may lose him his position, one necessarily will "steer far wider of the unlawful zone...." For "(t)he threat of sanctions may deter ... almost as potently as the actual application of sanctions." The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed.

*Id.* at 604. The Court thus recognized that professors, like Dr. Buchanan, have First Amendment rights over their *teaching and scholarship* (which are indisputably part of their "official duties") and that universities may not enforce policies that infringe upon these "precious freedoms"—even while evaluating job performance. *Id.* at 603.

The district court simply ignored this long history of the Supreme Court protecting faculty speech. Not once did it mention any of these cases in anything more than a parenthetical.

### B. The Supreme Court refused to extend *Garcetti* to faculty speech "related to teaching."

This backdrop is vital to applying *Garcetti* correctly. As the Court unveiled its new "official duties" test, Justice Souter sounded an alarm: "This ostensible domain beyond the pale of the First Amendment is spacious enough to include even the teaching of a public university professor." *Garcetti*, 547 U.S. at 438 (Souter, J. dissenting). He hoped the majority "does

not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and right 'pursuant to … official duties.'" *Id.* (Souter, J. dissenting).

The majority recognized "expression related to academic scholarship or classroom instruction implicates additional constitutional interests." *Id.* at 425. Thus, it declined to extend the new test to faculty: "We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* Notably, these remarks are not limited to scholarship and teaching narrowly construed but cover any "speech *related to* scholarship or teaching." *Id.* (emphasis added).

Where the Supreme Court stopped, the district court charged ahead, applying the "official duties" test to speech that clearly occurred in the instructional context. It did so after deciding Dr. Buchanan's speech was not "part of her pedagogical strategy." ROA.1336; *accord* ROA.1327. But a professor's remarks in class, during assessment meetings, or "when educating students," ROA.1299-1301, 1303, 1305-06, are by definition "related to … teaching" and "related to … classroom instruction." *Garcetti*, 547 U.S. at 425. When she explained her pedagogical rationale, the district court empaneled itself as the jury and "rejected" this evidence "as spurious." ROA.1335. But even if she was teaching poorly, her speech was still "related to … teaching." Thus, *Garcetti* itself proves the "official duties" test should not apply.

## C. Other federal appellate courts have ruled that *Garcetti's* "official duties" test does not apply to faculty speech.

Given these historical protections and *Garcetti's* refusal to erode them, federal appellate courts have refused to apply the "official duties" test to faculty engaged in teaching and scholarship. That the district court failed even to cite these cases, let alone distinguish them, magnifies its error.

In 2006, Dr. Adams, a criminology professor, was denied a promotion. *Adams*, 640 F.3d at 555. His colleagues objected to views he expressed on his own time in books and op-eds, media interviews, and his free speech activism. *Id.* at 553–55. Applying *Garcetti,* the district court ruled against him, concluding that when he referenced this expression in his application, it became "at least for promotion purposes" speech "made pursuant to his official duties." *Id.* at 561.

The Fourth Circuit reversed, partly because "the district court"—like the one below—"applied *Garcetti* without acknowledging, let alone addressing, the clear language in that opinion that casts doubt on whether the *Garcetti* analysis applies in the academic context of a public university." *Id.* It concluded that "*Garcetti* would not apply in the academic context of a public university as represented by the facts of this case" *Id.* at 562. While the "official duties" test "may apply" to faculty when "declaring or administering university policy," it does not apply to them when engaged in "teaching and scholarship." *Id.* at 563. Otherwise, "many forms of speech or service a professor engaged in during his employment" would be "beyond the reach of First Amendment protection." *Id.* at 564.

"That would not appear to be what *Garcetti* intended, nor is it consistent with our long-standing recognition that no individual loses his ability to speak as a private citizen by virtue of public employment." *Id.*

Notably, to the Fourth Circuit, "teaching and scholarship" includes expression that did not occur in Dr. Adams' classroom, was not aimed at his students, and had no "direct application to his UNCW duties." *Id.* at 563–64. It was not part of a "pedagogical strategy" and did not "relate[] in any way to assignments, instructions, and education of [criminology students]." ROA.1335. But that did not matter. It was still speech "related to teaching and scholarship." *Garcetti*, 547 U.S. at 425. Thus, *Pickering*—not the "official duties" test—applied. *Adams*, 640 F.3d at 564–65. The same is true for Dr. Buchanan.

In 2011, another district court granted summary judgment to university officials who disciplined a professor for distributing various writings. *Demers v. Austin*, 746 F.3d 402, 406–09 (9th Cir. 2014). It found this expression was pursuant to Dr. Demers' "official duties and so is not protected under *Garcetti*." *Id.* at 409.

The Ninth Circuit agreed that these writings stemmed from his official duties. *Id.* at 409–10. But it recognized that "teaching and academic writing are at the core of the official duties of teachers and professors. Such teaching and writing are 'a special concern of the First Amendment.'" *Id.* at 411 (quoting *Keyishian*, 385 U.S. at 603). "[I]f applied to teaching and academic writing, *Garcetti* would directly conflict with the important

First Amendment values previously articulated by the Supreme Court." *Id.* Thus, it ruled that "*Garcetti* does not—*indeed, consistent with the First Amendment, cannot*—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher or professor." *Id.* at 412 (emphasis added).[3] That speech is instead "protected under the First Amendment, using the analysis established in *Pickering*." *Id.*

Here, the district court declared that "it is undisputed that [Dr. Buchanan's] speech was made while performing her official duties of teaching and supervising student teachers." ROA.1336. Thus, *Garcetti's* "official duties" test *cannot* constitutionally apply, regardless of how effectively she was teaching. By applying it anyway, the district court erred.

In short, *Garcetti* did not upset decades of precedent protecting faculty speech. Numerous federal appellate courts agree that it did not. Thus, the *Pickering* analysis, not *Garcetti*, governs Dr. Buchanan's speech.

## II. The district court erred by denying Dr. Buchanan's facial claim against the University's sexual harassment policy.

The district court also committed a litany of legal errors in rejecting Dr. Buchanan's claims that the University's sexual harassment policy facially violated the First Amendment. Hence, it should be reversed.

### A. The district court applied the wrong legal standard.

The district court stumbled in the first sentence of its facial analysis, as it erroneously applied the "no set of circumstances" test from *United*

---

[3]    *Accord Sheldon*, 2009 WL 4282086, at *3 ("*Garcetti* by its express terms does not address … the First Amendment's application to teaching-related speech.").

*States v. Salerno*, 481 U.S. 739, 745 (1987). ROA.1344, 1358. This test does not apply in First Amendment cases as *Salerno* is not a speech case. *United States v. Stevens*, 559 U.S. 460, 472 (2010).

"In the First Amendment context," the Supreme Court "recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 473 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). It permits these challenges when "every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker," or when "the ordinance sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129 (1992).

The district court never considered this. It emphasized overbreadth as to standing, not as to the policy's terms. ROA.1345. As applying the wrong standard is legal error, the district court should be reversed.

### B. The district court failed to review the policy's terms on their merits, separate from Dr. Buchanan's speech.

During its facial analysis, the district court highlighted its disdain for Dr. Buchanan's speech. ROA.1355 (criticizing failure to connect "vulgarities and unwelcome prying into students' sex lives" with an educational objective). But none of this is relevant to a facial challenge, where the

focus is solely on what the policy permits.

"[T]he success of a facial challenge on the grounds that [a policy] delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content- [or viewpoint-] based manner, but whether there is anything in the [policy] preventing him from doing so." *Forsyth Cnty.*, 505 U.S. at 133 n.10; *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988) ("Facial attacks ... are not dependent on the facts surrounding any particular permit denial.").

By interjecting as-applied considerations into its facial analysis, the district court failed to recognize that the policy may have (indeed, does have) constitutional flaws, despite what Dr. Buchanan said. In contrast, the Sixth Circuit ruled that a university could terminate a professor under *Pickering* because his speech did not address a public concern. *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1185–91 (6th Cir. 1995). But it also invalidated the discriminatory harassment policy as facially overbroad and vague. *Id.* at 1182–85. Similarly, the Third Circuit struck down Temple University's sexual harassment policy as facially unconstitutional, even though the student plaintiff lost his retaliation claim. *DeJohn*, 537 F.3d at 304–06. Both facial claims succeeded because the policies were flawed, not because the plaintiffs were pristine.[4]

---

[4]   The district court quoted a case dealing with the converse factual scenario: dismissing a professor using a policy that is unconstitutional *as-applied*. ROA.1354 (quoting *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 972 (9th Cir. 1996)). There, the Ninth Circuit recognized that a college can discipline a professor under "a clearer and more precise policy," but not using one that is "is simply too vague as applied." *Cohen*, 92 F.3d at 972.

16

As it failed to evaluate the policy's facial flaws without reference to Dr. Buchanan's speech, the district court should be reversed.

## C. The district court failed to require the University to include a "severe and pervasive" standard in its policy.

### 1. The district court dismissed the Supreme Court's and Fifth Circuit's guidance on hostile environment claims.

In the first footnote of its analysis, the district court faltered when it dismissed *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591 (5th Cir. 1995), as "not instructive." ROA.1346 n.251. *DeAngelis* and the Supreme Court cases it cites outline the requirements for workplace hostile environment claims. If anything, the requirements for those claims are higher at universities, as nowhere else is the "vigilant protection of constitutional freedoms … more vital." *Keyishian*, 385 U.S. at 603. But as LSU's policy cannot survive the workplace standard, it flunks anything more rigorous.

While Title VII includes hostile environment claims, *DeAngelis*, 51 F.3d at 594 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)), the Supreme Court articulated standards to prevent it "from expanding into a general civility code." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). "'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.'" *Id.* (quoting *Harris*, 510 U.S. at 21). So a Title VII hostile environment sexual harassment claim must involve (1) severe

17

or pervasive conduct and (2) use a reasonable person standard. *Accord Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 205–06 (3d Cir. 2001) (discussing Title VII). The district court refused to require this of LSU.

*DeAgnelis* reiterated this in reversing a sexual harassment verdict. It concluded articles published in the workplace, using arguably tasteless remarks, "were not severe or pervasive enough to create an objectively hostile or abusive work environment." *DeAngelis*, 51 F.3d at 596. It noted that "Title VII cannot remedy every tasteless joke or groundless rumor that confronts women in the workplace." *Id.* at 597. Inexplicably, the district court dismissed this ruling as having no bearing on the firing of a professor based on "just profanity, poorly worded jokes, or occasionally sexually explicit jokes." ROA.1310. Yet the Third Circuit relied on it when evaluating a high school's harassment policy. *Saxe*, 240 F.3d at 206.

This disregard is bewildering as the Supreme Court explicitly imported these principles into the education context. To recover for student-on-student harassment, "a plaintiff must establish sexual harassment … that is so severe, pervasive, and objectively offensive … that the victim students are effectively denied equal access to an institution's resources and opportunities." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999). So when the district court distinguished *Davis* and its progeny from this case, saying "there is a distinction between a university's obligation to regulate the classroom speech of its students and that of its faculty," ROA.1351-52, it had things backwards. The Supreme Court

used these employment law principles in the student-on-student context. LSU's policy flunks even the comparatively easier workplace standards.

## 2. The district court ignored the flaws in the University's policy, flaws that mirror those in other stricken policies.

Federal courts nationwide consistently invalidate harassment policies that mirror LSU's. Many of these the district court ignored. When discussing others, it focused on trivial distinctions, rather than the overwhelming consensus: a hostile environment harassment policy that lacks (1) a severe and pervasive requirement and (2) an objective, reasonable person standard violates the First Amendment. Both are required.

In 1989, a student challenged the University of Michigan's discriminatory harassment policy. *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 854–58 (E.D. Mich. 1989). Like LSU, it defined harassment to include "verbal or physical conduct" that "[h]as the purpose or reasonably foreseeable effect of interfering with an individual's academic efforts, employment," or participation in university activities or that "[c]reates an intimidating, hostile, or demeaning environment." *Compare id.* at 856 *with* ROA.1341-42. This policy was unconstitutionally overbroad because it penalized speech that some found "unseemly or offensive," *Doe*, 721 F. Supp. at 864–66, and vague because "it was simply impossible to discern any limitation on its scope or any conceptual distinction between protected and unprotected conduct." *Id.* at 866–67. The district court ignored *Doe*.

It likewise ignored a 1991 decision invalidating the University of

Wisconsin's harassment policy. *UWM Post, Inc. v. Bd. of Regents of Univ. of Wis. Sys.*, 774 F. Supp. 1163 (E.D. Wis. 1991). Like LSU's policy, it encompassed "comments, epithets or other expressive behavior" that "[c]reate an intimidating, hostile or demeaning environment." *Compare id.* at 1165 *with* ROA.1341-42. Once again, this policy was overbroad. *UWM Post*, 774 F. Supp. at 1168–78. It was also vague partly because it was not clear "whether the prohibited speech must actually create a hostile educational environment or whether speaker must merely intend to create such an environment." *Id.* at 1179; *accord id.* at 1180–81. LSU's "purpose or effect" phrase does likewise. ROA.1341-42.

In 1993, a coach and students challenged Central Michigan University's discriminatory harassment policy. *Dambrot*, 55 F.3d at 1179–82. As at LSU, harassment included "any intentional, unintentional, physical, verbal, or nonverbal behavior" that creates "an intimidating, hostile or offensive … environment." *Compare id.* at 1182 *with* ROA.1341-42. Because this definition included protected speech, the policy was overbroad. *Dambrot*, 55 F.3d at 1183. As it did not "provide fair notice of what speech will violate the policy" but instead allowed officials to define "what offensive is," the policy granted unbridled discretion and was vague. *Id.* at 1184. LSU officials—using similar discretion under their policy—similarly concluded that the "sexual harassment standard [is] one of 'offensiveness'" as judged "'in the eye of the beholder.'" ROA.1308. Rather than address this problem, the district court ignored that aspect of *Dambrot*

and cited only its *Pickering* analysis. ROA.1326 n.162.

The district court did discuss the Ninth Circuit's ruling on a professor challenge to a sexual harassment policy. ROA.1352-56 (discussing *Cohen*, 92 F.3d 968). As that court simply ruled that the policy was "unconstitutionally vague as applied to Cohen in this case," *Cohen*, 92 F.3d at 972, it has limited value in assessing facial claims. Even so, the district court never applied its vagueness findings to this policy, focusing instead on its qualified immunity holding. ROA.1355-56. Yet qualified immunity has no bearing on injunctive or declaratory claims against the policy.

A professor in Kentucky challenged a similar sexual harassment policy. *Booher v. Bd. of Regents, N. Ky. Univ.*, 1998 WL 35867183, *1 (E.D. Ky. July 22, 1998). This policy—which mirrors LSU's, *compare id. with* ROA.1341-42—was overbroad because it (1) "fail[ed] to draw the necessary boundary between the subjectively measured offensive conduct and objectively measured harassing conduct," and (2) it did not "indicate that a hostile environment [must be] caused by 'severe or pervasive' actions." *Booher*, 1998 WL 35867183, at *8. The same defects rendered it vague. *Id.* at *9–10. LSU's policy lacks the second required element but still received the district court's approval.

In 2001, the Third Circuit invalidated a high school's harassment policy, which (like LSU's) defined harassment to include "verbal or physical conduct … which has the purpose or effect of … creating an intimidating, hostile or offensive environment." *Compare Saxe*, 240 F.3d at 202 *with*

21

ROA.1341-42. The Third Circuit noted that the "purpose or effect" language "focus[ed] on the speaker's motive rather than the effect of speech" and "appears to sweep in those 'simple acts of teasing and name-calling' that the *Davis* Court explicitly held were insufficient for liability." *Saxe*, 240 F.3d at 210–11. It went on to fault the policy for "not, on its face, requir[ing] any threshold showing of severity or pervasiveness," rendering it unconstitutionally overbroad. *Id.* at 217.

Rather than apply this straightforward holding, the district court quibbled over the protected classes and a different provision, neither of which impacted the Third Circuit's holding. ROA.1349. It mischaracterized that holding, saying that "a 'severe or pervasive' requirement should be in a policy," ROA.1349, an error compounded later when it ruled that having one required element (*i.e.*, an objective standard) compensated for lacking another (*i.e.*, a "severe and pervasive" requirement). ROA.1352. In reality, *Saxe* holds that both are required and the latter must be explicit, apparent in the policy "on its face."[5] *Saxe*, 240 F.3d at 217.

Last, the Third Circuit struck down Temple's sexual harassment policy as "facially overbroad." *DeJohn*, 537 F.3d at 320. Once again, this policy prohibited "expressive, visual, or physical conduct" that "has the purpose or effect of creating an intimidating, hostile, or offensive environment," *id*. at 305, terms that mirror LSU's policy. ROA.1341-42.

---

[5]    The school district responded by including both an objective, reasonable person standard and a severe and pervasive requirement in its new policy. *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 261 n.20 (3d Cir. 2002) (quoting new policy).

Once again, the Third Circuit faulted the "purpose or effects" language for focusing "on the motives of the speaker." *DeJohn*, 537 F.3d at 317. Terms like "hostile" or "offensive" "could conceivably be applied to cover any speech of a 'gender-motivated' nature 'the content of which offends someone," including "political and religious speech." *Id.* (quoting *Saxe*, 240 F.3d at 217). It held this policy "provides no shelter for core protected speech" as it lacked (1) "a requirement akin to a showing of severity and pervasiveness" and (2) "a requirement that the conduct objectively and subjectively creates a hostile environment." *Id.* at 317–18.

Rather than applying this holding, the district court noted that not all harassment policies violate the First Amendment. ROA.1351. Regardless, *DeJohn* held that a policy that features the language included in LSU's policy and that lacks a "severe and pervasive" requirement, which is missing from LSU's policy, *does* violate the First Amendment.[6]

In the end, the district court upheld a sexual harassment policy that features all the components that condemned similar policies at five major universities and a high school. It upheld this policy although it lacks the "severe and pervasive" element the Supreme Court, this Court, and numerous other federal courts say the First Amendment requires. It did so

---

[6]    The district court referenced *DeJohn's Tinker* analysis, without noting a critical ruling: "Temple's administrators are granted *less leeway* in regulating student speech than are public elementary or high school administrators." *DeJohn*, 537 F.3d at 316. The Third Circuit later detailed five reasons *Tinker* "cannot be taken as gospel in cases involving public universities." *McCauley v. Univ. of V.I.*, 618 F.3d 232, 242–47 (3d Cir. 2010).

without citing a single case upholding such a policy facially.[7] Thus, it should be reversed.

### D. The district court wrongly deferred to contradicted examples and a meaningless disclaimer.

*Saxe* and *DeJohn*—drawing from Supreme Court and Fifth Circuit precedent—hold that a hostile environment harassment provision must include both an objective standard and a "severe and pervasive" requirement to comply with the First Amendment. The latter must be in the policy "on its face." *Saxe*, 240 F.3d at 217. But the district court ruled instead that having just one is effectively good enough for government work, citing "examples … in the policy." ROA.1352.

The only example that matters is LSU's enforcement. *See Doe*, 721 F. Supp. at 864–66 (evaluating enforcement history to assess the policy); *UWM Post*, 774 F. Supp. at 1167–68 (same). Here, the committee "unanimously determined that [Dr. Buchanan] violated [these policies] through her use of profanity, poorly worded jokes, and sometimes sexually explicit jokes." ROA.1364. Its chair "testified that he understood the sexual harassment standard to be one of 'offensiveness'" and that it "is 'in the eye of the beholder.'" ROA.1308. These LSU officials—those charged with enforcing the policy—clearly do not think that it prohibits only conduct that is "severe and pervasive."

Similarly, the district court minimized any policy defects, crediting

---

[7]    *Vega v. Miller*, 273 F.3d 460, 468–70 (2d Cir. 2001), did not evaluate the challenged harassment policy's merits, but rather determined the policy played no causative role in the termination.

LSU's disclaimer that its policies are "not intended to infringe upon constitutionally guaranteed rights nor upon academic freedom." ROA.1311; *accord* R.O.A1341. But presuming officials "will act in good faith and adhere to standards absent from the [policy's] face"—whether due to examples or disclaimers—is "the very presumption that the doctrine forbidding unbridled discretion disallows." *Lakewood*, 486 U.S. at 770; *accord Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 367 (M.D. Pa. 2003) ("[G]iven that this is a facial challenge, our inquiry must assume not the best of intentions, but the worst.").

LSU is just the latest university to promise to apply unconstitutional policies constitutionally. But these disclaimers are meaningless to professors and students. "How are college students [and professors] to be able to determine (when judges have so much difficulty doing so) whether any particular speech or expressive conduct will be deemed (after the fact) to fall within the protections of the First Amendment?" *Coll. Republicans*, 523 F. Supp. 2d at 1021. Faced with the policy's vague, overbroad provisions, people will self-censor rather than speak "in the hope that the powers-that-be will agree, after the fact, that the course of action [they] chose was protected by the First Amendment." *Id.*; *accord Keyishian*, 385 U.S. at 604. Hence, courts regularly reject these promises. *See, e.g.*, *Dambrot*, 55 F.3d at 1183 (invalidating policy despite free speech proviso); *Dambrot v. Cent. Mich. Univ.*, 839 F. Supp. 477, 482 n.7 (E.D. Mich. 1993) ("The university … says in essence 'trust us….' The Court is not willing

to entrust the guardianship of the First Amendment to the tender mercies of this institution's discriminatory harassment/affirmative action enforcer."); *Pro-Life Cougars v. Univ. of Hous.*, 259 F. Supp. 2d 575, 584 (S.D. Tex. 2003) (rejecting dean's assurance of content-neutral application per *Lakewood*).

In sum, "the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige.*" *Stevens*, 559 U.S. at 480. The district court was wrong to "uphold an unconstitutional [policy] merely because the Government promised to use it responsibly." *Id.* This Court should correct that error and reverse the decision below.

## CONCLUSION

For over forty-five years, it has been clear that "state colleges and universities are not enclaves immune from the sweep of the First Amendment." *Healy v. James*, 408 U.S. 169, 180 (1972). But the district court created just such an enclave. By applying *Garcetti* to a professor's instructional speech, it allowed university officials to declare, after the fact, that any speech they find objectionable is not part of a "pedagogical strategy," rendering it completely unprotected. This essentially nullifies the First Amendment for professors. By refusing to strike down LSU's sexual harassment policy even though it lacked constitutionally required elements, the court sent the message that the First Amendment's mandates are optional and can be evaded with a promise from the very officials whose power the Constitution exists to restrain. Both conclusions violate

governing law and endanger precious liberties. Thus, *amici* respectfully request that this Court reverse the ruling below.

Respectfully submitted this the 4th day of May, 2018.

*/s/ Travis C. Barham*

DAVID A. CORTMAN
TRAVIS C. BARHAM
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,
Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
dcortman@ADFlegal.org
tbarham@ADFlegal.org

KRISTEN K. WAGGONER
TYSON C. LANGHOFER
ALLIANCE DEFENDING FREEDOM
15100 North 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444–0020
Facsimile: (480) 444–0024
kwaggoner@ADFlegal.org
tlanghofer@ADFlegal.org

*Attorneys for Amici Curiae*

## R<span>ULE</span> 32(g)(1) C<span>ERTIFICATE OF</span> C<span>OMPLIANCE</span>

1. This document complies with the type-volume limit of F<span>ED.</span> R. A<span>PP.</span> P. 32(a)(7)(B) and F<span>ED.</span> R. A<span>PP.</span> P. 29(a)(5) because, excluding the parts of the document exempted by F<span>ED.</span> R. A<span>PP.</span> P. 32(f) this document contains 6,466 words according to the word count function of Microsoft Word 2013.

2. This document complies with the typeface requirements of F<span>ED.</span> R. A<span>PP.</span> P. 32(a)(5) and Fifth Circuit Rule 32.1 and the type-style requirements of F<span>ED.</span> R. A<span>PP.</span> P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in fourteen point Century Schoolbook font, except for the footnotes which are in twelve point Century Schoolbook font.

Respectfully submitted this the 10th day of May, 2018.

/s/ Travis C. Barham
T<span>RAVIS</span> C. B<span>ARHAM</span>
A<span>LLIANCE</span> D<span>EFENDING</span> F<span>REEDOM</span>
1000 Hurricane Shoals Road N.E.,
Ste. D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339–0774
Facsimile: (770) 339–6744
tbarham@ADFlegal.org

*Attorney for Amici Curiae*

Date: 10 May 2018

<u>CERTIFICATE OF SERVICE</u>

Pursuant to FED. R. APP. P. 31 and Fifth Circuit Rule 31.1, I hereby certify that on May 8, 2018, a digital copy of the foregoing brief was filed electronically with the Court using the its electronic filing system, which automatically sends an electronic notification to the following attorneys of record:

> Robert Corn-Revere
> Ronald G. London
> Lisa B. Zycherman
> DAVIS WRIGHT TREMAINE, LLP
> 1919 Pennsylvania Avenue, NW, Suite 800
> Washington, D.C. 20006
> Telephone:  (202) 973–4200
> bobcornrevere@dwt.com
> ronnielondon@dwt.com
> lisazycherman@dwt.com
>
> *Attorneys for Plaintiff-Appellant*
>
> Sheri M. Morris
> DAIGLE FISSE & KESSENICH
> 8480 Bluebonnet Boulevard, Suite F
> Baton Rouge, Louisiana 70810
> Telephone:  (225) 421–1800
> Facsimile:  (225) 421–1792
> smorris@daiglefisse.com
>
> *Attorney for Defendants-Appellees*

These attorneys of record have waived service of paper copies of the brief and have agreed to be served with an electronic copy only. Upon instruction from the Clerk of Court of the United States Court of Appeals for the Fifth Circuit, seven paper copies of the foregoing brief will be sent via United Parcel Service Second Day Air, postage prepaid.

Respectfully submitted this the 10th day of May, 2018.

/s/ Travis C. Barham
TRAVIS C. BARHAM
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,
Ste. D-1100
Lawrenceville, Georgia 30043
Telephone:  (770) 339–0774
Facsimile:  (770) 339–6744
tbarham@ADFlegal.org

*Attorney for Amici Curiae*

Date:  10 May 2018