No. 18-30148

IN THE

# United States Court of Appeals

FOR THE FIFTH CIRCUIT

TERESA BUCHANAN,

*Plaintiff-Appellant,*

v.

F. KING ALEXANDER, DAMON ANDREW, A.G. MONACO, and GASTON REINOSO,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF LOUISIANA, NO. 3:16-CV-00041-SDD-EWD,

THE HONORABLE SHELLY D. DICK, PRESIDING

**BRIEF OF *AMICI CURIAE***
**THE NATIONAL COALITION AGAINST CENSORSHIP, THE WOODHULL**
**FOUNDATION, PROFESSOR RICHARD FOSSEY, & PROFESSOR DAVID BLOOMFIELD**
**IN SUPPORT OF PLAINTIFF-APPELLANT AND URGING REVERSAL**

Niles Illich
THE LAW OFFICE OF NILES
ILLICH, PH.D., J.D.
701 Commerce
Suite 400
Dallas, Texas 75202

Earl N. "Trey" Mayfield, III
Christopher M. Day
JURIS DAY, PLLC
10521 Judicial Dr., #200
Fairfax, VA 22030
(o) 703-268-5600

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fed. R. App. P. 26.1(a) and Fifth Circuit Rules 26.1.1 and 28.2.1, the undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1 and in addition to those disclosed in the parties' certificates of interested persons, have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1. The National Coalition Against Censorship .
2. The Woodhull Freedom Foundation.
3. Professor Richard Fossey.
4. Professor David Bloomfield.
5. Mr. Niles Illich is an attorney and represents *amici curiae* in this matter.
6. Mr. Earl N. "Trey" Mayfield is an attorney and represents *amici curiae* in this matter.

Pursuant to Fed. R. App. P. 26.1 and Fed. R. App. P. 29(c), the undersigned

certifies that *amici* National Coalition Against Censorship and Woodhull Freedom Foundation are nonprofit organizations that have no parent corporation(s) and no publicly held corporation owns 10% or more of its stock. A supplemental disclosure statement will be filed upon any change in the information provided herein.

DATED this 4th of May, 2018.

Respectfully submitted,

/s/ Niles Illich
Niles Illich, TB# 24069969
niles@appealstx.com
The Law Office of Niles Illich, Ph.D., J.D.
701 Commerce
Suite 400
Dallas, Texas 75202
(o) 972-802-1788

# **TABLE OF CONTENTS**

Page

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

TABLE OF CASES, STATUTES AND AUTHORITIES ...................................... iii

INTEREST OF AMICI CURIAE ............................................................................ 1

SUMMARY OF ARGUMENT ............................................................................... 4

ARGUMENT ......................................................................................................... 6

    I.     Faculty Free Speech Rights Are Under Threat Nationwide. ............... 6

    II.    The First Amendment is the Foundation of Academic Freedom
           at Public Universities. ....................................................................... 13

    III.   The First Amendment Forbids Restricting Faculty Speech
           Under the Guise of Anti-Harassment Laws in Order to Shield
           Public University Students from "Offense." ...................................... 16

    IV.   Nothing in the Civil Rights Laws Prohibiting a Hostile Work
           Environment Precludes Speech on the Ground that the Listener
           Doesn't Like the Message. .................................................................. 20

    V.    The First Amendment Allows Public University Faculty the
           Pedagogical Flexibility to Interact With Students, and that
           Flexibility Cannot Be Restricted by Student Assertions of
           "Offense" Under the Civil Rights Laws.............................................. 22

CONCLUSION .................................................................................................... 29

CERTIFICATE OF COMPLIANCE .................................................................... 30

CERTIFICATE OF SERVICE ............................................................................. 31

# TABLE OF CASES, STATUTES AND AUTHORITIES

**Page(s)**

## Cases

*Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008).........................................28

*Bethel Sch. Dist. v. Fraser*, 478 U.S. 675 (1986) ............................................ 14, 15

*Buchanan v. Alexander*, 284 F.Supp.3d 792 (M.D.La. 2018) .............. 15, 23, 24, 26

*Carder v. Continental Airlines, Inc.*, 636 F.3d 172 (5th Cir. 2011) .......................20

*Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968 (9th Cir. 1996) ......................28

*Coll. Republicans at S.F. State Univ. v. Reed*, 523 F. Supp. 2d 1005
    (N.D. Cal. 2007) ..................................................................................... 17, 23

*Dambrot v. Central Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995).............................17

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999) ..................................20

*DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591
    (5th Cir. 1995) ...............................................................................................23

*DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008)......................... 13, 16, 17, 23

*Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602
    (E.D. Va. 2016)....................................................................................... 17, 24

*Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989)..................................18

*Fair Housing Council, Inc. v. Village of Olde St. Andrews*,
    210 Fed. Appx. 469 (6th Cir. Dec. 15, 2006)................................................18

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)...........................................27

*Genosky v. Minnesota*, 244 F.3d 989 (8th Cir. 2001)............................................22

*Healy v. James*, 408 U.S. 169 (1972) ...................................................... 13, 15, 16

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
    993 F.2d 386 (4th Cir. 1993) ........................................................................17

*Kang v. Bd. of Supervisors of LSU*, 75 Fed. Appx. 974 (5th Cir. 2003) ................21

*Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*,
    385 U.S. 589 (1967)........................................................................22

*Kim v. Coppin State Coll.*, 662 F.2d 1055 (4th Cir. 1981) .......................................14

*Kinamore v. EPB Elec. Util.*, 92 Fed. Appx. 197 (6th Cir. Feb. 9, 2004)..............21

*LaBella v. N.Y. City. Admin. for Children's Servs.*,
    2005 U.S. Dist. LEXIS 18296 (E.D.N.Y. March 11, 2005).........................21

*McCauley v. Univ. of V.I.*, 618 F.3d 232 (3d Cir. 2010) ................................. *passim*

*Moore v. Watson*, 738 F.Supp.2d 817 (N.D. Ill. 2010) ...........................................16

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) .................... 20, 27

*Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667 (1973) .....................24

*Paul v. Elayn Hunt Correc. Ctr.*, 666 Fed. Appx. 342 (5th Cir. 2016) ..................27

*Peters v. HealthSouth of Dothan, Inc.*, 542 Fed. Appx. 782
    (11th Cir. Oct. 10, 2013)................................................................21

*Reed v. Neopost USA, Inc.*, 701 F.3d 434 (5th Cir. 2012)......................................27

*Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703
    (9th Cir. 2010) ..................................................................... 17, 23

*Rosenberger v. Rector and Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995)........................................................................14

*Speer v. Rand McNally & Co.*, 123 F.3d 658 (7th Cir. 1997) ...............................21

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ...................................................16

*Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337 (5th Cir. 2007) .................27

*UWM Post, Inc. v. Board of Regents of Univ. of Wis. Sys.*,
    774 F.Supp. 1163 (E.D. Wis. 1991) .............................................18

*Widmar v. Vincent*, 454 U.S. 263 (1981)................................................................16

*Williams v. Giant Food, Inc.*, 370 F.3d 423 (4th Cir. 2004)...................................21

## Other Authorities

Abby Spegman, *Evergreen Professor at Center of Protests Resigns;
College Will Pay $500,000*, SEATTLE TIMES, Sept. 16, 2017 ..........................9

American Assoc. of Univ. Professors ("AAUP"), Report of
Committee A on Academic Freedom and Tenure on Trigger
Warnings, Aug. 2014 ................................................................. 13, 25

Anne-Marie Slaughter, *Why Women Still Can't Have It All,* ATLANTIC,
July/Aug. 2012 ..............................................................................19

Boulder Faculty Assembly Ad Hoc Committee, Report of the Boulder
Faculty Assembly (BFA) Ad Hoc Committee to Investigate the
Patricia Adler Case, May 1, 2014 .................................................11

Bret Weinstein, *The Campus Mob Came for Me — and You, Professor,
Could Be Next*, WALL ST. J., May 30, 2017 ....................................8

Connie Schaeffer, Deborah Gleich-Bope, et al., *Urban Immersion:
Changing Pre-service Teachers' Perceptions of Urban Schools*,
NEBRASKA EDUCATOR, Winter 2014 .............................................25

Diana Sroka Rickert, *The Marquette Professor Who Dared to Speak Out*,
CHI. TRIB., Apr. 11, 2016 .............................................................9

Drew Mikkelson, *Professor Told He's Not Safe on Campus After College
Protests*, KING 5 NEWS, May 27, 2017 .........................................9

Elizabeth Noll, Lindsey Reichlin, & Barbara Gault, *College Students
With Children: National and Regional Profiles*, INSTITUTE FOR
WOMEN'S POLICY RESEARCH, Jan. 2017 ......................................19

Eugene Volokh & Ann Wexler, *A Practitioner's Guide to the First
Amendment Defense in Hostile Work Environment Harassment
Cases*, Fall 1998 ..........................................................................19

Greg Lukianoff & Jonathan Haidt, The Coddling of the American Mind,
ATLANTIC, Sept. 2015 ............................................................ 18, 26

Jeannie Suk Gerson, *The Trouble With Teaching Rape Law*, NEW YORKER,
Dec. 15, 2014 ..............................................................................10

Letter from Peter Bonilla, Assoc. Dir., Individual Rights Def. Program,
      Found. for Individual Rights in Educ., to Michael A. Steinback,
      Chair, Bd. of Trustees, Appalachian State Univ., Mar. 19, 2013.................12

Letter from Peter Bonilla, Dir., Individual Rights Def. Program, Found.
      for Individual Rights in Educ., to Bernadette Gray-Little,
      Chancellor, Univ. of Kan., Feb. 3, 2016........................................................10

Letter from Peter Bonilla, Dir., Individual Rights Def. Program,
      Found. for Individual Rights in Educ., to Frederick Keating,
      President, Rowan Coll. at Gloucester County, Oct. 29, 2014 ......................10

Press Release, Found. for Individual Rights in Educ., Ouch! Brazilian
      Wax Test Question Nets Howard University Professor a 504-day
      Title IX Investigation, Sanctions, July 6, 2017 ...............................................8

Stephen Rushton, *Student Teacher Efficacy in Inner-City Schools*,
      Urb. Rev., Vol. 32, No. 4, Dec. 2000 .........................................................25

## INTEREST OF AMICI CURIAE[1]

The National Coalition Against Censorship ("NCAC") is an alliance of more than 50 national non-profit literary, artistic, religious, educational, professional, labor, and civil liberties groups that are united in their commitment to freedom of expression. (The views presented in this brief are those of NCAC and do not necessarily represent the views of each of its participating organizations.) Since its founding, NCAC has worked to protect the First Amendment rights of artists, authors, teachers, students, librarians, readers, and others around the country. NCAC has a longstanding interest in protecting the free speech rights of members of university communities, and joins this brief to urge the Court to preserve the distinction between offensive speech that is protected under the First Amendment, and the unlawful harassment that Title IX proscribes.

The Woodhull Freedom Foundation ("Woodhull") is a 501c3 human rights organization whose work focuses on the intersection of freedom of speech and sexual expression. Founded in 2003, Woodhull advocates for the First Amendment

---

[1] All parties have consented to undersigned *amici*'s request to file a brief.  No party's counsel authored this brief in whole or in part, and no party or party's counsel made a monetary contribution to fund the preparation or submission of this brief. No person or entity other than *amici curiae* or their counsel made a monetary contribution to the preparation or submission of this brief.

and has testified before Congress on the censorship of pornography. Woodhull fights attempts to censor free speech in locations ranging from campuses to the adult entertainment industry, from social media to libraries. Protecting the free exchange of ideas is central to Woodhull's mission of encouraging positive social change.  Woodhull advocates for education on issues of gender, sex work, and pornography, sometimes requiring the use of language that may offend some listeners' or readers' sensibilities.  The decision in the lower court threatens this educational process.

Richard Fossey is the Paul Burdin Endowed Professor of Education at the University of Louisiana at Lafayette and Policy Director of the Picard Center for Child Development and Lifelong Learning. He is lead editor of *Contemporary Issues in Higher Education Law* and a member of the Editorial Advisory Board of *Education Law Reporter* and *Teachers College Record*. He has written extensively about academic freedom of university faculty members.

David Bloomfield, J.D., M.P.A., is Professor of Educational Leadership, Law & Policy at Brooklyn College, CUNY and The City University of New York Graduate Center.  A lifelong practitioner of Education Law, Prof. Bloomfield has served as General Counsel to the New York City Board of Education, was the Brooklyn College Faculty Grievance Counselor, and currently serves on the Brooklyn College Committee on Academic Freedom. He is the author of American

Public Education Law, and many other published works in the field of education practice, law, and policy.

## <u>SUMMARY OF ARGUMENT</u>

The lower court's decision ignored the binding effect of the First Amendment on public universities that precludes them from censoring the content of faculty speech. College students are adults, with no more right to expect protection from disagreeable thoughts and words than any other adult in the community. Notwithstanding the pretext of the university in this case, which was accepted by the lower court, nothing in the federal civil rights laws requires colleges to protect college students from faculty speech they find "offensive." To the contrary; not only do Title VII and Title IX not remotely require such insulation, the First Amendment prohibits public universities from seeking to accomplish that objective by sanctioning professors for speech students find objectionable.

The vital role of protecting First Amendment rights on public college campuses has been recognized by the Supreme Court in holdings spanning six decades. Nonetheless, campus censorship of faculty continues to increase, as college administrators seek to appease students who believe emotional comfort should take precedence over the development of critical thinking skills. The decision below is not only contrary to the First Amendment and its vital protection of academic freedom, but entirely unmoored from the stringent legal standards required to find a hostile work environment. Here, the university discharged a

tenured professor under the guise that she had created a "hostile work environment." The university made this finding in the absence of any evidence that any student was targeted on the basis of being in a protected class, or that the educational or work environment was objectively hostile. The professor was investigated and removed merely for having given "offense" in the course of carrying out her pedagogical duties. Left unchecked, the district court's opinion grants public universities the untrammeled ability to censor and punish faculty based solely on the content of their speech.

We urge the Court to consider the impact of any ruling on the free speech rights of faculty, and the fundamental purpose of higher education. If the district court decision stands, public college administrators will be given a blank check to eliminate any faculty expression that might cause them difficulty by simply invoking a meaningless standard of "offense." To ensure that the intellectual marketplace of ideas remains vibrant, that administrative efforts at censorship fail, and that students are able to partake of higher education instead of being infantilized, the Court should reaffirm the necessity of broad First Amendment protections for college faculty by reversing the decision below.

# **ARGUMENT**

## I.    **Faculty Free Speech Rights Are Under Threat Nationwide.**

Academic freedom at America's higher education institutions is under assault. Coming under the mantle of protecting adult college students from ideas and expressions that may cause "offense," professors at colleges and universities are increasingly finding themselves censored, sanctioned, and even facing termination for crossing the sensibilities of students—or college administrators seeking to escape student ire.

Often, these attacks on academic freedom are couched as simply institutional efforts to achieve compliance with the federal civil rights laws prohibiting hostile work and educational environments. But contrary to the prevailing orthodoxy in higher education administration, nothing in the civil rights laws prevents professors from espousing words and concepts that may cause adult students discomfort or dismay. Nor could the civil rights laws do so; the First Amendment is the supreme law of the land, and, at least for public institutions of higher learning, precludes the censorship of faculty carrying out their teaching functions.

The law governing academic freedom is not, however, apparent to the administration at Louisiana State University. After seventeen years of successfully teaching in LSU's Education College and managing the College's "Early Childhood Program," Professor Teresa Buchanan for the first time in 2013

received complaints labeled by the University as "sexual harassment." Virtually all of these complaints were ostensibly from students in her program. While Prof. Buchanan vigorously disputes much of those allegations, and the lower court opinion is unclear as to which of those allegations LSU ultimately relied on (or upon which the court depended in its determinations), the allegations against Prof. Buchanan can be summarized as follows:

- Remarking to her students that becoming a parent could adversely affect their performance in the program;
- Upsetting a student teacher with her critique of the student in an assessment meeting;
- Occasionally using profanity and making sexually-tinged remarks and jokes in class; and
- Criticizing a local school district superintendent, and using the word "pussy" three times in an undisputedly non-sexual way to other adults.

As a matter of law, even if true, none of these acts, whether together or separately, could constitute sexual harassment, or comprise a hostile work environment. All of these alleged acts fall well within acceptable conduct for the workplace and in higher education under the civil rights laws. More crucially, all are within the sphere of academic freedom protected by the First Amendment. Nonetheless, LSU terminated Prof. Buchanan based on the legally-impossible conclusion that she had created a "hostile learning environment."

Prof. Buchanan's case is, regrettably, not an isolated circumstance. The curbing of faculty free speech under the banner of student "offense" is becoming

depressingly familiar across the landscape of American higher education. To take but a few recent examples:

In May 2017, two student complaints about a test question involving a Brazilian wax and an upset client resulted in Howard University holding law professor Reginald Robinson responsible for sexual harassment. After a 504-day investigation, administrators required Robinson to undergo mandatory sensitivity training, prior administrative review of future test questions, and classroom observation. He also received a stern warning that any further "violations" of the university's Title IX policies could result in his termination.[2]

In March 2017, Evergreen State College professor Bret Weinstein sent an email to students and faculty objecting to a planned "Day of Absence" at the college that "invited" white students, staff, and faculty to voluntarily leave campus for a day.[3] The student responses to his email were so vitriolic that the chief of

---

[2] *See* Press Release, Found. for Individual Rights in Educ., Ouch! Brazilian Wax Test Question Nets Howard University Professor a 504-day Title IX Investigation, Sanctions, July 6, 2017, *available at* https://www.thefire.org/a-sticky-situation-at-howard-university-brazilian-wax-test-question-nets-professor-a-504-day-title-ix-investigation-sanctions.

[3] Bret Weinstein, *The Campus Mob Came for Me — and You, Professor, Could Be Next*, WALL ST. J., May 30, 2017, *available at* https://www.wsj.com/articles/the-campus-mob-came-for-meand-you-professor-could-be-next-1496187482.

police told Weinstein he was not safe on campus.[4] Weinstein and his wife, also an

Evergreen State professor, resigned in September 2017.[5]

In March 2016, Marquette University suspended tenured political science

professor John McAdams without pay for nine months for using his personal blog

to criticize a graduate student instructor who told an undergraduate student that it

was inappropriate to express opposition to same-sex marriage in her class.[6]

In November 2015, University of Kansas communications professor Andrea

Quenette held an in-class discussion of a forum held the previous day about racial

and cultural issues affecting the campus. Afterwards, eight graduate students —

some of whom were not even in Quenette's class — filed complaints against

Quenette arguing that her comments (in particular, her noting of academic

performance issues among black students) during the discussion were

"unacceptably offensive" and violated KU's Racial & Ethnic Harassment Policy.

---

[4] Drew Mikkelson, *Professor Told He's Not Safe on Campus After College Protests*, KING 5 NEWS, May 27, 2017, *available at* http://www.king5.com/news/local/olympia/professor-told-hes-notsafe-on-campus-after-college-protests/443098670.

[5] Abby Spegman, *Evergreen Professor at Center of Protests Resigns; College Will Pay $500,000*, SEATTLE TIMES, Sept. 16, 2017, *available at* https://www.seattletimes.com/seattle-news/evergreen-professor-at-center-of-protests-resigns-college-will-pay-500000.

[6] Diana Sroka Rickert, *The Marquette Professor Who Dared to Speak Out*, CHI. TRIB., Apr. 11, 2016, *available at* http://www.chicagotribune.com/news/opinion/commentary/ct-mcadams-marquette-speech-campus-perspec-0413-jm-20160411-story.html.

9

Quenette was subsequently placed on paid leave, pending the outcome of a university investigation.[7]

In December 2014, Harvard Law Professor Jeannie Suk Gerson stated, "About a dozen new teachers of criminal law at multiple institutions have told me that they are not including rape law in their courses, arguing that it's not worth the risk of complaints of discomfort by students."[8]

In the fall of 2014, Rowan College at Gloucester County terminated sociology professor Dawn Tawwater after students complained about her use of "indecent language" and screening of a music video in the classroom as part of a lecture on post-modern theory. She was terminated after refusing to sign a "last chance agreement" requiring her to publicly apologize to her classes and to refrain from using "indecent language" in the future.[9]

---

[7] Letter from Peter Bonilla, Dir., Individual Rights Def. Program, Found. for Individual Rights in Educ., to Bernadette Gray-Little, Chancellor, Univ. of Kan., Feb. 3, 2016, *available at* https://www.thefire.org/fire-letter-to-university-of-kansas.

[8] Jeannie Suk Gersen, *The Trouble With Teaching Rape Law*, New Yorker, Dec. 15, 2014, *available at* https://www.newyorker.com/news/news-desk/trouble-teaching-rape-law.

[9] Letter from Peter Bonilla, Dir., Individual Rights Def. Program, Found. for Individual Rights in Educ., to Frederick Keating, President, Rowan Coll. at Gloucester County, Oct. 29, 2014, *available at* https://www.thefire.org/fire-letter-to-rowan-college-at-gloucester-county-october-29-2014.

In November 2013, after a graduate teaching assistant expressed concern to University of Colorado administrators that undergraduate teaching assistants might feel uncomfortable about participating in role-playing exercises in sociology professor Patty Adler's "Deviance in US Society" class, the administrators sought to terminate her. The class, which she had taught for more than twenty years, featured subjects relevant to course material involving the global sex trade. Class performances animated character types, such as an "Eastern European 'slave whore,' a pimp, a 'bar whore,' and a high-end escort." Professor Adler's dean offered her a buyout for early retirement, indicating that if she did not accept the offer, she could incur penalties up to and including forfeiture of her retirement benefits, because her pedagogical approach entailed too much risk in a "post-Sandusky" climate; alternatively, she could return to the classroom, but no longer teach the course. Only after an outcry from faculty, students, and advocacy groups did the University drop he matter, and without apology, as if it had never happened.[10]

In 2012, Appalachian State University sociology professor Jammie Price was put on administrative leave after students complained about her speech in the

---

[10] Boulder Faculty Assembly Ad Hoc Committee, Report of the Boulder Faculty Assembly (BFA) Ad Hoc Committee to Investigate the Patricia Adler Case, May 1, 2014, *available at* http://www.colorado.edu/bfa/sites/default/files/attachedfiles/ReportBFAAdlerFinalReport05.2014.pdf.

classroom. Among other things, several student-athletes complained after Price criticized student athletes and referenced recent allegations of sexual assault at App State involving student athletes.[11]

The list could go on. These censorship pressures continue across the academy today. The misapplication of the laws governing hostile environment claims to Prof. Buchanan in order to appease student sensibilities is not random, and it is not by mistake. College administrators are intentionally repressing faculty free speech in order to avoid student complaints. This runs counter to higher education's purpose:

> The presumption that students need to be protected rather than challenged in a classroom is at once infantilizing and anti-intellectual. It makes comfort a higher priority than intellectual engagement and . . . it singles out politically controversial topics like sex, race, class, capitalism, and colonialism for attention. Indeed, if such topics . . . are likely to be marginalized if not avoided altogether by faculty who fear complaints for offending or discomforting some of their students. . . . In this way the demand for trigger warnings creates a repressive, "chilly climate" for critical thinking in the classroom.

---

[11] Letter from Peter Bonilla, Assoc. Dir., Individual Rights Def. Program, Found. for Individual Rights in Educ., to Michael A. Steinback, Chair, Bd. of Trustees, Appalachian State Univ., Mar. 19, 2013, *available at* https://www.thefire.org/fire-letterto-appalachian-state-university-board-of-trustees-chair-michael-a-steinback-march-19-2013.

American Assoc. of Univ. Professors ("AAUP"), Report of Committee A on Academic Freedom and Tenure on Trigger Warnings, Aug. 2014 ("AAUP Report").[12]

Amici request that the Court use this occasion to remind public universities that the First Amendment protects academic freedom, that the civil rights laws may not be contorted to achieve pedagogical repression, and that higher education is an adult activity in which students are expected to participate in vigorous, unsettling adult discourse.

## II.     The First Amendment is the Foundation of Academic Freedom at Public Universities.

American jurisprudence has long recognized that the First Amendment's free speech guarantee is central to the academic freedom undergirding its public colleges and universities. "'[T]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Healy v. James*, 408 U.S. 169, 180 (1972). Free speech is of critical importance to America's public universities because it is the lifeblood of academic freedom. *DeJohn v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008). "The university atmosphere of speculation, experimentation, and creation is essential to the quality of higher education." *McCauley v. Univ. of V.I.*, 618 F.3d 232, 243 (3d Cir. 2010). "Our

---

[12] *Available at* https://www.aaup.org/report/trigger-warnings.

public universities require great latitude in expression and inquiry to flourish[.]" *Id.*

at 243. Universities are intended to be "great bazaars of ideas where the heavy

hand of regulation has little place." *Kim v. Coppin State Coll.*, 662 F.2d 1055, 1064

(4th Cir. 1981).

When evaluating academic freedom cases, undue weight is often given to

case law governing the pre-college school milieu, with rationales having little

applicability to the college environment. The Supreme Court has described

universities as "one of the vital centers for the Nation's intellectual life."

*Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 836 (1995).

By contrast, K-12 schools serve to "inculcate the habits and manners of civility" in

the children in their care. *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 681 (1986).

In light of that foundational distinction, "the teachings of *Tinker*, *Fraser*,

*Hazelwood*, *Morse*, and other decisions involving speech in public elementary and

high schools cannot be taken as gospel in cases involving public universities."

*McCauley*, 618 F.3d at 247. While these K-12 cases set a floor for the extent to

which speech can be limited in the context of higher education, they cannot set a

ceiling for the free speech rights of adults. Hence, to the extent the lower court's

decision here was influenced by court decisions limiting the speech rights of

children or adults interacting with children, that reliance is misplaced, as is any

argument that adults who will interact with children in other circumstances must

themselves be treated as children. See, e.g., *Buchanan v. Alexander*, 284 F.Supp.3d 792, 828-830, 821–22 (M.D.La. 2018) (discussing *Hazelwood* and *Tinker*, and ignoring Prof. Buchanan's stated pedagogical rationale for preparing her adult students for difficult teaching environments).

There is no rational basis for treating adult college students as children. "[T]he pedagogical missions of public universities and public elementary and high schools are undeniably different. While both seek to impart knowledge, the former encourages inquiry and challenging a priori assumptions whereas the latter prioritizes the inculcation of societal values." *McCauley*, 618 F.3d at 243. "The college classroom with its surrounding environs is peculiarly the marketplace of ideas," *Healy*, 408 U.S. at 180, and "the First Amendment guarantees wide freedom in matters of adult discourse[.]" *Fraser*, 478 U.S. at 682. As the Supreme Court further emphasized:

> To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

*Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Universities do not act *in loco parentis* for their students. *McCauley*, 618 F.3d at 243. College students are overwhelmingly adults, and with attending a university comes the panoply of adult rights and responsibilities. *Widmar v. Vincent*, 454 U.S. 263, 274 n.14 (1981); *McCauley*, 618 F.3d at 246. Simply put, there is "no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180; see also *Moore v. Watson*, 738 F.Supp.2d 817, 829 (N.D. Ill. 2010) (recognizing that First Amendment standard for speech at public universities is that of adult discussion). For public university students, this means exposure to the full extent of discourse protected by the First Amendment.

### III.    The First Amendment Forbids Restricting Faculty Speech Under the Guise of Anti-Harassment Laws in Order to Shield Public University Students from "Offense."

"[I]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable." *DeJohn*, 537 F.3d at 314 (internal citations and quotations omitted). A public university need not—indeed, must not—violate the First Amendment in attempting to address sexual harassment. See, e.g., *id.* at 320 (3d Cir. 2008) (striking down university sexual harassment policy for overbreadth). "In the context of school anti-discrimination policies, 'harassing'

16

or discriminatory speech, although evil and offensive, may be used to communicate ideas or emotions that nevertheless implicate First Amendment protections." *Id*. at 314 (internal citations omitted). "[O]verbroad harassment policies can suppress or even chill core protected speech, and are susceptible to selective application amounting to content-based or viewpoint discrimination[.]" *Id*. A public university has "a substantial interest in maintaining an educational environment free of discrimination," but it likewise "has many constitutionally permissible means to protect female . . . . students," and it must "accomplish[] its goals in some fashion other than silencing speech on the basis of its viewpoint." *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 393 (4th Cir. 1993).

By whatever name, e.g., sexual harassment policy, anti-discrimination standards, or codes of conduct, public universities have no writ to insulate their students from "offense" by shackling constitutionally protected expression on campus. *McCauley*, 618 F.3d at 242–52; *see Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703 (9th Cir. 2010); *DeJohn*, 537 F.3d at 313–20; *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1182–85 (6th Cir. 1995); *Iota Xi*, 993 F.2d 386. *See also Coll. Republicans at S.F. State Univ. v. Reed*, 523 F. Supp. 2d 1005, 1020 (N.D. Cal. 2007); *Doe v. Rector & Visitors of George Mason Univ.*, 149 F. Supp. 3d 602, 625–31 (E.D. Va. 2016); *UWM Post, Inc. v. Board of Regents of Univ. of*

*Wis. Sys.*, 774 F.Supp. 1163, 1163–78 (E.D. Wis. 1991); *Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989). And yet, providing that insulation has become a compulsion at America's universities, "driven largely by students, to scrub campuses clean of words, ideas, and subjects that might cause discomfort or give offense." Greg Lukianoff & Jonathan Haidt, The Coddling of the American Mind, ATLANTIC, Sept. 2015 at 1.[13] The authors observe:

> The current movement is largely about emotional well-being. More than the last [movements to restrict campus speech in the 1980s and 90s], it presumes an extraordinary fragility of the collegiate psyche, and therefor elevates the goal of protecting students from psychological harm. The ultimate aim, it seems, is to turn campuses into "safe spaces" where young adults are shielded from words and ideas that make them uncomfortable.

*Id.* at 3–4.

Student desires to be spared uncomfortable thoughts and unpleasant words are manifest in LSU's actions against Prof. Buchanan. For instance, several students purportedly complained that she had made statements to the effect that academic performance could suffer from the demands of parenting. Prof. Buchanan acknowledged describing "opportunity cost"[14]—the unexceptional

---

[13] *Available at* https://www.theatlantic.com/magazine/archive/2015/09/the-coddling-of-the-american-mind/399356.

[14] *See, e.g., Fair Housing Council, Inc. v. Village of Olde St. Andrews*, 210 Fed. Appx. 469, 477 (6th Cir. Dec. 15, 2006) (Discussing "opportunity cost": "In our world of scarce resources, every expenditure of money, time, or other resources

notion that time students spent on parenting would likely come at the expense of

time that could be spent on the teacher program in which they had enrolled—which

is not only a protected opinion under the First Amendment, but one reflecting

verifiable data.[15] The tradeoffs mothers face in the contemporary economy are

plainly the subject of vigorous discussion across American society.[16] Nonetheless,

LSU administrators deemed student discomfort with this concept to be actionable

umbrage. The punishment sought for this speech concerning tradeoffs between

work and family life is "precisely because of its political content." The "comments

on working mothers would have been acceptable if [the speaker] had instead

praised the advances made by women."[17] LSU's decision to act on this complaint

is a prima facie, content-based speech restriction in violation of the First

Amendment.

_____

results in the loss of the benefit that would have resulted if the same time or money
had been spent on something else.").

[15] *See, e.g.,* Elizabeth Noll, Lindsey Reichlin, & Barbara Gault, *College Students
With Children: National and Regional Profiles*, INSTITUTE FOR WOMEN'S POLICY
RESEARCH, Jan. 2017 (online) at 6–7 (noting that only 32% of college students
with children completed their undergraduate degrees within six years, compared to
56% of dependent students), *available at* https://iwpr.org/wp-
content/uploads/2017/02/C451-5.pdf.

[16] *See, e.g.,* Anne-Marie Slaughter, *Why Women Still Can't Have It All,* ATLANTIC,
July/Aug. 2012. https://www.theatlantic.com/magazine/archive/2012/07/why-
women-still-cant-have-it-all/309020.

[17] Eugene Volokh & Ann Wexler, *A Practitioner's Guide to the First Amendment
Defense in Hostile Work Environment Harassment Cases*, Fall 1998 (online) at 7,
*available at* http://apps.americanbar.org/labor/lel-aba-
annual/papers/2001/volokh.pdf.

### IV.    Nothing in the Civil Rights Laws Prohibiting a Hostile Work Environment Precludes Speech on the Ground that the Listener Doesn't Like the Message.

As LSU did to Prof. Buchanan, colleges often seek to curtail faculty speech on the ground that students may be upset or offended by what they hear, thereby giving rise to litigation for hostile educational (or work) environment claims. That rationale is pretextual, as the federal civil rights laws prohibiting hostile environments apply only to discrimination based on the employee or student's membership in a protected class, such as sex.[18] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Moreover, in the education context, the sexual harassment must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999).

Another of the complaints lodged against Prof. Buchanan was that a student teacher was upset by a strong critique Prof. Buchanan gave her during a teaching assessment meeting. Evaluating and criticizing student-teacher performance was a core function of Prof. Buchanan's job, and as common sense would dictate, the law

---

[18] Whether couched as emanating from Title VII for workplace discrimination, or Title IX's prohibition on sex discrimination in education, the standard for ascertaining a hostile work environment is the same. *Carder v. Continental Airlines, Inc.*, 636 F.3d 172, 180 (5th Cir. 2011).

is clear that there is nothing "harassing" about providing a poor performance review.  Being criticized, or receiving a poor performance evaluation, are not acts of a sexual nature. *Speer v. Rand McNally & Co.*, 123 F.3d 658, 664 (7th Cir. 1997). There is nothing intolerable or objectively offensive about being criticized in front of other people, however unjustly, or being yelled at, or being told one's performance is sub-par. *Kang v. Bd. of Supervisors of LSU*, 75 Fed. Appx. 974, 976–77 (5th Cir. 2003); *Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004). *See also Peters v. HealthSouth of Dothan, Inc.*, 542 Fed. Appx. 782, 788 (11th Cir. Oct. 10, 2013) (supervisor's mockery and yelling do not create hostile work environment). Subjective feelings of being "demoralized" and "victimized" by a supervisor's derogatory comments do not convert a harsh environment into a sexually hostile one. See, e.g., *Kinamore v. EPB Elec. Util.*, 92 Fed. Appx. 197, 200–01, 203–07 (6th Cir. Feb. 9, 2004) ("very humiliating" negative performance evaluation does not state an actionable act of harassment); *LaBella v. N.Y. City. Admin. for Children's Servs.*, 2005 U.S. Dist. LEXIS 18296 at *53–55 (E.D.N.Y. March 11, 2005) ("an employer's conduct is not hostile merely because it is unpleasant, harsh, combative or difficult," and a supervisor repeatedly referring to the plaintiff as an "idiot" over three months is neither an objectively hostile environment, nor one based on sex).

21

Despite the event being neither sexual nor harassing, LSU turned a student's displeasure at being criticized into fodder for a sexual harassment complaint. *See also, e.g., Genosky v. Minnesota*, 244 F.3d 989, 993 (8th Cir. 2001) (untruthful, humiliating performance evaluations made in front of other employees as a means to "insult, accuse and intimidate" the female plaintiff did not describe hostile work environment where there was no evidence of her being singled out on the basis of sex, and performance evaluations were part of the job). Receiving feedback is at the essence of academic freedom. The urge of university administrators to shelter student feelings will not only eviscerate the purpose of faculty, but deprive students of the higher education they seek.

**V.    The First Amendment Allows Public University Faculty the Pedagogical Flexibility to Interact With Students, and that Flexibility Cannot Be Restricted by Student Assertions of "Offense" Under the Civil Rights Laws.**

Pedagogical flexibility undergirds academic freedom. "The classroom is peculiarly the 'marketplace of ideas.'" *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967) ("The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.") (internal citation omitted). Prof. Buchanan's teaching methods are well within the bounds of instructive discourse. LSU's reliance on these complaints to conclude that Prof. Buchanan had created a "hostile learning

environment," *Buchanan*, 284 F. Supp. 3d at 805, is erroneous under both the First

Amendment and the federal civil rights laws: "There is no 'harassment exception'

to the First Amendment's Free Speech Clause." *DeJohn*, 537 F.3d at 316; *accord*

*Rodriguez*, 605 F.3d at 708. "[W]hen laws against harassment attempt to regulate

oral or written expression on [university speech], however detestable the views

expressed may be, [courts] cannot turn a blind eye to the First Amendment

implications." *DeJohn*, 537 F.3d at 316 (quoting *DeAngelis v. El Paso Mun. Police*

*Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995)). "Where pure expression is

involved," anti-discrimination law "steers into the territory of the First

Amendment." *DeAngelis*, 51 F.3d at 596. Free speech precludes a public university

like LSU's from cabining faculty expression in the name of student sensitivity.

Indeed, the First Amendment entitles a faculty member "to convey the full

emotional power with which the speaker embraces her ideas or the intensity and

richness of the feelings that attach her to her cause." *Reed*, 523 F.Supp.2d at 1020.

The remainder of the student complaints against Prof. Buchanan consisted of

allegations that she used profanity, made poorly worded jokes, and sometimes

made sexually explicit comments. She admitted to making some such statements,

explaining that they were part of her "overall pedagogical strategy" in teaching,

and that she used such language to "get the attention of students" and "loosen them

up." *Buchanan*, 284 F. Supp. 3d at 802–03. Prof. Buchanan expounded upon her

didactic rationale:

> [Profanity] is part of the common vernacular even among
> very young children, and teacher-education students need
> to be aware that they will be confronted with that
> language and professionally decide how they will
> respond. I have never had a student tell me that it was
> offensive or that they were uncomfortable with my
> language.

*Id*. at 804. She further explained that she utilized "humor to help student teachers

recognize their 'own feelings regarding dress and sexuality' to prepare them for

their future interactions with 'children from family backgrounds that are different

from their own' and their responsibility 'for establishing and maintaining effective

and reciprocal relationships with all families.'" *Id*. at 804.

    While such statements in the college classroom environment might strike

some as offensive, crude, or profane, these qualities alone do not deprive them of

First Amendment protection. *Papish v. Bd. of Curators of the Univ. of Mo.*, 410

U.S. 667, 670 (1973) ("[T]he mere dissemination of ideas—no matter how

offensive to good taste—on a state university campus may not be shut off in the

name alone of "conventions of decency.'""); *Doe v. George Mason Univ.*, 149

F.Supp.3d at 627 ("[U]niversity students cannot thrive without a certain thickness

of skin that allows them to engage with expressions that might cause 'distress' or

'discomfort.'"). Indeed, Prof. Buchanan's objective of preparing the future teachers

in her program for teaching environments radically different than the ones they

grew up in is a concern that pervades teacher programs in higher education.[19] As

emphasized by the AAUP in the context of discussing "trigger warnings" sought to

protect students from unpleasant thoughts:

> Some discomfort is inevitable in classrooms if the goal is
> to expose students to new ideas, have them question
> beliefs they have taken for granted, grapple with ethical
> problems they have never considered, and, more
> generally, expand their horizons so as to become
> informed and responsible democratic citizens. Trigger
> warnings suggest that classrooms should offer protection
> and comfort rather than an intellectually challenging
> education. They reduce students to vulnerable victims
> rather than full participants in the intellectual process of
> education. The effect is to stifle thought on the part of
> both teachers and students who fear to raise questions
> that might make others "uncomfortable."

AAUP Report.

   The student complaints about language and jokes are not so much about

Prof. Buchanan as they are about the students. Tellingly, as both Prof. Buchanan

and her colleague, adjunct Prof. Karen Donnelly observed, nothing had changed in

Prof. Buchanan's instructional methods during the preceding seventeen years prior

---

[19] *See, e.g.,* Connie Schaeffer, Deborah Gleich-Bope, et al., *Urban Immersion: Changing Pre-service Teachers' Perceptions of Urban Schools*, NEBRASKA EDUCATOR, Winter 2014 (studying perceptions and methods for increasing the interest of college teaching majors for placement in urban schools); Stephen Rushton*, Student Teacher Efficacy in Inner-City Schools*, URB. REV., Vol. 32, No. 4, Dec. 2000 (exploring the perceptions of inner-city school student-teachers to discern the challenges they face and how they can become effective teachers).

to the complaints, which were entirely devoid of any sexually hostile environment

complaints. See *Buchanan*, 284 F.Supp.3d at 804. These student demands that their

feelings must be accommodated at the expense of academic freedom too often find

a receptive audience among college administrators, as happened at LSU:

> Because there is a broad ban in academic circles on
> "blaming the victim," it is generally considered
> unacceptable to question the reasonableness (let alone the
> sincerity) of someone's emotional state, particularly if
> those emotions are linked to one's group identity. The
> thin argument "I'm offended" becomes an unbeatable
> trump card.
>                          . . .
> Everyone is supposed to rely on his or her subjective
> feelings to decide whether a comment by a professor or a
> fellow student is unwelcome, and therefore grounds for a
> harassment claim. Emotional reasoning is now accepted
> as evidence.

*Coddling*, at 11–12.

The reliance of higher education administrators upon the hostile work

environment laws to cabin faculty speech holds no water. If Prof. Buchanan were

employed in the non-education sector, where academic freedom at a public

university was not at issue, her use of the alleged language some students found

offensive would not come remotely close to creating a sexually hostile work

environment. At previously noted, such a claim requires, ab initio, that there be

evidence that the behavior complained of be directed at the students because of

their gender. LSU never proffered any evidence that Prof. Buchanan treated any

students differently because of their sex; instead, it relied on nothing more than student claims to have been "offended" by Prof. Buchanan's teaching style. But Title VII does not set forth a "general civility code" for the workplace. *Paul v. Elayn Hunt Correc. Ctr.*, 666 Fed. Appx. 342, 347 (5th Cir. 2016) (citing *Oncale*, 523 U.S. at 80). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Even accepting the student allegations at face value (which Prof. Buchanan contests), being exposed to those kinds of comments could not possibly have deprived a reasonable student of the educational benefits of LSU's teacher training program any more than similar remarks would create an intolerable work environment. See, e.g., *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 443 (5th Cir. 2012) (holding that incidental or occasional age-based comments, including references to an employee like "old man" and "old fart" were insufficient to support an age-based hostile work environment claim); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (explaining that comments to a black female employee about "ghetto children" and additional derogatory comments about the employee's education, car, and shopping habits were not sufficient to demonstrate a hostile work environment). Nor would a

hostile environment have been created even if Prof. Buchanan's purported language had been more emphatic than the record indicates. See, e.g., *Baloch v. Kempthorne*, 550 F.3d 1191, 1199, 1201 (D.C. Cir. 2008) (supervisor's occasional yelling of obscenities at subordinate not pervasive). Davis requires that the harassing conduct be not only severe and objectively offensive, but also pervasive enough that a reasonable person would no longer be able to obtain an educational benefit. As with most instances of complaints against faculty based on the content of speech, none of those factors were present in Prof. Buchanan's teaching.

Given that nothing in Prof. Buchanan's longstanding teaching methods ran afoul of the lawful subject of LSU's sexual harassment policies, i.e., targeting students for disparate treatment based on their gender, or engaging in behavior that might be plausibly characterized as creating a hostile environment that deprived students of their educational experience, LSU's actions against her are an unlawful, ad hoc ambush in contravention of her First Amendment rights. See, e.g., *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 970–72 (9th Cir. 1996) (college's sexual harassment policy gave professor no notice that his use over many years of sexual innuendo and profanity as pedagogical devices might be prohibited, defying First Amendment's requirement that such policies be narrowly tailored).

## **CONCLUSION**

For the foregoing reasons, the decision below should be reversed.

Respectfully submitted,

/s/ Niles Illich

Niles Illich, TB# 24069969
niles@appealstx.com
The Law Office of Niles Illich, Ph.D., J.D.
701 Commerce
Suite 400
Dallas, Texas 75202
(o) 972-802-1788


Earl N. "Trey" Mayfield, III
tmayfield@jurisday.com
Christopher M. Day
cmday@jurisday.com
Juris Day, PLLC
10521 Judicial Dr., #200
Fairfax, VA 22030
(o) 703-268-5600
(x) 703-268-5602

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P.

29(a)(5) and 32(a)(7)(B) because it contains 6176 words, excluding the parts of

the brief exempted by Fed. R. App. P. 32(f) and the Rules of this Court.


2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)

and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been

prepared in a proportionally spaced typeface using Microsoft Word 2011 in

14-point Times New Roman.


/s/ Niles Illich

Niles Illich, TB# 24069969
niles@appealstx.com
The Law Office of Niles Illich, Ph.D., J.D.
701 Commerce
Suite 400
Dallas, Texas 75202
(o) 972-802-1788


Earl N. "Trey" Mayfield, III
tmayfield@jurisday.com
Christopher M. Day
cmday@jurisday.com
Juris Day, PLLC
10521 Judicial Dr., #200
Fairfax, VA 22030
(o) 703-268-5600
(x) 703-268-5602

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this brief has been served through the Court's ECF system on

counsel for all parties required to be served on May 4, 2018.

/s/ Niles Illich


Niles Illich, TB# 24069969
niles@appealstx.com
The Law Office of Niles Illich, Ph.D., J.D.
701 Commerce
Suite 400
Dallas, Texas 75202
(o) 972-802-1788

Earl N. "Trey" Mayfield, III
tmayfield@jurisday.com
Christopher M. Day
cmday@jurisday.com
Juris Day, PLLC
10521 Judicial Dr., #200
Fairfax, VA 22030
(o) 703-268-5600
(x) 703-268-5602